UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

SUREFIL, LLC, and
SUREFIL PROPERTIES, LLC,

          Debtor.

_____/

Case No. 09-06914
Case No. 09-06916
Chapter 11
Hon. Jeffrey R. Hughes

## STIPULATION AUTHORIZING USE OF
## CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

      Surefil, LLC ("**Surefil**") and Surefil Properties, LLC ("**Properties**") (collectively referred to as "**Debtors**"), together with William B. Hunt ("**Guarantor**") and The Huntington National Bank ("**Bank**") stipulate as follows:

      1.    Surefil filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. ("**Code**") on June 8, 2009.

      2.    Properties filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code on June 8, 2009. Collectively, the filing dates for the Debtors are referred to as the "**Petition Date.**"

      3.    The Debtors and the Bank are parties to the following primary credit facilities:

          (a)    Irrevocable Letter of Credit No. OSB.003803 of Bank for the account of Properties, dated April 26, 2006 (the "**2006 L/C**"), to secure 2006 variable rate limited demand obligation tax-exempt bonds of the Michigan Strategic Fund[1] (the "**2006 Bonds**"). The proceeds of the 2006 Bonds were loaned to Properties;

---

[1] Pursuant to a Loan Agreement between the Michigan Strategic Fund and Properties dated April 1, 2006 (the "**2006 Loan Agreement**").

(b)    Irrevocable Letter of Credit No. OSB.004336 of the Bank for the account of Properties, dated March 22, 2007 (the "**2007 L/C**") (the 2007 L/C and the 2006 L/C are collectively referred to herein as the "**Letters of Credit**"), to secure 2007 variable rate limited demand obligation tax-exempt bonds of the Michigan Strategic Fund[2] (the "**2007 Bonds**") (the 2006 Bonds and 2007 Bonds are collectively referred to herein as the "**Bonds**"). The proceeds of the 2007 Bonds were loaned to Properties.   The Letters of Credits were supported by reimbursement agreements between Bank and both Debtors, jointly and severally (the "**Reimbursement Agreements**"); and

(c)   A revolving line of credit in the amount of $3,000,000, as evidenced by a Fifth Amended and Restated Revolving Credit Note (the "**Revolving Note**") from Surefil and Properties, jointly and severally, to the Bank dated May 1, 2009 (the "**Line of Credit**").

Collectively, the terms and conditions of these credit facilities are governed by loan documents hereinafter referred to as the "**Prepetition Loan Documents.**"

4.    The outstanding principal amount of the 2006 Bonds is $4,300,000, and the outstanding principal amount of the 2007 Bonds is $5,400,000.   The Letters of Credit collectively secure the $9,700,000 aggregate principal amount, together with a maximum amount of accrued interest on the Bonds equal to $119,590 (45 days interest at 10% per annum).   The 2006 L/C has a scheduled expiration date of April 15, 2016, and the 2007 L/C has a scheduled expiration date of April 15, 2017.   As of the Petition Date, Debtors have deposited $26,900.17 in an escrow account for the 2006 Bonds, and $31,733.36 for the 2007 Bonds.   As of the Petition

---

[2] Pursuant to a Loan Agreement between the Michigan Strategic Fund and Properties dated March 1, 2007 (the "**2007 Loan Agreement**").

Date, the amount owed under the Line of Credit was $2,279,372.14 plus interest, expenses and fees accruing. Collectively, the amounts owed under the Prepetition Loan Documents including but not limited to the Reimbursement Agreements and the Line of Credit are referred to as the "**Prepetition Indebtedness.**"

5.     The Prepetition Indebtedness is secured, without limitation, by substantially all assets of Debtors, including without limitation: (a) existing and future accounts, chattel paper, contract rights, deposit accounts, general intangibles, instruments, commercial tort claims, documents, software, rights to payment evidenced by chattel paper, documents or instruments, letters of credit, letter of credit rights, supporting obligations and rights to payment for money or funds advanced or sold; (b) presently owned and hereafter acquired inventory; (c) presently owned and hereafter acquired investment property or other property in possession or control of Bank; (d) presently owned and hereafter acquired machinery, equipment, furniture, fixtures, tools, parts and accessories, and all proceeds and products of and accessions to all of the foregoing (collectively, the "**Prepetition Collateral**"), all as more particularly described in the Security Agreements executed by each of the Debtors and the Bank dated February 17, 2006. The Surefil security interests are evidenced by a UCC-1 financing statement filed with the Michigan Secretary of State on February 17, 2006, Filing No. 2006030548-0. The Properties' security interests are evidenced by a UCC-1 financing statement filed with the Michigan Secretary of State on February 17, 2006, Filing No 2006030530-3. The Prepetition Indebtedness is also secured by a mortgage and an assignment of rents on property owned by Properties commonly known as 4560 and 4518 Danvers Drive, SE, Kentwood, Michigan (the "**Danvers Drive Mortgage**"). The Danvers Drive Mortgage is dated March 15, 2006, and recorded as Instrument No. 20060330-0035981, Kent County Records. The assignment of rents is dated

March 15, 2006, and recorded as Instrument No. 20060330-0035982. The Prepetition Indebtedness is also secured by an Amended and Restated Guarantee under the terms of which the Guarantor guaranteed the payment of the Prepetition Indebtedness.

6.    Debtors and Guarantor acknowledge that: (a) Bank's security interest in the Prepetition Collateral is valid, perfected, first in priority and unavoidable (the Danvers Drive Mortgage is subject to construction liens filed by Prosys, LLC and Process Results, Inc. The validity and amounts of the construction liens have not yet been determined. The Danvers Drive property may also be subject to a construction lien filed by Rush Creek.); (b) the Prepetition Indebtedness is a valid, binding and unavoidable obligation of Debtor and Guarantors; and (c) there are no setoffs, counterclaims or defenses to the Prepetition Indebtedness.

7.    In order for Debtors to continue to operate their business, and preserve goodwill and going concern value, it is necessary for Debtors to use cash collateral to enable them to pay normal operating expenses (including, without limitation, wages, salaries, insurance premiums, utilities, rent and taxes) and to purchase inventory and supplies.

8.    The Bank is willing to consent to the temporary use of cash collateral, for a period not to exceed three weeks, with such consent to be exclusively upon the terms and conditions set forth in the Stipulation.

9.    The use of cash collateral will be governed by the Prepetition Loan Documents subject to the following modifications:

   a.    Debtors may use cash collateral to fund payment of expenses as and when budgeted, in the budget attached as Exhibit A ("**Budget**"). The Debtors' use of cash collateral is limited to the amounts shown for Deposits, Material

Purchases and Payroll, although the payment of such amounts may occur at any time during this three week period as authorized hereunder.

b.  Debtors may not use, and must cease using, cash collateral if at any time the amount of the Revolving Credit Commitment, as defined in the Revolving Note, falls below the amount of the Revolving Credit Commitment as of the Petition Date (excluding $20,839.30 of the $300,000 "over-advance" portion thereof), which Debtors, Bank, and Guarantor acknowledge and agree was $2,279,372.10; provided, however, that in determining the Revolving Credit Commitment amount for the purposes of this Stipulation, the Debtors may include any collected funds in their depository accounts with the Bank (less any amounts representing checks that have been delivered to third parties and not yet cashed).

c.  Debtors' authority to use cash collateral under this Stipulation shall terminate on the earlier of June 28, 2009, or upon a default by either Debtor as described in this Stipulation ("**Termination Date**"), unless the Termination Date is extended by written stipulation of Bank and Debtor.

d.  Debtors shall supply financial information and information relating to the collateral as required by the Prepetition Loan Documents and at the request of Bank.    Without limitation, Debtors shall deliver to Bank: (i) the information and reports required under the Prepetition Loan Documents; (ii) as and when filed, all reports and other documents and pleadings filed by Debtors with the Bankruptcy Court or the Office of the U.S. Trustee; and (iii)

a weekly cash flow statement, comparing actual receipts and disbursements to the projected receipts and disbursements set forth in the Budget.

e.  Guarantor ratifies and affirms his Guaranty of all indebtedness of Debtors including all Postpetition Indebtedness.

10.    Adequate protection under §§ 361 and 363 of the Code with respect to the Prepetition Indebtedness and for any diminution in the Prepetition Collateral (whether cash collateral or non-cash collateral) shall include the following:  (a) Bank is granted a continuing and replacement security interest and lien in all of the property of Debtors (collectively, the "**Postpetition Collateral**" and identified together with the Prepetition Collateral as the "**Collateral**"), including without limitation: (i) all of the following, whether now owned or existing or hereafter created or acquired, wherever located, together with all additions and accessions and all proceeds and products thereof: all accounts, accounts receivable, instruments, documents, drafts, notes, acceptances, chattel paper, general intangibles (including, without limitation, all goodwill, copyrights, patents, trademarks, trade names and franchises), software, contract rights, rights to payment evidenced by chattel paper, documents or instruments, deposit accounts, rights to payment for money or funds advanced or sold, causes of action, chooses in action, commercial tort claims, letters of credit, letter of credit rights, supporting obligations, investment property or other property in possession or control of Bank, all personal property received as returns and repossessions, all other forms of receivables, tax refunds of any form, all inventory, including all goods held for sale and documents evidencing inventory, all equipment (together with spare and repair parts, special tools and equipment and replacements), the proceeds of credit and other forms of insurance coverage of any of the foregoing and all books and records pertaining to all of the foregoing; and (ii) all interests in real property and fixtures;

-6-

provided, however, that if Debtors' interest in any of the foregoing property as of the Petition Date was encumbered by a valid, binding and unavoidable lien senior to the prepetition lien held by Bank, the lien on that property granted to Bank under this Stipulation shall be junior to such existing senior lien only. The obligations to the Bank postpetition are collectively referred to as the "**Post Petition Indebtedness.**" The Prepetition and the Postpetition Indebtedness are collectively referred to as the "**Indebtedness**."

11.     No costs or expenses of administration which have been or may be incurred in these proceedings (including any conversion of these proceedings under § 1112 of the Code, or any other related proceedings), and no priority claims are, or will be, prior to or on a parity with the claim of Bank against Debtors arising out of the Indebtedness, or with the security interest of Bank in the Collateral except as provided herein, and no such cost or expenses of administration shall be imposed against Bank, its claims or its Collateral under § 506(c) or § 552 of the Code or otherwise.

12.     The security interests and liens granted to Bank under this Stipulation shall be evidenced by the entry of the order approving this Stipulation, and except as otherwise provided herein, shall be deemed to be first, valid and perfected as against all third parties upon entry of this Stipulation, without regard to applicable federal, state or local filing and recording statutes, as of the Petition Date, provided, however, that Bank may take such steps as it deems appropriate to comply with such recording statutes and Debtor shall execute and deliver such additional documents and shall take any and all additional action to comply with such recording statutes as Bank may request. At Bank's discretion, it may attach this Stipulation to financing statements bearing Debtors' names and file them with any state or local office to further evidence the liens granted hereby without the signature of Debtors.

13.     Debtors shall pay all reasonable fees and out-of-pocket disbursements incurred by Bank, in any way arising from or in connection with this Stipulation, the Prepetition Loan Documents or the Indebtedness, including, without limitation, the reasonable fees of counsel for Bank for the preparation, examination and approval of this Stipulation, for the payment of all fees and out-of-pocket disbursements incurred by Bank, including reasonable attorney fees incurred by Bank, in any way arising from or in connection with any action taken by Bank as holder of the Prepetition Indebtedness to monitor, advise, enforce or collect the Indebtedness, or enforce any obligations of Debtors under this Stipulation, the Prepetition Loan Documents or any other document or agreement arising from or relating to the business relationship between Bank and Debtors, including any actions to lift the automatic stay or otherwise in any way participate in this bankruptcy proceeding.  Debtors shall also be responsible for such fees and disbursements of Bank for any defense of any litigation instituted by Debtors, Guarantor or any third party against Bank arising from or relating to the Indebtedness, this Stipulation, the Prepetition Loan Documents or the business relationship between Debtors and Bank.  Payment of such fees shall be made on demand, but not less frequent than monthly.

14.     The terms of this Stipulation constitute a "finding of fact" as to the "adequate protection necessary" for Debtors' use of both cash and non-cash Prepetition Collateral of Bank under § 363 of the Code and for Debtors' incurring the Postpetition Indebtedness.

15.     In consideration for the agreement of Bank to enter into this stipulation, Debtors and Guarantor fully and forever remise, release and discharge Bank, and each and all of its parent, subsidiary and affiliated corporations, companies and divisions, together with its or

their predecessors, successors and assigns, and each and all of its or their directors, officers, employees, attorneys, accountants, consultants, and other agents of and from any and all claims, demands, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, costs, expenses, accounts, damages, judgments, losses, liabilities, and defenses, of whatsoever kind or nature, in law, equity or otherwise, whether known or unknown, whether concealed or hidden, which Debtors may have had or now have, or which any of their predecessors, successors or assigns hereafter can, shall or may have, for or by reason of any matter, cause or thing whatsoever, whenever arising, to and including the date this Order is entered, including without limitation, (a) claims arising from or in any way related to this Stipulation, the Indebtedness, the Prepetition Loan Documents or the business relationship among Debtors, Guarantor and Bank, and (b) claims under the avoidance provisions of §§ 544, 547, 548, 549 and 550 of the Code.

16.    Debtors and Guarantor admit they have no defenses, offsets or counterclaims with respect to the payment of any sum owing to Bank, with respect to the validity and/or enforceability of the Prepetition Loan Documents, or with respect to the Indebtedness. In addition, Debtors and Guarantor irrevocably waive any right, without the prior written consent of Bank, (a) to grant or impose, under § 364 of the Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to Bank's liens and security interests; (b) to use, or seek to use, cash collateral on terms other than those set forth in this Stipulation; or (c) to modify or affect any of the rights of Bank under this Stipulation or the Prepetition Loan Documents by any plan of reorganization confirmed in this case or subsequent Order entered in this case.

17.    Defaults have occurred under the Prepetition Loan Documents.  Debtors and Guarantor to the fullest extent allowed under applicable law, waive all notices that Bank might be required to give but for this waiver, including any notices otherwise required under Section 6 of Article 9 of the Uniform Commercial Code as enacted in the State of Michigan or other relevant state (the "**UCC**") concerning the Collateral.  Furthermore, Debtors and Guarantor waive (a) the right to notification of disposition of the Collateral under § 9-611 of the UCC, (b) the right to require disposition of the Collateral under § 9-620(e) of the UCC, and (c) all rights to redeem any of the Collateral under § 9-623 of the UCC.

18.    Debtors shall keep the Collateral maintained by sufficient insurance coverage acceptable to Bank, with Bank named as the mortgagee, lender's loss payee and/or additional insured on all such policies.

19.    Debtors agree that they shall not seek any extension of the exclusivity periods set forth in §§ 1121(b) and 1121(c) of the Code without the express written consent of Bank, which consent Bank may withhold in its sole discretion.  Debtors agree that the intent of the foregoing sentence is to prohibit any extensions of the exclusivity periods unless Bank, in its sole discretion, consents in writing to any such extensions.  Debtors and all parties receiving notice of this Order shall have no claim, cause of action or defense on account of Bank's exercise of the foregoing rights.

20.    Debtors shall provide Bank, its attorneys, accountants, employees and agents including its financial advisor with access to Debtors' books and records for the purpose of audit, examination, and inspection thereof, and observation of Debtors' operations, and shall provide all reasonable information and documents requested by Bank or its designated agents, including a Loan & Collateral Report furnished on a daily basis, in a form satisfactory to Bank.

Bank, its attorneys, accountants, employees and agents including its financial advisor shall have the right to enter Debtors' business premises during reasonable business hours for the purpose of examining and appraising the Collateral. Debtors shall pay the cost of any audit requested or performed by the Bank.

21.     The covenants and other terms of this Stipulation are for the sole benefit of Bank; Bank, in its sole discretion, may in writing waive any covenant or term.

22.     Upon entry of this Order, the Debtors are authorized and directed to take such actions as may be necessary or appropriate in order to effectuate the agreements set forth in this Order.

23.     In the event that Debtors default  in performance of any of their respective obligations under this Stipulation or under the Prepetition Loan Documents (excluding existing defaults under the Prepetition Loan Documents of which the Bank has been notified in writing), or upon the entry of an order dismissing this case, appointing a trustee in this case, converting this case to a case under Chapter 7 of the Code, or transferring the venue of this case to another district, Debtors' authority to use cash collateral under this Stipulation and the Prepetition Loan Documents shall terminate, Debtors shall segregate and account for all cash collateral then in their possession and/or control, and Bank shall have the right to apply for relief from the stay under § 362 of the Code.  Any such application by Bank may be scheduled for an expedited hearing on two business days notice without objection by any of the parties to this Stipulation (or as soon thereafter as practicable, depending on the Court's schedule and availability).

24.     The Bank has advised the Debtors that the automatic stay does not prevent it from notifying itself, as Trustee of the Bonds, that the Bonds be accelerated and paid in full as provided for by the Bond indentures and the Letters of Credit.  Such action would result in

-11-

accelerating the unpaid balance of the outstanding principal and interest owing on the Bonds, causing draws on the Letters of Credit in that aggregate amount, and making the same payable under the Reimbursement Agreements. Debtors and Guarantor have advised the Bank that they agree that the automatic stay does not prevent this action and furthermore that they do not intend to apply for authorization to use cash to pay the necessary principal and interest payments on the Bonds. The Debtors have been notified of the Bank's intent to accelerate the payment of the amounts owing under the Bonds immediately following the June 26, 2009 hearing on this Stipulation and that any action for injunctive relief or otherwise must be commenced by the Debtors on or before June 26, 2009 or they shall be barred from instituting action to challenge the acceleration of the Bonds.

      25.    Debtors and Guarantor stipulate and agree that Section 362(b) and Section 560 permit the termination of the Swap Agreement. The Debtors have been notified of the Bank's intent to collapse the Swap Agreement immediately following the June 26, 2009 hearing on this Stipulation and agree that any action for injunctive relief or otherwise must be commenced by the Debtors on or before June 26, 2009 or they shall be barred from challenging the termination of the Swap Agreement.

      26.    This Stipulation shall only be binding on the Debtors, Guarantor and Bank.

-12-

**IN WITNESS HEREOF, THE PARTIES HAVE EXECUTED THIS STIPULATION ON JUNE 16, 2009:**

**SUREFIL, LLC**
BY W B HUNT CORP., Its Manager

By _____

William B. Hunt, President and Chief Executive Officer

**SUREFIL PROPERTIES LLC**

By _____

William B. Hunt, Manager

_____

**WILLIAM B. HUNT**

**THE HUNTINGTON NATIONAL BANK**

By _____

Frederick W. Puleo, Vice President

-13-

# EXHIBIT A

Surefil, LLC.
**Confidential**
as of 6-10-09

| | Week #<br>WE 06/14<br>Forecast | Week #<br>WE 06/21<br>Forecast | Week #<br>WE 06/28<br>Forecast |
|---|---|---|---|
| Utility Deposits | | | |
| Water | 8,000 | | |
| DTE | 6,000 | | |
| Consumers | 10,000 | | |
| | | | |
| *Material purchases* | | | |
| Labels-new-c | | 10,000 | |
| Wrap-new-c | | 10,000 | |
| Bottle-new-c | | 32,500 | |
| M Label | 12,000 | | |
| T-Raw-new | 2,000 | | |
| Th Shippers | | 1,300 | |
| Bottles | | | 16,000 |
| shippers | | | 18,500 |
| C-wrap machine | | 4,000 | |
| Setup Line 4 maint | | | 1,500 |
| Setup sleever | 500 | | |
| Consumable | 1,800 | 1,800 | 1,800 |
| Selling Expenses | 5,000 | 5,000 | 5,000 |
| UPS | 400 | 400 | 400 |
| bottles | | | 28,000 |
| Raw Chemicals | | | 20,000 |
| | | | |
| Lab | 1,000 | 1,000 | 1,000 |
| Maint | | 100 | 100 |
| Office Depot | | 100 | 100 |
| Shrink | 2,500 | 2,500 | 2,500 |
| Freight | 1,000 | 0 | 20,000 |
| Legal / Collection costs | 5,000 | 5,000 | 5,000 |
| Label Misc | 4,000 | 4,000 | 4,000 |
| Operating Exp Misc | 5,000 | 5,000 | 5,000 |
| Inventory Misc | 20,000 | 20,000 | 20,000 |
| | | | |
| **AP Cash** | 84,200 | 102,700 | 148,900 |
| | | | |
| **Payroll Cash** | | 80,000 | |
| **Third shift** | 1,500 | 1,500 | 1,500 |
| | | | |
| **Total Cash needed** | 85,700 | 184,200 | 150,400 |

| | Week #<br>WE 06/14<br>Forecast | Week #<br>WE 06/21<br>Forecast | Week #<br>WE 06/28<br>Forecast |
|---|---|---|---|
| Collections for the week | | | |
| | | | |
| **Total Collections** | 85,852 | 439,900 | 57,235 |

| **Summary** | | | |
|---|---|---|---|
| Cash in | 85,852 | 439,900 | 57,235 |
| Cash out | (85,700) | (184,200) | (150,400) |
| Net Cash | 152 | 255,700 | (93,165) |
| | | | |
| Cummulative Cash | 152 | 255,853 | 162,687 |

| | Week #<br>WE 06/14<br>Forecast | Week #<br>WE 06/21<br>Forecast | Week #<br>WE 06/28<br>Forecast |
|---|---|---|---|
| Invoice | 150,000 | 150,000 | 150,000 |
| Collection | (85,852) | (439,900) | (57,235) |
| A/R change | 64,148 | (289,900) | 92,765 |
| Inventory additions | 38,000 | 77,800 | 106,500 |
| Inventory COGS | (79,500) | (79,500) | (79,500) |
| Inventory change | (41,500) | (1,700) | 27,000 |

### HNB formula impact

| | |
|---|---|
| 450,000 | A/R increase |
| (582,987) | A/R decrease |
| (132,987) | A/R reduction |
| 80% | |
| (16,200) | Inventory decrease |
| 40% | |
| (106,390) | AR Formula reduction |
| (6,480) | Inventory Formula reduction |
| 162,687 | Cummulative Cash |
| 49,817 | Net Bank / Cash |