# Exhibit O

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                        Richmond Division

 3

 4  ACMA USA, Inc.                    }
                                      }
 5  v.                                }    Civil Action No.
                                      }    3:08 CV 71
 6  SUREFIL, LLC                      }

 7                                         November 20, 2008

 8

 9  TRANSCRIPT OF TESTIMONY FROM TOMMY HENCH, WILLIAM HUNT,
    MICHAEL TRACY, PAUL ARNETT AND MOTIONS FROM JURY TRIAL
10          BEFORE THE HONORABLE HENRY E. HUDSON
               UNITED STATES DISTRICT COURT JUDGE
11

12  APPEARANCES:

13  William R. Baldwin, III, Esquire
    MARCHANT THURSTON HONEY & BALDWIN, LLP
14  5600 Grove Avenue
    Richmond, Virginia  23226-2102
15
          Counsel on behalf of ACMA USA, Inc.
16

17  Bruce M. Marshall, Esquire
    Christine A. Williams, Esquire
18  DURRETTE BRADSHAW PLC
    600 East Main Street
19  20th Floor
    Richmond, Virginia  23219
20
          Counsel on behalf of Surefil, LLC
21

22

23

24              KRISTA M. LISCIO, RMR
                OFFICIAL COURT REPORTER
25              UNITED STATES DISTRICT COURT
```

2

| | EXAMINATIONS | | | |
|---|---|---|---|---|
| | DIRECT | CROSS | REDIRECT | RECROSS |
| Tommy Hench | 4 | 44 | 54 | -- |
| William Hunt | 65 | 116 | 145 | --- |
| Michael Tracy | 150 | 167 | --- | --- |
| Paul Arnett | 171 | 174 | --- | --- |

REDIRECT EXAMINATION OF TOMMY HENCH          65

1  BY MS. WILLIAMS:

2  Q     Good morning.

3  A     Good morning.

4  Q     Will you tell the jury your name, please.

5  A     William Booth Hunt.

6  Q     What is your current job title?

7  A     My current job title is Chief Executive Officer of

8  Surefil.

9  Q     And can you please briefly describe for the jury

10 your educational background.

11 A     Educationally I attended Washington University in

12 St. Louis.  I got a bachelors of science degree in

13 chemical engineering, then I went to the University of

14 Chicago and got a degree in finance and an MBA in

15 finance.

16 Q     Can you likewise briefly describe your work

17 experience since graduating from college.

18 A     Yes.  Since graduating from college, I graduated

19 into a role in sales with the Dow Chemical Company.  I

20 went to school at night and got the MBA.  Then I took a

21 job with General Electric in marketing, and was the

22 marketing director for G.E.  From there, I went to a

23 company called Boral.  That's a brick manufacturing

24 company in Augusta, Georgia.  And I was their vice

25 president of sales and marketing there.  They

DIRECT EXAMINATION OF WILLIAM HUNT     66

1  transferred me to Sydney where I was a general manager

2  of Boral Bricks East, they called it.

3      And then I took a job as Executive Director of

4  Brambles, which is an industrial service company as

5  well in Sydney.  And then I was recruited back to Grand

6  Rapids, Michigan by a parent company, Alticor, who had

7  the Access Business Group, which was contract

8  manufacturing business that produced shampoos and

9  conditioners on contract.

10 Q    What did you do for them?

11 A    And I was the head of what's called the Access

12 Business Group third-party manufacturing, so I sold the

13 capacity of the plant to third parties.

14 Q    And what happened after that?

15 A    After that I decided to start my own company.  I

16 did spend one year consulting working with Turtle Wax

17 in sales and marketing, but started Surefil, LLC, and

18 established that company.

19 Q    What led to the creation for the idea of Surefil?

20 A    The creation of Surefil, I saw things happening in

21 the marketplace where I saw these large companies

22 outsourcing their capacity and their work,

23 manufacturing both in the US, but more overseas, say

24 China and Mexico, and I saw an opportunity to set up a

25 manufacturing facility that was very cost-efficient and

DIRECT EXAMINATION OF WILLIAM HUNT          67

1  produced high quality products for those companies and

2  to be able to keep that in the US, specifically Grand

3  Rapids, Michigan.  So I wanted to capitalize on that

4  opportunity.

5  Q    When did Surefil open its doors?

6  A    We opened the doors on December 1, 2005.

7  Q    When did it start actual manufacturing?

8  A    Would have been the end of March, 2006.

9  Q    And at that time, how many production lines did

10 you have?

11 A    We had one line.

12 Q    Did there come a time when you believed Surefil

13 needed a second production line?

14 A    Yes, there was.  In about the summer of 2006, it

15 -- we had sold out the capacity on the first line, and

16 it was looking like a second line was possible.

17 Q    And what did you do to go about getting that

18 second line into place?

19 A    We started to talk to equipment manufacturers, and

20 generally let it be known to our suppliers that we were

21 considering this.

22 Q    Okay.  And how did you come to learn about the

23 ACMA machine in particular?

24 A    One of our suppliers who helped us put forward the

25 first line was across the street from Surefil, and they

DIRECT EXAMINATION OF WILLIAM HUNT            68

1  came across and told us about this company, ACMA, that

2  makes the ACMA filler, and that sounded pretty

3  exciting.  And they told us that, you know, a bigger

4  and better machine would be the way to go.  And while

5  it costs a lot, it would do a really good job.

6  Q    Can you open your exhibit notebook to D, as in

7  dog.

8  A    Yes.  I'm on D.

9  Q    Would you recognize this to be the order

10 confirmation from ACMA for the machine that we have

11 been talking about the last few days?

12 A    Yes, I do.

13 Q    Can you turn to Page 2.

14 A    Yes.

15 Q    And there is various information there.  There are

16 two numbers that say 240 bpm. Can you tell the jury

17 what bpm means?

18     MR. BALDWIN:  Your Honor, if I may, I believe we

19 filed an objection to this.

20     MS. WILLIAMS:  I'm sorry.  I thought it had

21 already been entered.

22     MR. BALDWIN:  There was references made to it from

23 our copy, but I don't believe this one, and I would

24 object to it because there's handwritten changes to

25 this document that are not those of the author of the

DIRECT EXAMINATION OF WILLIAM HUNT                69

1   document.

2        MS. WILLIAMS:  I thought we already moved ours

3   into evidence.

4        MR. BALDWIN:  Your Honor, I withdraw the

5   objection.  There's been an appropriate redaction.

6        THE COURT:  All right.  Very well.

7        It will be received without objection.  You may

8   proceed with your examination of Mr. Hunt.

9        MS. WILLIAMS:  Thank you.

10  Q    You had said bpm means?

11  A    Bpm mean bottles per minute.

12  Q    Looking generally at the information on this page.

13  What does this information mean to you?

14  A    What it means is that a machine is possible that

15  will take these products and produce them at 240

16  bottles per minute.

17  Q    Was the speed of the machine important to you for

18  any reason?

19  A    Yes.  The speed of the machine is important

20  because it relates to the cost of production of each

21  unit, and that's the way Surefil sells their products.

22  We sell X number of cents per unit, so if the machine

23  can go faster, the price can be lower and we can get

24  the business and keep it here.

25  Q    On Page 2, and elsewhere on this, just

DIRECT EXAMINATION OF WILLIAM HUNT          70

1   specifically looking at Page 2, it says, "*Machine,*

2   *Automatic filler capper monoblock MO5 28/12-150.*"  Do

3   you understand what that language means?

4   A    I understand a little bit of that.  That automatic

5   capper filler Monoblock means caps and fills within the

6   same machine while holding the bottle.  It has 28

7   filling heads, 12 capping heads, and there's something

8   called a pitch, which is generally the size of the

9   machine.  It's 150.  And I'm not quite sure about that.

10  Q    And do the number of filling heads and capping

11  heads correlate to the speed of the machine?

12  A    Yes.

13  Q    Can you turn to Page 12 of this document.

14  A    Yes.

15  Q    And review the section entitled, "*Payment.*"

16  A    Yes, I can see.

17  Q    Are these the payment terms Surefil and ACMA

18  agreed upon?

19  A    They are the payment terms that Surefil and ACMA

20  agreed upon under, "*Payment.*"

21  Q    Did you pay ACMA a down payment for the machine?

22  A    Yes, we did.  We paid ACMA the down payment.

23  Q    And if I can have you flip to the other book very

24  quickly.  I think it's right over here.  To Number 8 in

25  that book.

DIRECT EXAMINATION OF WILLIAM HUNT          71

1    A    Yes.

2    Q    What is this document?

3    A    This is the deposit check for over $273,000.

4    Q    What is the exact amount on that check?

5    A    It's $273,506.33.

6    Q    And the date?

7    A    And the date of that is October 16, 2006.

8    Q    And going back to Exhibit 8 that you were looking

9    at.

10   A    Yes.

11   Q    When were the other payments due on the machine?

12   A    October 23, 2007, and October 3, 2008.

13   Q    And did there come a time when the payment date

14   for the second installment was pushed out?

15   A    Yes.

16   Q    What was the new date of that second installment?

17   A    I believe it was on, or close to, January 3, 2007.

18   Q    Why were the payments spaced out like this?

19   A    The reason the payments were spaced out is this

20   was a very expensive machine.  We were a new startup

21   company, and so financially we couldn't pay for that

22   machine all up front, but the sales approach to it was

23   this machine pays for itself over time.  And I said,

24   "Explain that to me."

25        And they said, "Well, it generates all this

1    *product.  You charge for that product, you get that*

2    *revenue, and you use that revenue to pay for the*

3    *machine."*

4         MR. BALDWIN:  Your Honor, I would object.  The

5    intention of the witness is irrelevant in a matter of

6    contract.

7         THE COURT:  Objection is overruled.  Go ahead.

8    A    So we made some calculations as to when we would

9    be able to pay for it based on how much production we

10   had, and then we made that agreement with ACMA and they

11   supported that, and this was a way to get this --

12        MR. BALDWIN:  Your Honor, I'd object to a

13   reference to ACMA.  There are individuals at ACMA, and

14   I would ask that the witness be asked to identify

15   the --

16        THE COURT:  You can ask that on cross-examination,

17   sir.  Your objection is overruled.

18        Go ahead.

19        MS. WILLIAMS:  Your Honor, just a small

20   housekeeping matter.  To the extent it wasn't admitted

21   into evidence, I move the admission of 6.

22        THE COURT:  Six?

23        MS. WILLIAMS:  Yes.  That was a copy of the check.

24        THE COURT:  It's not at issue.  You don't need to

25   put every document in evidence.  There are things not

1  at issue, and you don't need it.   It's cumulative.

2       MS. WILLIAMS:   Okay.

3  Q    Were you able to secure new business for Line 2,

4  Mr. Hunt?

5  A    Yes, we did secure new business for Line 2.

6  Q    Can you turn to Exhibit G, as in Gary.

7  A    Yes.

8  Q    What is this document?

9  A    This is a contract with Conopco, doing business as

10 Unilever.

11 Q    Can you turn to Page 8 of this document.

12 A    Yes.

13 Q    Do you recognize your signature on that page?

14 A    That's my signature.

15      MS. WILLIAMS:   Move the admission of this

16 document.

17      THE COURT:   Any objection?

18      MR. BALDWIN:   No, Your Honor.

19      THE COURT:   Okay.   It will be received.

20 Q    What type of products, very briefly, does Unilever

21 make?

22 A    Unilever makes a range of, as it relates to us, a

23 range of personal care products, including Suave hair

24 conditioner and body wash and shampoo, as well as Dove,

25 Caress and Dermasil, and so forth.   Very popular,

DIRECT EXAMINATION OF WILLIAM HUNT                74

1 long-standing brands.

2 Q    And, roughly, how many bottles does this contract

3 call for Surefil to fill?

4     MR. BALDWIN:  Your Honor, the contract speaks for

5 itself.

6     THE COURT:  We can pass it out to the jury and sit

7 here and have them go through it.

8     MR. BALDWIN:  Well, I would ask if there are

9 particular parts of the contract which counsel makes

10 reference.

11     THE COURT:  That's all she's asking about is one

12 item.

13     Am I correct, just one item?

14     MS. WILLIAMS:  Yes, sir.

15     THE COURT:  That's all she's asking about.  Do you

16 want the jury to take the time to read it, or have the

17 witness do it?

18     MR. BALDWIN:  I'll withdraw the objection.

19     THE COURT:  Thank you, sir.

20     Go ahead.

21 A    The contract was for 44 and a half million units.

22 Q    Did you, or anyone on behalf of Surefil, ever

23 advise ACMA about the new business that Surefil had

24 secured to be produced on Line 2?

25 A    Yes.  I advised ACMA about this, and these are

1  some of the bottles there that are there on the front

2  picture.

3  Q    What were you told by ACMA about the installation

4  of the machine?

5  A    I was told that they should install it.  Since it

6  was their machine, that I should enlist them to do it,

7  and it will take two, maybe three weeks.

8      THE COURT:  Now, I do believe I agree with

9  Mr. Baldwin on this.  With a comment like that, you

10 really ought to identify the declarant, who is making

11 that comment, so I'll sustain his objection.

12     MS. WILLIAMS:  I was.

13     THE COURT:  All right.  Go ahead.

14 Q    And who did you have conversations with at ACMA

15 about this?

16 A    John Bowerman.

17 Q    Were you ever told by anyone at ACMA, or told by

18 Mr. Bowerman, that no production could occur on the

19 machine during installation?

20 A    No.

21 Q    Was the installation included in the quotation or

22 order confirmation?

23 A    No, it was not.

24 Q    How was that handled?

25 A    John and I talked about it, and he said he would

DIRECT EXAMINATION OF WILLIAM HUNT          76

1  have his guys do it and he would invoice us and we

2  would pay it.

3  Q    And what were your expectations for the

4  installation?

5       MR. BALDWIN:  Objection, Your Honor.

6       THE COURT:  Objection sustained.  Irrelevant.

7  Q    Can you please turn to Exhibit O.

8  A    Yes.

9  Q    Is this an e-mail from you -- the bottom portion

10 of the e-mail from you dated April 12, 2007?

11 A    Yes, it is.

12      MS. WILLIAMS:  Move its admission.

13      THE COURT:  Any objection, Mr. Baldwin?

14      MR. BALDWIN:  No, Your Honor.

15      THE COURT:  Received.

16 Q    Can you briefly tell the jury what this document

17 is.

18 A    Sure.  This is a communication from me copying a

19 number of people, but to also Ferrari at ACMA S.p.A.

20 And I'm concerned about the progress being made to

21 install and commission this machine.

22 Q    You've heard some testimony in this case that you

23 were pushing production during the installation.  Do

24 you recall that testimony?

25 A    I do.

DIRECT EXAMINATION OF WILLIAM HUNT          77

1  Q    Can you address that testimony for the jury?

2  A    Sure.  I mean, our role at this point was, as it

3  says here, we were just sitting back quietly observing

4  what was going on, but getting increasingly

5  uncomfortable with the lack of the progress on the

6  installation of the machine.  So my role here is what I

7  did was just write a letter back to the head office and

8  say this is what I think -- this is all my concerns,

9  this is what I'm seeing, and what I'm not seeing, and,

10 you know, two weeks has passed now and we're not

11 anywhere close to anything.  So, I was concerned.

12 Q    You heard Mr. Hench testify about a vacuum issue.

13 Do you recall that testimony?

14 A    Yes.

15 Q    What do you recall about that issue?

16 A    What I recall was at the end of a certain period

17 of time when the Italian -- first of all, a vacuum

18 system did come with the equipment, and it wasn't

19 installed, so at the end of the period I asked the two

20 Italian guys probably through Tommy why wasn't it

21 installed.  And they said it was not necessary.  That

22 we had vacuum otherwise in their line, and this wasn't

23 going to be needed, but we had it if we did need it.

24 Q    Did Surefil ever actually install the ACMA vacuum?

25 A    Absolutely.  Yeah, we took the time and did it

DIRECT EXAMINATION OF WILLIAM HUNT          78

1  ourselves.   Yes.

2  Q     You heard some testimony yesterday that you signed

3  some documents accepting the machine.   Do you recall

4  that testimony?

5  A     I do recall that testimony.

6  Q     Will you please tell the jury what happened in

7  relation to that paperwork.

8  A     Sure.   I was approached after that initial period

9  of time.   Somewhere around three weeks they came to me

10 through Tommy Hench, or with Tommy Hench, and said they

11 were going to -- they were assigned to another job and

12 they were going to leave.   And they said they needed to

13 get paid and they had to have a record that they had

14 been at Surefil.   So they said would you sign these

15 documents, and here is what we have accomplished, so

16 would you sign-off and put your signature on it, and I

17 did.

18 Q     Was it your intention to officially accept the

19 machine?

20       MR. BALDWIN:   Objection to his intention, Your

21 Honor.

22       THE COURT:   I think the objection is overruled on

23 this.

24       Go right ahead.

25 Q     Was it your intention by signing the document --

DIRECT EXAMINATION OF WILLIAM HUNT       79

1    MR. BALDWIN:  Objection.  It's leading in form.

2    THE COURT:  I agree.

3    Rephrase your question.

4  Q    What was your intention by signing this document?

5  A    My intent was to just acknowledge these guys had

6  done this work and that they were there, had been there

7  at Surefil.

8  Q    Can you turn to Plaintiff's Exhibit 19.

9  A    Yes.  I'm on 19.

10  Q    Okay.  What are the numbers given on the top

11  portion of that document?

12  A    There's the numbers associated with the filler,

13  and then some bottles per minute numbers.  One hundred

14  thirty bottles per minute.

15  Q    And what was the number that we talked about

16  earlier that was in the order confirmation?

17  A    It was 240 bottles per minute.

18  Q    Can I focus your attention there, there's about

19  three blank lines, and there's some language above it

20  that starts, *"The customer declares the supply is in

21  accordance with the equipment described in"*?

22  A    Right.  I see that.  Yes.

23  Q    And the area underneath that is blank?

24  A    It is blank, yes.

25  Q    What would you expect to go in that space?

DIRECT EXAMINATION OF WILLIAM HUNT      80

1  A    I would expect that it would be in accordance with
2  a quote or Purchase Order 7.1.1, or whatever those
3  designations are, the specific thing that they're
4  trying to reference.
5  Q    Are the numbers above in accordance with that
6  quotation confirmation number?
7  A    No.
8  Q    Mr. Busi, via the interpreter yesterday testified
9  to the affect that you did not say anything about the
10 machine at the time you signed these documents.  I
11 think the question was did he say it was not
12 acceptable, or something to that affect.  Do you
13 remember his testimony on that?
14 A    Right.  I do remember that.
15 Q    And why is -- is that true?
16 A    That's true.
17 Q    And why didn't you say anything about that?
18 A    Well, one, you know, he's not an English speaking
19 guy and, two, he's the technical guy hooking up the
20 wires on the machine and making it run.  So if I'm
21 going to accept, or not accept, I'm not going to do it
22 with the technician.  I'm going to talk to John
23 Bowerman, or someone who I perceive to have the
24 authority to do something about that.
25 Q    At that time, on April 26, 2007 -

DIRECT EXAMINATION OF WILLIAM HUNT          81

1  A    Right.

2  Q    - were you aware of the full extent of the

3  problems?

4  A    Absolutely not.

5       MR. BALDWIN:  Objection, Your Honor.  Facts not in

6  evidence.

7       THE COURT:  I couldn't hear the question, so I

8  don't know.

9       MS. WILLIAMS:  I'm sorry.  The question was at

10 that time, April 26, 2007, were you aware of the full

11 extent of the problems with the machine?

12      THE COURT:  Objection is overruled.  He is the

13 manager.

14 A    I was not.  I had expected that the machine was

15 going to be in good shape.

16 Q    Starting about May 1, 2007 -

17 A    Yes.

18 Q    - how many shifts was Surefil running at that

19 time?

20 A    We were running three shifts.

21 Q    How many days a week?

22 A    That would be seven days a week.

23 Q    And three shifts, 24 hours a day?

24 A    That's correct.

25 Q    How many bottles was Surefil aiming to fill a

DIRECT EXAMINATION OF WILLIAM HUNT                    82

1  month during this time?

2  A    We were aiming to do a ramp-up to about six or

3  seven million -- between six and seven million bottles

4  a month.

5  Q    What numbers are you supporting to use that?  What

6  numbers support that?

7  A    How I get to that number is you take the speed of

8  240, but let's say I would use 200, and say 200 bottles

9  a minute, times 24 hours a day, times seven days a

10 week, gives you a certain amount of bottles.  Then I

11 take, say, 80 percent of that for efficiency, and so

12 forth.

13 Q    Can you turn to Exhibit X.

14 A    Yes.

15      THE COURT:  Exhibit X?

16      MS. WILLIAMS:  Yes.

17      THE COURT:  Fine.

18 A    Okay.  I'm on X.

19 Q    Do you see the middle portion e-mail from you?

20 A    Yes.

21 Q    What does that e-mail reference?

22 A    That e-mail is referencing the ACMA machine not

23 functioning.

24 Q    Does that make reference to an issue that also

25 occurred during installation?

DIRECT EXAMINATION OF WILLIAM HUNT          83

1  A     Right.  It's making reference to what we saw at

2  start-up as well, and the initial installation.  So

3  it's now June 3rd, and the same issue is still

4  occurring.

5  Q     What is the significance of -- even just one of

6  the 28 filler heads not filling?

7  A     The significance of that is it generates a lot of

8  scrap.  It generates -- you have to slow down.  You

9  have to take that bottle off by hand, and you're going

10 to have to somehow try and recycle or use those bottles

11 and those caps.

12       And then it also creates all sorts of issues

13 depending on how it's not working.  If it's

14 overfilling, then it's creating a huge mess.  If it's

15 not filling at all, then of course you have empty

16 bottles going and it fills up the reject arm very,

17 never quickly.  So bottom line is, you cannot run

18 efficiently, you cannot run at any good speeds, and you

19 have a real problem.

20 Q     Did you have a video of Line 2 made in August of

21 2008?

22 A     I did.

23 Q     What else does that video show?

24       MR. BALDWIN:  Your Honor, if counsel may approach?

25       THE COURT:  Yes, sir.

1    (Bench conference held outside the hearing of the

2                        jury.)

3       MR. BALDWIN:  Your Honor, I objected to this

4   exhibit.  It was created in August of 2008, which is

5   after the close of the Court's normal discovery

6   process.  It could have been made at some other time,

7   but it was made at a time that I didn't even know about

8   it until the exhibits were filed with the Court, and

9   therefore I object.  I don't think it's appropriate to

10  have an unnoticed, unilateral, one-sided video made

11  after the close of normal discovery and without notice

12  to the other side.

13      MS. WILLIAMS:  It's demonstrative only.  It's

14  about three minutes long.  It shows the entire line

15  running, and it's a person pulling a single bottle off

16  the line that's not being filled.  They are separated.

17      I think it would be very helpful for the jury to

18  see the line running.  I think this is all very

19  confusing.

20      THE COURT:  I would agree that they're going to

21  have a difficult time visualizing this, and ordinarily

22  I'd not let it in.

23      How are you prejudiced by this?

24      MR. BALDWIN:  If I may suggest something, Your

25  Honor?

DIRECT EXAMINATION OF WILLIAM HUNT        85

1       THE COURT:  Sure.

2       MR. BALDWIN:  Except for the one bottle, it's a

3   neutral presentation, and so I understand Your Honor's

4   desire to give the jury some video.

5       THE COURT:  I think it would help them a great

6   deal.

7       MR. BALDWIN:  But I'd ask for the ambush nature on

8   this.

9       THE COURT:  Well, I don't think so.  Don't be so

10  dramatic.  Try to get along here and be professional.

11      MR. BALDWIN:  We actually get along very well.

12      Because of that one point with the bottle --

13      THE COURT:  You want to omit that one point?  I

14  think this a very fair resolution.

15      Do you need a minute to do that?

16      MS. WILLIAMS:  I'll tell my paralegal.

17      MR. BALDWIN:  Thank you, Judge.

18      THE COURT:  Very good.  Proceed.

19              (Bench conference concluded.)

20  Q    You said you had a video of Line 2 made in August

21  of 2008, is that right?

22  A    That's correct.

23      MS. WILLIAMS:  We'd like to show the video at this

24  time.

25      THE COURT:  As discussed.  Go ahead.

DIRECT EXAMINATION OF WILLIAM HUNT        86

1              (Video is being played at this time.)

2  Q    What is this showing?

3  A    That is the unscrambler.  So they're putting

4  bottles into the unscrambler.

5      THE COURT:  Let me ask you to go back.  Rewind it

6  back and play it again.  I didn't get a chance to see

7  the earlier portion of this.  I'd like to see all of

8  this, if I could.

9      MS. WILLIAMS:  Sure.

10     Can you stop it and show it again?

11             (Video is being played at this time.)

12 Q    You said this is the beginning of the line?

13 A    Right.  This is Line 2.  This is the unscrambler.

14 And it's putting bottles on the line.  So it sorts them

15 out one by one.  You can see them up there.  That's

16 where it's coming in horizontally and then they stand

17 up here, right here on the line.  This is going down

18 the line towards the labeler.

19     THE COURT:  Going down towards what, Mr. Hunt?

20     MR. HUNT:  Towards the labeler, which is what you

21 see right here on the right.  The labels and the

22 bottles are coming in on the left going around the

23 rotary platform.

24     THE COURT:  Sure.

25 A    So that's the labeler functions.  And there's

DIRECT EXAMINATION OF WILLIAM HUNT          87

1  labels going on bottles front and back.

2  Q    Are we still on the labeler?

3  A    It's still on the labeler.  And now is the filler.

4  That was the filler right there for a second.

5       MS. WILLIAMS:  Can you turn that back for a

6  second.

7            (Video is being played at this time.)

8  A    There it is.  That's the filler there.  And that's

9  the head that's dysfunctional there.

10 Q    What is that right there?

11 A    This is the cap sorter.  So we're putting the caps

12 in here and they're going up into the sorter bowl,

13 coming down this alleyway here.  And that thing going

14 up and down right there behind that, that's picking up

15 the caps and putting them on the bottles.  So at this

16 point -- and we're trying to orient that cap so it

17 opens up over the front label, which is a nice thing

18 for the costumer, and required by the customer.

19      This is the drop caser.  They file into an area

20 and they drop case.  This is the case erector.  It's

21 going faster.  Good.  And it's just taking these

22 cardboard boxes, opening them up, glueing the bottoms

23 and setting them on the line so we can drop the bottles

24 in.

25      And there they're putting them on -- they're going

DIRECT EXAMINATION OF WILLIAM HUNT          88

1  down the line here and they come underneath the bottles
2  and the bottoms drop in the case.  So they don't drop
3  too far and break, we lift them up and they drop them
4  in the box and you put the box back down.
5      It's going now to a top case sealer.  And so right
6  there it goes by a coder.  So it just got coded.  You
7  couldn't really see it, but it happened.
8      And then this is the top case sealer.  It folds
9  the flaps down and puts glue on them, and then we put
10 them on this pallet here, stretch wrap them and ship
11 them.
12     THE COURT:  All right.
13 Q   Now, going back to my question before we watched
14 the video about the significance of even a single head
15 not filling.
16 A   Right.
17 Q   Does that require any additional manpower on the
18 line when one head is not filling?
19 A   Yes, it does.  What has to happen is you have to
20 -- first of all, you have to go slower.  But additional
21 manpower, you have to have someone take that empty
22 bottle off the line, and then do something with it.
23 Take the caps apart and try to reuse them, or something
24 like that.
25     You have to be very careful about the hygiene

DIRECT EXAMINATION OF WILLIAM HUNT          89

1  because if there is a little product in it and you

2  start taking it off with your hands and touching it and

3  doing things, then you contaminate it, and that's not

4  acceptable in the manufacturing process.

5  Q    Can you turn to Exhibit DD.

6  A    Yes.

7  Q    Do you recognize the bottom of the June 11, 2007,

8  e-mail from you?

9  A    Yes.  It's from me, June 11th.

10      MS. WILLIAMS:  We move its admission.

11      THE COURT:  DD.  All right.

12      Any objection to that, Mr. Baldwin?

13      MR. BALDWIN:  There is none, Your Honor.

14      THE COURT:  DD will be admitted without objection.

15  Q    And who is this e-mail directed to?

16  A    This e-mail is directed to Bill Fenner, Bob

17  Farmer, John Bowerman and Ettore Bandieri.  So, ACMA.

18  Q    And just generally what is this e-mail about?

19  A    Generally, it's about all the issues that are

20  still occurring on June 11th with the filler capper

21  machine.

22  Q    Okay.  Do you tell ACMA in this e-mail that you

23  believe the machine has not yet been commissioned?

24  A    Yes.  I specifically say the filler, *"Has not been*

25  *commissioned and there are still many issues."*

DIRECT EXAMINATION OF WILLIAM HUNT          90

1  Q     Did anyone at ACMA at this time tell you that they

2  believed the machine has been commissioned?

3  A     No.

4  Q     And you heard Mr. Hench testify about the service

5  visit he made in June, 2007?

6  A     Yes.

7  Q     And Mr. Fenner and Mr. Saccani testified about a

8  service visit they made at the end of June, beginning

9  of July?

10 A     Yes.

11 Q     And you heard Mr. Hench testify about grippers.

12 Do you remember that testimony?

13 A     I did, yes, the grippers.

14 Q     And what was your understanding of the problem

15 with the grippers?

16       MR. BALDWIN:  Objection to the witness's

17 understanding as opposed to the testimony of what he

18 actually observed.

19       THE COURT:  Objection is overruled.  He is the one

20 that is communicating to your clients, and what his

21 rationale for doing that I think is very relevant, so

22 the objection is overruled.

23       You may answer.

24 A     My understanding with the grippers is they hold

25 the bottle and keep it from spinning when they put the

1  cap on, but there were pieces missing with the change

2  parts.  We call them change parts, they called them

3  something else.  And I can't remember the Italian

4  version of that.

5      But they're missing the parts, and so we can't

6  hold onto that bottle.  So as we spin a cap on it, it

7  spins and it wears out the rubber pieces, and so that's

8  a problem.  And those missing parts, you know, he's

9  right, that bottle was spinning.

10 Q    Can you go to Exhibit HH.

11 A    Yes.  I'm on HH.

12 Q    And can you identify this document?

13 A    It's an e-mail from me on Saturday, June 30th.

14 I'm sorry -- yes, it's from me on Saturday, June 30th

15 to a number of people, but including people from

16 Unilever.

17      THE COURT:  People from where?

18      MR. HUNT:  Unilever.  The customer.

19      MR. BALDWIN:  May counsel approach again?

20      THE COURT:  Yes, sir.

21    (Bench conference held outside the hearing of the

22                      jury.)

23      THE COURT:  Yes, sir.

24      MR. BALDWIN:  We objected to this.  It's not

25 directed to ACMA.  It has nothing to do with ACMA.

1  It's *ex parte*, irrelevant and complete hearsay.

2  Insofar as this case is concerned, it has no

3  communication to ACMA in any way, shape, or form.

4        MS. WILLIAMS:  It's actually to Unilever.

5        THE COURT:  Which is it, hearsay or irrelevant?

6        MR. BALDWIN:  Well, it's hearsay and irrelevant.

7  It's both, Your Honor.

8        MS. WILLIAMS:  It's from Mr. Hunt, who is on the

9  stand, and it's to Unilever, who is the contract that

10 was lost in the case.

11       THE COURT:  Okay.  Sustained.  I'm going to let it

12 in.

13            (Bench conference concluded.)

14 Q    Mr. Hunt, do you recall Mr. Chism's testimony

15 about Pareto Charts that he had made?

16 A    I do.  I remember that well, yes.

17 Q    Did you direct Mr. Chism to prepare those Pareto

18 Charts?

19 A    I did.  I asked him to do that.

20 Q    Why did you ask him to do that?

21 A    I asked him to do that because the customer is

22 saying why aren't you producing product?  We want to

23 see some data.  They wanted to see some data as to why

24 the production wasn't happening.

25 Q    And were you also personally observing any issues

1  that may have been occurring on Line 2 at this time?

2  A    Yes.  I was out observing the line.

3  Q    And what did your observations and conclusions

4  with the work you directed Mr. Chism to do result in?

5  A    What that resulted in is it gave me an idea of

6  really what was the root cause of what was happening on

7  the line, and it was the capper --

8       MR. BALDWIN:  I object, Your Honor.  The documents

9  speak for themselves, and the witness is about to

10 testify about what he thinks of the documents that have

11 not been received in evidence, nor have they been

12 offered.

13      MS. WILLIAMS:  I'm happy to limit it to his

14 personal observation.

15      THE COURT:  Go ahead.  Why don't you do that.

16 Objection sustained.

17 Q    Based on your personal observations during this

18 time frame, which was roughly June, July, August, 2007,

19 what was the main issue on Line 2?

20 A    The main issue on Line 2 was this capper.  The

21 capper was faulting out.  It was unreliable.  It was

22 stopping.  It was absolutely a capper issue.

23      The capper heads were just stopping and burning

24 out and failing.  And when it stops, it shuts down the

25 whole machine.

DIRECT EXAMINATION OF WILLIAM HUNT          94

1  Q      And you heard Mr. Chism testify that there were

2  issues with the labeler, correct?

3  A      Yes.

4  Q      Can you talk to the jury about that issue?

5  A      Yes.  From time to time, but certainly on that

6  day, August 7th and 8th, he covered two shifts, one on

7  the 7th and one on the 8th.  There was an issue of some

8  sort with the labeler not placing the label on

9  correctly.  Generally, those things are quickly fixed

10 and are a momentary type thing.  And we tend to, as it

11 was talked about, fix those on first shifts.  We have

12 lots of people around.

13 Q      And was that problem with the labeler in fact

14 fixed?

15 A      Yes.  That was in fact fixed.

16 Q      And were there any other issues with other

17 components on the line?

18 A      Yes.  There were issues with components and

19 mechanical equipment on the line from time to time, but

20 generally they're fixed relatively quickly.  And a lot

21 of times, we can adjust that around the team that's

22 going to take a 15 minute break anyway, and get those

23 things fixed and we run faster.

24 Q      How fast does the labeler run?

25 A      The labeler is rated up to about 300 bottles a

DIRECT EXAMINATION OF WILLIAM HUNT          95

1    minute.

2         MS. WILLIAMS:  Your Honor, may I consult with

3    opposing counsel for a moment?

4         THE COURT:  You go right ahead.

5         MS. WILLIAMS:  Thank you.

6         MR. BALDWIN:  Thank you, Your Honor.

7         THE COURT:  Go right ahead.

8    Q    Mr. Hunt, what was the status of your contract

9    with Unilever in the middle of July, 2007?

10   A    We were under some pressure in July of 2007.  They

11   were asking for -- I mean, they were asking for

12   performance, and we were not performing to what had

13   been requested and agreed to.

14   Q    And can you turn to Exhibit JJ.

15   A    Yes.

16        MS. WILLIAMS:  And I'm going to let Mr. Baldwin

17   make his objection before I go any further, Your Honor.

18        THE COURT:  What's the exhibit number?

19        MS. WILLIAMS:  I'm sorry.  JJ.

20        THE COURT:  JJ.  Let me take a look at it.

21   Q    Is this an e-mail from someone at Unilever,

22   Mr. Hunt?

23   A    Yes, this is an e-mail from Dave Shinn at

24   Unilever.

25        MR. BALDWIN:  If I may have a moment to confer

1  with counsel, Your Honor?

2       THE COURT:  Okay.

3  Q    Mr. Hunt, I'm sorry, did you already answer the

4  question as to what was the status of the Unilever

5  contract?

6       THE COURT:  He did.  He said he was under pressure

7  for nonperforming.  Go ahead.  Next question.

8       MS. WILLIAMS:  Thank you.

9  Q    Had they taken any other action at that time in

10 terms of the contract?

11 A    Yes.  And in July, what they did was basically cut

12 the contract in half and said you're not going to get

13 this volume anymore.  We can't rely on you.  We have to

14 go somewhere else.

15      MR. BALDWIN:  Your Honor, I object to hearsay.

16      THE COURT:  Truth of the matter is irrelevant.

17 The fact of the matter is he was told this is what's at

18 issue.  Mere fact of utterance.  That's what they told

19 him.

20      Go ahead.  Objection is overruled.

21      MS. WILLIAMS:  Thank you.

22 Q    Mr. Hunt, can you turn to Exhibit OO.

23 A    Yes.

24 Q    And can you -- I'm just going to have Mr. Hunt

25 flip to PP.

DIRECT EXAMINATION OF WILLIAM HUNT          97

```
 1  A    Yes.

 2  Q    QQ?

 3  A    Yes.

 4  Q    And RR?

 5  A    Yes.

 6  Q    And can you summarize what these pictures are?

 7  A    Okay, these are exhibits from myself and from

 8  Martin Chism.  They're e-mails to ACMA basically

 9  talking about all of these issues that we've seen since

10  day one, and none of them being resolved.

11       MS. WILLIAMS:  Move the admission of those

12  documents.

13       THE COURT:  Any objection, Mr. Baldwin?

14       MR. BALDWIN:  There was not.

15       THE COURT:  They'll be received.

16  Q    And you heard Mr. Hench testify that he then came

17  to the Surefil site in September of 2007, correct?

18  A    Yes, I did.

19  Q    What happened after that visit by Mr. Hench?

20  A    After that visit by Mr. Hench when he was

21  replacing the bushings, those bushings, the capper

22  stopped failing, and those particular issues that we

23  had with the capper just didn't happen and it started

24  to run and we were able to cap bottles.  So that was

25  the first, oh, yea.
```

DIRECT EXAMINATION OF WILLIAM HUNT          98

1  Q    Were you encouraged by that?

2  A    I was extremely encouraged by that.  It was a huge

3  weight off our shoulders.  We were under a huge amount

4  of pressure.  Our contracts were being cut.

5       MR. BALDWIN:  Your Honor, I move to strike as

6  nonresponsive.  The question was, "*Were you encouraged*

7  *by that*?," and the response was a soliloquy.

8       THE COURT:  Okay, I'll sustain the objection, but

9  we're going to hold you to the same rule when we start

10  your examination.  I've given you a lot of latitude, a

11  lot of latitude, and I'll hold you to the same

12  standard, okay, sir?

13       MR. BALDWIN:  Yes, sir.

14       THE COURT:  Go right ahead.

15  Q    What happened after that point in time?

16  A    After that, we started to run the line, and we

17  thought, okay, this is it.  You know, it's going to be

18  good.  We can go.

19       So what we did was actually start to run in and

20  started to move the speeds up, and then all heck broke

21  loose on a bunch of other things.  So then the camera

22  failure became extremely evident, and that was

23  terrible.  And then the filler problems started to

24  intensify, and so all the rest of the parts started to

25  fail.

DIRECT EXAMINATION OF WILLIAM HUNT                99

1  Q    Can you turn to Exhibit ZZ.

2  A    Yes.  I'm there.

3       THE COURT:  Did you say ZZ?

4       MS. WILLIAMS:  Yes.

5       THE COURT:  Yes, ma'am.

6  Q    Can you tell the jury what this document is.

7  A    This is an update on the commissioning of the

8  filler from October 5th and 6th, 2007.

9  Q    Thank you.  And is this -- did you send this

10 document to ACMA?

11 A    Yes.  We sent this to ACMA.

12 Q    Was it Surefil's position that the machine had

13 been commissioned as of this time?

14      MR. BALDWIN:  Objection to the leading form.

15      THE COURT:  Yes, I think the objection is

16 sustained in that I think it suggests the answer.

17 Rephrase it.

18      MS. WILLIAMS:  Yes, sir.

19 Q    Does this memo mention anything about Surefil's

20 position on a commissioning of the machine?

21 A    Yes.  The machine is not yet commissioned, and

22 this is an update on the process.

23      MS. WILLIAMS:  We would move the admission of this

24 document.

25      THE COURT:  Any objection, Mr. Baldwin?

DIRECT EXAMINATION OF WILLIAM HUNT       100

1    MR. BALDWIN:   No, Your Honor.

2    THE COURT:   ZZ will be received without objection.

3  Q    Does this memo mention anything about what rate

4  the machine is currently running at as of October,

5  2007?

6  A    It talks about 100 a minute for 10 to 30 seconds

7  on certain products.  And it also talks -- well, 100 a

8  minute on certain products for very short periods of

9  time is what I'm seeing there.

10 Q    Okay.

11 A    Would you like me to look further?

12 Q    No.   That's fine.   Mr. Hunt, as of this time, had

13 Surefil paid ACMA for the installation invoice?

14 A    No, we had not paid the installation invoice.

15 Q    Why not?

16 A    In my conversations with John Bowerman, he said he

17 understood the gravity of the situation, and that he

18 was not asking me to pay that invoice at that time and

19 that we would work something out after they finally got

20 this thing installed and commissioned.

21 Q    Aside from the down payment, which we previously

22 discussed, had Surefil paid ACMA any amounts up until

23 this date?

24 A    Yes.   We paid -- we had paid amounts up to that

25 date.   It was $275,000, plus tens of thousands of

1  dollars for spare parts, and other things along the

2  way.

3  Q    What do you recall happening next after this early

4  October, 2007 visit?

5  A    After this, then we really wanted to get to the --

6  someone with higher authority to get this working.  So

7  we got a meeting with Giuseppe Marcante and John

8  Bowerman, and they came to Surefil in Grand Rapids.

9  Q    And what happened during that meeting?

10 A    Mr. Marcante, we met with him, and he basically

11 wanted to see our personnel, see the machine, and see

12 what was working and what wasn't working.  And so he

13 actually -- I allowed him to interview some of our

14 people, and he said that they were amazing, excellent,

15 extremely talented, and he gave them very, very high

16 marks, which made me proud.

17     And then he also looked at the key issues with the

18 machine, and he committed that they will absolutely do

19 everything, including throwing the kitchen sink at it,

20 and get it fixed by year-end.  So by December 31,

21 absolutely everything will be perfect, and that was his

22 commitment.

23     And that's what happened.

24 Q    Can you turn to Exhibit LLL.

25 A    Yes.  Okay, I'm on triple L.

DIRECT EXAMINATION OF WILLIAM HUNT      102

1  Q      Do you see the first e-mail, the top e-mail?  Who
2  is that from?

3  A      That's from Giuseppe Marcante.

4  Q      Okay.

5         MR. BALDWIN:  If I may, Your Honor, I thought
6  counsel referenced triple O?

7         MS. WILLIAMS:  L.

8         THE COURT:  I think it was triple L.

9         Triple L is already in evidence.  Go ahead.

10        Was there any objection to triple L, Mr. Baldwin?

11        MS. WILLIAMS:  I think it's in.

12        THE CLERK:  It is in evidence.

13        THE COURT:  You go ahead.

14  Q      And then just flipping back to the very last page.

15  A      Okay.  I'm on Page 3.

16  Q      And there's a subparagraph that starts with, "*Dear*
17  *Bill.*"

18  A      Yes.

19  Q      Who is that from?

20  A      That's from Giuseppe Marcante.

21  Q      And do you see the place where it says, "*We do*
22  *insist that the open issues need to be fixed before the*
23  *end of year 2007*"?

24  A      Yes, I do see that.

25  Q      What was your understanding of what he was

DIRECT EXAMINATION OF WILLIAM HUNT                103

1   referencing as to that?

2   A    As to the open issues, fixing the filling, the

3   capping, and everything that's, you know, basically

4   fully commissioned with this machine, and getting

5   everything working.

6   Q    And did ACMA perform those fixes by the end of

7   2007?

8   A    No.  He had a specific list, and none of them were

9   looked after at all.

10  Q    Did they ever perform any of those fixes?

11  A    No.

12  Q    If you go down a little further, it says, "*On the

13  contrary, I would ask you to ship the machine back to

14  us.  If this will be the decision, we need to evaluate

15  the economic conditions of the contract breach that

16  will represent for us a financial damage.*"

17       Do you recall reading that language?

18  A    I do recall reading it, yes.

19  Q    Why didn't you take Mr. Marcante up on his

20  suggestion to ship the machine back?

21  A    Well, I wasn't really quite sure about, "*on the

22  contrary, I would ask you to ship the machine back.*"  I

23  wasn't quite sure what it meant, so I called -- I

24  communicated with Bowerman, and he said, "*We don't want

25  to have you ship the machine back.  We're going to fix*

 1  *it.   We went to the top, we got it in writing, they're*

 2  *going to fix the machine."*

 3       So I never really considered that or thought that

 4  that was something that made sense.  Additionally, of

 5  course, it would be extremely hard for Surefil because

 6  we're still maintaining some parts of some contracts,

 7  and it would take us five months to get another new

 8  machine, we'd have to design it.  You know, it would

 9  have to be made and we would have to go through all

10  that.

11       So it was a situation where they said they were

12  going to fix it, so we didn't really consider sending

13  it back.  We had a lot invested in this thing at this

14  point:  Time, money, effort.  We're in.

15  Q    What's the state of Surefil at this point in time?

16  A    We're in a very depleted state.  We had a loss for

17  the full year.  This is December of 2007, so we're

18  ending out the year.  And we're in a big negative

19  position because we're basically taping money to every

20  bottle that goes down because we're not running it at

21  the cost it should be run at, but our price is fixed.

22  Q    And do you recall in Mr. Baldwin's opening

23  statement that he referenced an e-mail from you, and

24  you threatened to sue him for 31 and a half million

25  dollars?

DIRECT EXAMINATION OF WILLIAM HUNT          105

1  A    I do remember that, yes.

2  Q    Can you turn to the other book, Plaintiff's

3  Exhibit 25.

4  A    Yes.

5  Q    Is this the e-mail that he was referencing?

6  A    I believe it was.  Yes.  Dated December 31st.

7  Q    Why did you send this e-mail?

8  A    Well, they said they were going to fix the issues

9  by December 31st.  That was the date that all the

10  issues were going to be fixed.  None of the issues had

11  been fixed, addressed, nor did I have a plan or

12  understanding of when the -- I wasn't given any hope.

13  I wasn't given any information that said we agreed to

14  all these things, we didn't get them done by Tuesday,

15  but we're going to get them done by next Thursday, and

16  they said no -- nothing.

17      So, I needed to get their attention.  I was trying

18  to get their attention and to say to them, Look,

19  please, help us.  We're dedicated here.  We have your

20  machine.  Help.

21  Q    What happened after this point in time?

22  A    What happened after this point in time was that

23  started some conversations with John where John and I

24  were trying to figure out what to do, and what we could

25  do.  So, that's what started was sort of a back and

1  forth of where do we go from here.

2  Q     And did you come up with any conclusions?

3  A     We did.  He, you know, basically he said hold on,

4  let me get to my guys and I'll see if we can get this

5  thing fixed.  We had the letter of credit that was a,

6  you know, payment that was coming up, and he basically

7  said, We'll push back the payment for a period of time.

8  We can get this thing -- we'll get an agreement here of

9  how we can do something.

10  Q     What is the next thing that occurred?

11  A     The next thing that occurred was they sued me.

12  Q     Can you turn to Exhibit OOO.

13  A     Yes.

14  Q     Do you recall receiving a copy of this letter?

15  A     Yes, I do.

16  Q     And what was your understanding of the basics of

17  what this letter was saying?  Who is this letter from?

18  A     This letter is from Marchant Honey and Baldwin.

19  From Bill Baldwin.

20  Q     Okay.

21  A     And it's basically -- let me take a quick look

22  here.  It's basically demanding payment, and they're

23  saying that we're going to court.

24  Q     Did it say anything about future service and

25  support?

DIRECT EXAMINATION OF WILLIAM HUNT          107

1   A    I believe it did.  Let me just take a quick look.

2   It basically said that -- well, I can't find the

3   specific thing, but I remember reading it, but it says

4   we're not going to provide you any service or support

5   or do anything to help you.

6   Q    What is the date of this letter?

7   A    This is January 31, 2008.

8   Q    Had ACMA already sued Surefil by this point in

9   time?

10  A    Yes, I believe they had.

11  Q    Did ACMA in fact provide future support and

12  service after January 31, 2008?

13  A    Yes.  We continued to work with ACMA, and we got

14  -- we paid in advance.  And the answer is, yes.  For

15  several things, yes.

16  Q    And what was the -- what do you recall the next

17  time frame being when ACMA provided support or service?

18  A    Sure.  This was January 31, so the next one would

19  have been in February, the month of February, when we

20  had a catastrophic failure with the personal computer

21  in February and they came and fixed that.

22  Q    And did you pay ACMA for that service?

23  A    We did pay ACMA for that service, yes.

24  Q    Do you recall how much that was, approximately?

25  A    Yes.  We paid $15,000 for the labor to replace the

DIRECT EXAMINATION OF WILLIAM HUNT          108

1  PC, and we paid $10,000 and change for the PC.  So it

2  was over $25,000 for replacing the PC.

3  Q   And can you turn to Exhibit SSS.

4  A   Yes.

5      THE COURT:  What was that again?

6      MS. WILLIAMS:  Triple S.

7      THE COURT:  Triple S.  Yes, ma'am.  Okay.

8  Q   Can you tell the jury what this document is

9  talking about.

10 A   Okay.  This is dated March 20th, and it's from our

11 purchasing person and carbon copying our maintenance

12 engineer.  And it's basically asking for additional

13 parts.  Additional parts have failed on the machine,

14 their pressure sensors, and we're just asking them to

15 ship -- putting in an order, and they're shipping us

16 parts and telling us what to do as far as replacing

17 these sensors.

18 Q   That was March 28, 2008?

19 A   Correct.

20 Q   And at that time, was ACMA willing to supply you

21 parts?

22 A   Yes.

23 Q   What occurred after this point in time?

24 A   After this point in time, then we continued for

25 several months to try and fix the remaining issues with

DIRECT EXAMINATION OF WILLIAM HUNT          109

1  the machine, diagnose issues with the machine.  You

2  know, we're working with it everyday we possibly could

3  to try to get something to run on it.  We were trying.

4  And it -- that's what we were doing.  So up until about

5  August, we continued to try for the next couple of

6  months to get this -- to understand this beast and try

7  to figure out how to fix it.

8  Q    Starting around Spring of 2008, how many shifts

9  were you running at this point?

10 A    At this point, we're down to one shift.

11 Q    And how many days a week?

12 A    Four or five days, depending on the week.

13 Q    All right.  And sitting here today, is Unilever

14 still a client of Surefil?

15 A    No.

16 Q    And what occurred in August of 2008 in relation to

17 the machine?

18 A    In August of 2008, we diagnosed what we thought

19 was one of the key fundamental problems that had been

20 the issue at the beginning with the machine.  And we

21 brought it down to a specific part, and this part -- we

22 wanted to try and get that part put in and see if that

23 was it, and see if this would be another major step,

24 and so we ordered that part from ACMA.

25 Q    And did ACMA supply that part to you?

DIRECT EXAMINATION OF WILLIAM HUNT          110

1    A     No.   ACMA refuses to supply that part.

2    Q     Why didn't you go and get it someplace else?

3    A     We looked at what we could do with that, but it's

4    a proprietary part, and it could only -- it's a

5    technical part, and only ACMA designs it and none of

6    the people who make those will make them for anyone

7    else but ACMA.  So it's proprietary and you can't get

8    it otherwise.

9    Q     Now, up to this point in time in August, is

10   Surefil using the machine?

11   A     We are trying to use the machine, yes.

12   Q     And why are you trying to use the machine?

13   A     Well, a couple of reasons.  One, we're trying to

14   mitigate the damages that we have.  We have a total

15   loss.  After we have invested millions of dollars here,

16   we have a total loss.  We didn't make anything.

17        The people of course lose their jobs, and I'm

18   quite attached to the people.  And we're trying to

19   mitigate out damages, and if we can't make a profit,

20   we're trying to at least reduce the loss as much as we

21   possibly can.  And we're still being told, and we're

22   still hopeful, that this machine can work.  You know,

23   we're still trying to get there.  So that's why we were

24   doing it.

25        And you can't try to improve it if you're not

DIRECT EXAMINATION OF WILLIAM HUNT     111

1  actually running it because you don't know what's going

2  to break until you run it.  You have to see it.  You

3  don't know what's wrong until you operate it.

4  Q    What happened in August of 2008 when you could not

5  get this particular part that you testified about from

6  ACMA?

DIRECT EXAMINATION OF WILLIAM HUNT          110

1   A    No.   ACMA refuses to supply that part.

2   Q    Why didn't you go and get it someplace else?

3   A    We looked at what we could do with that, but it's

4   a proprietary part, and it could only -- it's a

5   technical part, and only ACMA designs it and none of

6   the people who make those will make them for anyone

7   else but ACMA.   So it's proprietary and you can't get

8   it otherwise.

9   Q    Now, up to this point in time in August, is

10  Surefil using the machine?

11  A    We are trying to use the machine, yes.

12  Q    And why are you trying to use the machine?

13  A    Well, a couple of reasons.   One, we're trying to

14  mitigate the damages that we have.   We have a total

15  loss.   After we have invested millions of dollars here,

16  we have a total loss.   We didn't make anything.

17       The people of course lose their jobs, and I'm

18  quite attached to the people.   And we're trying to

19  mitigate out damages, and if we can't make a profit,

20  we're trying to at least reduce the loss as much as we

21  possibly can.   And we're still being told, and we're

22  still hopeful, that this machine can work.   You know,

23  we're still trying to get there.   So that's why we were

24  doing it.

25       And you can't try to improve it if you're not

1  actually running it because you don't know what's going

2  to break until you run it.  You have to see it.  You

3  don't know what's wrong until you operate it.

4  Q    What happened in August of 2008 when you could not

5  get this particular part that you testified about from

6  ACMA?

7  A    Well, I mean, I had a meeting with my guys and I

8  said, "What are we going to do, guys?  They're not

9  going to fix the machine, they're not going to help us,

10 they're not going to give us parts.  What do we do?

11 Can we get somebody else to program it?"

12      We talked to some other filler companies and said,

13 "Can you give us a board?"  But at the end of the day,

14 there's nothing to do, so we just had to reject the

15 machine, and that's it.

16 Q    Can you turn to Exhibit WWW.

17 A    Yes.

18 Q    Is this a letter that you authorized me to send?

19 A    Yes, it is.

20      MS. WILLIAMS:  We would move its admission.

21      THE COURT:  Any objection, Mr. Baldwin?

22      MR. BALDWIN:  There is not.

23      THE COURT:  It will be received without objection.

24 Q    Mr. Hunt, did you feel it was reasonable to reject

25 the machine at this point in time?

DIRECT EXAMINATION OF WILLIAM HUNT        112

1        MR. BALDWIN:  Objection to the leading form.

2        THE COURT:  Objection sustained.  I think you need

3   to rephrase that and -- well, go ahead.  I'll wait for

4   the next move on the chessboard here.

5   Q    Mr. Hunt, what is the average life of a filler

6   capper machine?

7        MR. BALDWIN:  Objection.  There's lack of

8   foundation that this witness has that knowledge.

9        THE COURT:  I have to agree.  Objection sustained.

10       You will have to lay some foundation if he's aware

11  of what the normal life would be.  All right, go ahead.

12       MS. WILLIAMS:  Yes, sir.

13  Q    Mr. Hunt, do you have another production line,

14  Line 1?

15  A    Yes.

16  Q    Do you have a filler machine on that production

17  line?

18  A    Yes, we do.

19  Q    And what is the age of that filler machine?

20  A    The current age of that machine is 23 years old

21  and, you know, we do expect it to go another 10 or 15

22  years, or so.

23  Q    Currently in production?

24  A    It's currently in production.

25  Q    And is it working?

DIRECT EXAMINATION OF WILLIAM HUNT          113

1  A    Yes.  Very well.

2  Q    Has Surefil made any substantial changes to the

3  machine?

4  A    No, we have not to the ACMA machine.  No.

5  Q    I'm sorry.  That is what I was referencing.

6       Mr. Hunt, do you believe the machine conformed to

7  either the quotation --

8       MR. BALDWIN:  Objection to the leading form.

9       THE COURT:  Objection sustained.

10 Q    What is the value of the ACMA machine to Surefil

11 as of September 5, 2008?

12      MR. BALDWIN:  Objection, Your Honor.  It's not

13 material to the case, the value, the subjective value,

14 to Surefil.

15      MS. WILLIAMS:  It's very material, Your Honor.

16      THE COURT:  I am going to overrule the objection.

17 Go right ahead.

18 A    Well, I mean, the answer to the question on value

19 of the machine is it doesn't work, it doesn't conform,

20 it doesn't do what it's supposed to do, and it's got

21 all this other very expensive equipment around it.  So

22 it's a negative.  I mean, it has nowhere near the value

23 that we were expecting.  It doesn't produce a product

24 it's supposed to produce, it doesn't give us the

25 revenue it's supposed to give, it generates high scrap

DIRECT EXAMINATION OF WILLIAM HUNT        114

1  when certain heads don't fill and certain cappers don't

2  cap, and we have difficulty with things being oriented.

3       So that, and, you know, it just -- it's just a

4  boat anchor for us.  It's a very bad situation.  Its

5  value is quite low relative to the expectations.  It's

6  below its break-even value, so to run it is to always

7  feel pain financially.

8  Q    Well, if that's the case, why did you wait until

9  September 5, 2008, to reject the machine?

10 A    We did it for a couple of reasons.  I mean, you

11 look back and they were telling us it's perfect,

12 nothing is wrong.  It's operator error, it's this and

13 it's that.  They were always saying like the magician,

14 look over here while I do this over here.  We were

15 always looking over there because they were the smart

16 guys, they were the ones we looked up to, they were the

17 experts.  And we were there everyday, but they weren't

18 listening to us or helping us.  You can see all the

19 communication.

20      So they kept telling us it was good and we were

21 believing them, and so we thought every issue that we

22 overcame, that would be the last issue.  And what we

23 didn't know is that it was a windy, curvey road and we

24 couldn't see around those corners.  We got around the

25 corner and the issues got bigger, bigger, bigger.  And

1  we never could get them all solved without help, and

2  ultimately with -- they were helping us.  So, it wasn't

3  as if they weren't helping us, they were, they were

4  giving us parts, so we kept going.

5  Q    And what about when it came a point in time when

6  they stopped helping you?

7  A    Then it was over.  Then we had to reject it.  We

8  had no hope.  There was no way I would expect this

9  thing to run for 40 years, and, you know, if you're

10  going to be spending the next couple months, each extra

11  couple months doesn't look like much in space if you're

12  going to run this for an extra 38 or 40 years.  And I'm

13  the owner of the company, so I'm going to be there

14  physically with this thing for 38, 40 years.  I'm

15  excited about it.  So each additional month we waited

16  didn't seem like much, but in the end when we were

17  abandoned, we had to abandon it.

18  Q    And did Surefil have the capability to obtain a

19  new filler prior to September 5, 2008?

20  A    We didn't.  We got financially depleted because

21  we're funding the losses, and that's where all of our

22  cash is going.  Plus, we're not generating cash because

23  the darn thing is not running.  So we really, you know,

24  would have had to somehow go out and try and find

25  money, raise money, or something, so we are having

1  difficulty buying -- would have a very difficult time

2  buying a new filler at this point.

3       Plus, it's a five month lead time, and we're right

4  there.  If it's only a month to fix it, why go buy

5  something that takes five or six months when you can

6  fix this in a month or two.  And we were always told

7  this thing will be fixed by this date, by this date, by

8  this date, and when those dates stopped coming, then we

9  had to try and get out of it.

10      MS. WILLIAMS:  Thank you.

11      THE COURT:  All right, cross-examination,

12  Mr. Baldwin.

13      MR. BALDWIN:  Thank you, Your Honor.

14                  **CROSS-EXAMINATION**

15  BY MR. BALDWIN:

16  Q    Mr. Hunt, let's start with, if we may, you were

17  discussing I think what the Italians refer to as the

18  acceptance protocol.  This is where the customer says

19  to accept certain kinds of parts, and you talked about

20  Mr. Busi and how he presented it to you.  Do you

21  remember that testimony, sir?

22  A    Yes, I do.

23  Q    And your testimony was that the reason you signed

24  that document without any caveats was that you were

25  under -- that Mr. Busi was telling you, or that