## ASSET SALE AND PURCHASE AGREEMENT

THIS AGREEMENT is made on July 22, 2010, among **SUREFIL, LLC**, a Michigan limited liability company ("**Surefil**") and **SUREFIL PROPERTIES, LLC**, a Michigan limited liability company ("**Properties**" and together with Surefil, the "**Sellers**" and each individually, a "**Seller**") and **CORYELL LIMITED, LLC**, a Michigan limited liability company ("**Purchaser**").

## BACKGROUND

A. Sellers are engaged in the business of performing bottling and filling services (the "**Business**") with a facility located at 4560 Danvers Drive, SE, Kentwood, Michigan 49512.

B. On June 8, 2009 (the "**Filing Date**"), Sellers filed voluntary petitions for reorganization relief (the "**Bankruptcy Case**") pursuant to Chapter 11 of the Title 11 of the United States Code, 11 USC §101 et seq. (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Western District of Michigan, Case Number HG 09-06916 (the "**Bankruptcy Court**").

C. Sellers currently wish to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) to Purchaser, in accordance with Sections 363(b), 363(f) and 365 and other applicable provisions of the Bankruptcy Code (the "**Sale of Assets**") and will file with the Bankruptcy Court a Motion to Approve Sale And For Other Related Relief (the "**Motion for Sale**") which establishes Bidding Procedures (as defined in Section 1 below) for the Sale of Assets.

D. Pursuant to the Motion for Sale, the Sellers propose to complete the Sale of Assets to the Purchaser pursuant to a Sale Order (as defined in Section 1 below) of the Bankruptcy Court.

Therefore, the parties, intending to be legally bound, hereby agree as follows:

SECTION 1.   <u>DEFINITIONS.</u>

As used in this Agreement, the following terms have the following meanings:

"**Accounts Receivable**" has the meaning set forth in Section 2.1(a)(xi).

"**Affiliate**" means any Person that, directly or indirectly, controls, is controlled by, or is under common control with, the subject party. For purposes of the preceding sentence, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power (i) to vote more than 50% of the securities having ordinary voting power for the election of directors or managers of the controlled Person, or (ii) to direct or cause the direction of

management and policies of the controlled Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Agreement.

"**Allocation Statement**" has the meaning set forth in Section 3.2.

"**Ancillary Agreements**" means collectively the Bill of Sale, the Real Property Deeds, the FIRPTA Affidavit, and the Assignment and Assumption Agreement.

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 2.4(a).

"**Assigned Agreements**" has the meaning set forth in Section 2.1(a)(iii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.4(a).

"**Bank**" shall mean The Huntington National Bank.

"**Bankruptcy Case**" has the meaning set forth in Paragraph B of the Preamble.

"**Bankruptcy Code**" means the United States Bankruptcy Code 11 U.S.C. Section 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in Paragraph B of the Preamble.

"**Bill of Sale**" has the meaning set forth in Section 2.2.

"**Business**" has the meaning set forth in Paragraph A of the Preamble.

"**Business Days**" means days other than Saturdays, Sundays and days on which banks in Grand Rapids, Michigan are authorized or obligated by law to be closed.

"**Cash**" shall mean all cash and cash equivalents in whatever form, including without limitation, funds held in escrow from proceeds of accounts receivable, funds escrowed or deposited with insurance companies or other third parties and cash equivalents in whatever form and without regard to custody of funds.

"**Closing**" has the meaning set forth in Section 4.1.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**COBRA**" means the provisions of the Code, ERISA and the Public Health Service Act enacted by Sections 10001 through 10003 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (P.L. 99-272), including any subsequent amendments to such provisions.

"**Cure Costs**" has the meaning set forth in Section 2.4(b).

"**Cure Obligees**" has the meaning set forth in Section 14.3(b).

**"Deferred Payments"** shall have the meaning set forth in Section 3.1

**"Disclosure Letter"** has the meaning set forth in Section 5.

**"Domain Name Assignment"** has the meaning set forth in Section 2.2.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Excluded Assets"** has the meaning set forth in Section 2.1(b).

**"Excluded Employees"** has the meaning set forth in Section 10.1.

**"Excluded Liabilities"** has the meaning set forth in Section 2.4(c).

**"Execution Date"** means the date of execution of this Agreement.

**"Filing Date"** means June 8, 2009.

**"FIRPTA Affidavit"** means a sworn affidavit from each Seller stating, under penalty of perjury, that such Seller is not a "foreign person" as defined under Section 1445(f)(3) of the Code, and other appropriate evidence or documents necessary to relieve Purchaser of any obligation to withhold a portion of the Purchase Price under Section 1445(a) of the Code or other withholding provision of any other Tax law.

**"Fixed Assets"** has the meaning set forth in Section 2.1(a)(ii).

**"Insider Claims"** means all of Sellers' claims or alleged claims of any kind or nature whatsoever against any person or persons whatsoever, whether arising prior to or after the Filing Date against insiders arising under Section 5 of the Bankruptcy Code or otherwise (and including any such claims arising under any other state or other jurisdiction) which any, some or all of the Sellers had or now have against any, some or all owners, officers, executives, employees or insiders of the Sellers.

**"Insurance Contract"** shall mean any pre-petition automobile liability insurance policies, workers compensation insurance policies, cargo insurance policies, general liability policy, or other policies of insurance under which the Sellers were the insured as of the Filing Date.

**"Intellectual Property"** has the meaning set forth in Section 2.1(a)(viii).

**"Inventory"** has the meaning set forth in Section 2.1(a)(x).

**"Knowledge of Sellers"** means the actual knowledge of all officers and directors of each Seller, following reasonable inquiry.

**"Lien"** means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement.

**"Material Adverse Effect"** means (i) with reference to Sellers, a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially and adversely affects the Purchased Assets or the Business, considered as a whole, or materially impairs or delays Sellers' ability to effect the Closing, or (ii) with reference to Purchaser, a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially impairs or delays Purchaser's ability to effect the Closing.

**"Motion for Sale"** shall have the meaning set forth in Paragraph C of the Preamble.

**"Other Assets"** shall have the meaning set forth in Section 2.1(a)(xvi).

**"Owned Real Property"** has the meaning set forth in Section 2.1(a)(i).

**"Permits"** has the meaning set forth in Section 2.1(ix).

**"Permitted Liens"** has the meaning set forth in Section 5.6.

**"Person"** means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust or unincorporated organization.

**"Prepaid Expenses"** has the meaning set forth in Section 2.1(a)(vii).

**"Proposed Cure Notice"** has the meaning set forth in Section 14.1(b).

**"Purchase Price"** has the meaning set forth in Section 3.1.

**"Purchased Assets"** has the meaning set forth in Section 2.1(a).

**"Purchaser"** has the meaning set forth in the introductory paragraph of this Agreement.

**"Purchaser Welfare Benefit Plans"** has the meaning set forth in Section 10.3(c).

**"Records"** has the meaning set forth in Section 2.1(a)(iv).

**"Real Property"** means the Owned Real Property.

**"Real Property Deeds"** has the meaning set forth in Section 2.2.

**"Rejected Contracts"** has the meaning set forth in Section 2.1(a).

**"Sale of Assets"** shall have the meaning set forth in Paragraph C of the Preamble.

**"Sale Order"** means an order of the Bankruptcy Court granting the Motion for Sale.

**"Schedule"** has the meaning set forth in Section 5.

**"Seller"** and **"Sellers"** have the meaning set forth in the introductory paragraph to this Agreement.

**"Seller Welfare Benefit Plans"** has the meaning set forth in Section 10.3(c).

**"Taxes"** means all taxes however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any governmental body, which taxes shall include, without limiting the generality of the foregoing, all income taxes, payroll and employee withholding taxes, unemployment insurance, social security, sales and use taxes, excise taxes, franchise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, workmen's compensation taxes and other obligations of the same or a similar nature, whether arising before, on or after the Closing; and **"Tax"** shall mean any one of them.

**"Tax Returns"** means any return, report, information return or other document (including any related or supporting information) filed or required to be filed with any governmental body in connection with the determination, assessment, collection or administration of any Taxes.

**"Title Commitment"** means a title commitment in respect of the each parcel of Owned Real Property.

**"Title Company"** means Transnation Title Agency.

**"Title Policy"** means an ALTA Extended Coverage Form B 1970 owner's policy of title insurance.

**"Transferred Employees"** has the meaning set forth in Section 10.1.

SECTION 2.   PURCHASE AND SALE OF THE PURCHASED ASSETS.

Section 2.1    Purchased Assets.

(a)    Subject to the terms and upon the conditions set forth herein, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, on the Closing Date, all legal and beneficial right, title and interest of any Seller in and to any and all assets of every kind and description, whether tangible or intangible, real, personal or mixed, wherever situated, owned, held or used by any Seller or in which any Seller has any right, title or interest that is owned, directly or indirectly, leased or otherwise held primarily for use in the Business (the **"Purchased Assets"**), except for the Excluded Assets and except for any executory contracts and leases which are not listed on Schedule 2.1(a)(iii) or otherwise included in the Assumed Contacts (the **"Rejected Contracts"**). The Purchased Assets shall be sold, transferred, assigned and delivered free and clear of any Liens except Permitted Liens, and shall specifically include the following:

(i)    all of the real property owned by a Seller, the street addresses and legal descriptions of which are set forth on Schedule 2.1(a)(i), together with all buildings, facilities and other structures and improvements located on such real property, all rights and privileges pertaining to such real property or to any of such structures and improvements, and, to the extent constituting real property under applicable law, all fixtures, installations, machinery, equipment and other property attached thereto (the **"Owned Real Property"**);

(ii)     all machinery, furniture, tooling, spare parts, supplies, office equipment, computers, telephone and other communications systems and switches, other office assets, shop equipment, maintenance equipment, oil, fuel supplies, tires, service vehicles, inventory (whether on hand or on consignment), finished goods, raw materials and work in progress and all other tangible personal property owned by any Seller, including the items listed on Schedule 2.1(a)(ii) (collectively, the **"Fixed Assets"**);

(iii)     all executory contracts, agreements and leases listed on Schedule 2.1(a)(iii) and (A) all license agreements to which any Seller is a party and that provide such Seller with rights to technology, products and/or trademarks, or by which any Seller grants rights to third parties for Intellectual Property, (B) all purchase orders, contracts or other commitments of any Seller issued after the Filing Date to suppliers of goods and services for materials, supplies or other items used in connection with the Business, (C) all sales orders, contracts or other similar commitments of any Seller to purchasers of goods and services used in connection with the Business, (D) all confidentiality agreements, non-competition, assignment of inventions and similar agreements that benefit the Business, and (F) all rights of any Seller to the rebates, warranties and licenses received from lessors, manufacturers and sellers of the Fixed Assets (collectively, the **"Assigned Agreements"**);

(iv)     all financial books, accounting records, files, lists, publications, and other records and data of Sellers regardless of the medium on which such information is stored or maintained (the **"Records"**); provided, however, that where such Records also contain data that is unrelated to the Business, Sellers may redact such unrelated data prior to furnishing such Records to Purchaser;

(v)     all goodwill of Sellers relating to the Business;

(vi)     all customer lists used by the Business;

(vii)     all credits, prepaid expenses, deferred charges, deposits and advance payments, owned or held for the benefit of Sellers (the **"Prepaid Expenses"**);

(viii)     all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Business), all domain names, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the patents), and all industrial designs, owned by any Seller or any Affiliate of any Seller (the **"Intellectual Property"**), and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by any Seller or any Affiliate of any Seller;

(ix)     all material licenses, license plates, permits, franchises, authorizations and approvals issued or granted to any Seller with respect to the Business by the federal government, any state or local government, any foreign national or local government, or

any department, agency, board, commission, bureau or instrumentality of any of the foregoing and all pending applications therefor (collectively, the **"Permits"**) and all financial assurance instruments, including letters of credit and surety or other bonds, related to the Permits;

(x)     all inventory (as defined in the Uniform Commercial Code of the State of Michigan, Act no. 174 of the Michigan Public Acts of 1962, MCL 440.1101 et seq., as amended (the **"UCC"**) (the **"Inventory"**);

(xi)    all accounts receivable and all notes and other receivables of every kind or character, and any instruments evidencing the foregoing (the **"Accounts Receivable"**);

(xii)   all Cash;

(xiii)  all rights and causes of action relating to the Purchased Assets;

(xiv)   the telephone and facsimile numbers currently used in connection with the Business;

(xv)    all bank accounts and lockbox arrangements benefiting the Business; and

(xvi)   any other assets (whether tangible or intangible, real, personal or mixed) owned, held or used by Sellers including, without limitation, stock or ownership interests in affiliates, tax attributes, Insider Claims, Insurance Contracts, any avoidance rights of Sellers regarding Grand Brands, LLC or the intellectual property transferred from Lander Intangibles Corporation to Grand Brands, LLC (the **"Avoidance Rights"**) and all other assets of any kind or nature whatsoever whether or not used in the Business (the **"Other Assets"**).

(b)     The Purchased Assets shall not include any of Sellers' right, title or interest in or to any of the following assets (collectively, the **"Excluded Assets"**):

(i)     any Rejected Contracts and all contracts and agreements that are rejected or are subject to a motion to reject by Sellers in Bankruptcy Court;

(ii)    any inventory of the Business disposed of, or other Fixed Assets consumed, by Sellers in the ordinary course of business between the Execution Date and the Closing Date in accordance with the terms and conditions of this Agreement;

(iii)   any corporate minute books, stock ledgers and other corporate books and records of Sellers; and

(iv)    Sellers' rights under this Agreement and the Ancillary Agreements.

Section 2.2   <u>Sale and Closing Date</u>.   The sale, transfer, assignment and delivery by Sellers of the Purchased Assets to Purchaser, as herein provided, shall be effected on the Closing Date by the due execution and delivery (notarized where necessary) of the bill of sale (**"Bill of Sale"**), real property deeds with respect to the Owned Real Property (**"Real Property Deeds"**),

FIRPTA Affidavits and any required local tax affidavits respecting the Owned Real Property in the forms attached hereto as Exhibits A, B and C respectively. Further, on the Closing Date, Sellers and Purchaser shall each deliver to the other such other documents or instruments of sale, assignment or transfer as are customary in transactions such as the transactions contemplated by this Agreement and as the other shall reasonably request.

Section 2.3   Subsequent Documentation; Further Assurances. Purchaser and Sellers shall, at any time and from time to time after the Closing Date, upon the reasonable request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such further (a) assignments, transfers and conveyances as may be required for assigning, transferring, granting, conveying and confirming the transactions contemplated herein, including aiding and assisting Purchaser in collecting and reducing to possession any or all of the Purchased Assets, including titles and registrations for any vehicles; and (b) documents and instruments as may be reasonably necessary for the further completion of any of the transactions contemplated herein.

Section 2.4   Assumption of Assumed Liabilities; Exclusion of Excluded Liabilities.

(a)   Assumed Liabilities. On the Closing Date, Purchaser shall assume and agree to pay, perform and discharge when due only the following liabilities and no other liabilities of any Seller or the Business (the liabilities so assumed, collectively, the **"Assumed Liabilities"**):

(i)   all liabilities and obligations of Sellers relating to the Purchased Assets, including liabilities and obligations under the Assigned Agreements and Seller Welfare Plans, but only to the extent such liabilities and obligations first arise and are related to periods subsequent to the Closing;

(ii)   all the matters set forth in Section 10 of this Agreement as obligations of Purchaser regarding the Transferred Employees and any accrued vacation liabilities owed to the Transferred Employees; and

(iii)   any obligations of Sellers to indemnify, defend, reimburse and/or provide contribution to their directors, officers, agents and employees; and

(iv)   all trade payables incurred by Sellers after the Filing Date and those incurred after the date of this Agreement in the ordinary course of Business (the **"Closing Payables"**).

The assumption of the Assumed Liabilities shall be effected on the Closing Date pursuant to an Assignment and Assumption Agreement in the form attached hereto as Exhibit D (the **"Assignment and Assumption Agreement"**).

(b)   Amounts Due Under Executory Contracts and Unexpired Leases; Cure Costs. Notwithstanding the provisions of Section 2.4(a), Purchaser shall pay all pre-petition cure and reinstatement costs or expenses (**"Cure Costs"**), incurred prior to the Closing Date, of or relating to the assumption and assignment of the Assigned Agreements pursuant to this Agreement. Purchaser's obligation under this Section 2.4(b) is subject to Purchaser's assumption

of the Assigned Agreements pursuant to their respective contract terms that were binding on Sellers and Purchaser's agreement to abide by such terms for the remaining term of such contract.

(c)    Excluded Liabilities.  Except as otherwise expressly assumed by Purchaser pursuant to Section 2.4(a) hereof, Purchaser shall not assume or pay, perform or discharge, nor shall Purchaser be responsible, directly or indirectly, for any other debts, obligations, accounts or trade payables, contracts, or liabilities of any Seller (all such debts, obligations, contracts or liabilities being herein referred to as the **"Excluded Liabilities"**).

(d)    Consent to Assumption.  Sellers will file appropriate motions and/or take such other actions as be necessary or appropriate to obtain an order from the Bankruptcy Court permitting Purchaser to accept the assignment of and assume the obligations under (subject to the provisions of this Agreement) the Assigned Agreements.

Section 2.5    Title Policies and Documents.

(a)    As soon as reasonably practicable after the Execution Date, Sellers shall provide Purchaser with (i) the tax parcel numbers for each parcel of Owned Real Property, (ii) a copy of each title policy, title commitment or any certificate of title that Sellers' possess evidencing title to the Owned Real Property, and (iii) copies of any instruments and documents affecting title to the Owned Real Property that any Seller has in its possession.

(b)    Promptly thereafter, Purchaser shall cause the Title Company to issue a Title Commitment for a Title Policy in the name of Purchaser insuring fee simple title for each parcel of the Owned Real Property. Sellers agree to execute all customary affidavits, in form reasonably acceptable to Sellers, and other reasonable documents requested by the Title Company in order to obtain each Title Policy. The following costs shall be borne by Purchaser: (i) all costs attributable to the issuance of the Title Commitment, any amendments or modifications thereto, and title searches; (ii) the premium for the Title Policy attributable to extended coverage; and (iii) one-half of all customary Closing costs, such as recording fees. The following costs shall be borne by Sellers:  (i) all costs of discharging encumbrances on the Owned Real Property that are not Permitted Liens, (ii) the premium for the Title Policy attributable to standard coverage; (iii) all applicable local, county and state documentary, transfer or conveyance stamps or Taxes for transfer of the Owned Real Property; and (iv) one-half of all customary Closing costs, such as recording fees.

(c)    The value of the Owned Real Property for title insurance, transfer Tax, documentary stamps and other relevant purposes will equal the value of such Owned Real Property as reasonably agreed upon by the parties.

Section 2.6    Prorations and Charges.  All Taxes relating to the Owned Real Property for any tax year prior to the real estate tax year in which the Closing occurs, and all special assessments and improvement liens in existence at the Closing shall be paid in full by Sellers on or before the Closing Date. Real property Taxes for the current tax year shall be prorated between Sellers and Purchaser as of the Closing Date on a daily, pro-rata basis based upon the latest available estimates of the amount thereof, or the actual amount of such Taxes. Purchaser,

on the one hand, and Sellers, on the other hand, shall each pay one-half of the escrow fees to the Title Company.

Section 2.7    Condemnation or Casualty.  If prior to Closing, the Owned Real Property or any part thereof is subject to an eminent domain or condemnation proceeding or any improvement thereon is damaged by fire, flood or other casualty, Sellers shall give written notice thereof to Purchaser and, without limiting Purchaser's rights under this Agreement, Purchaser shall be entitled to any condemnation award or insurance proceeds resulting from any such event. At the Closing Sellers shall execute and deliver all documents reasonably requested by Purchaser to effectuate such assignment.

## SECTION 3.  PURCHASE PRICE.

Section 3.1    Purchase Price.   As consideration for the Purchased Assets (the **"Purchase Price"**), the Purchase shall assume the Assumed Liabilities at Closing and make a payment in immediately available funds of Three Million Two Hundred Thousand and no/Dollars ($3,200,000).

Section 3.2    Allocation of Purchase Price.  Purchaser and Sellers agree to allocate the Purchase Price for all Tax purposes in accordance with an allocation statement to be prepared by Purchaser and presented to Sellers not less than five (5) days prior to the Closing Date (the **"Allocation Statement"**), which Allocation Statement shall be prepared in accordance with Section 1060 of the Code, including the regulations promulgated thereunder, and shall be acceptable to Sellers in their reasonable discretion. All Tax Returns, including IRS Form 8594, shall be filed consistent with such Allocation Statement. Neither Purchaser nor Sellers shall voluntarily take a position on any Tax Return or before any governmental agency charged with the collection of any such Tax that is any manner inconsistent with the terms of such Allocation Statement.

Section 3.3    Priority Lien Escrow.  $1,200,000 of the Purchase Price shall be placed in escrow with the Title Company to satisfy the Priority Liens (as defined in Section 5.6 below) pursuant to an Escrow Agreement in the form attached as Exhibit E.

## SECTION 4.  CLOSING.

Section 4.1    Closing.  Subject to the terms and conditions of this Agreement, the closing of the sale and purchase of the Purchased Assets and of the other transactions contemplated hereby (the **"Closing"**) shall take place within ten (10) days after entry of a final, non-appealable Sale Order at the offices of Miller, Canfield, Paddock and Stone, P.L.C. 99 Monroe Ave., N.W., Suite 1200, Grand Rapids, Michigan, or at such other time, date and place as may be mutually agreed to by the parties hereto.  The term **"Closing Date,"** as used in this Agreement, shall mean the date on which such Closing takes place.

Section 4.2    Deliveries at Closing.  At the Closing, the parties shall deliver to each other the Ancillary Agreements.  In addition, Purchaser shall deliver to Sellers the Purchase Price.

SECTION 5.  REPRESENTATIONS AND WARRANTIES OF SELLERS.

Except as set forth on the corresponding numbered sections (each, a **"Schedule"**) of the disclosure letter delivered by Sellers to Purchaser immediately prior to the Execution Date (the **"Disclosure Letter"**), Sellers, jointly and severally, hereby represent and warrant to Purchaser as follows on and as of the Execution Date and on and as of the Closing Date:

Section 5.1    Corporate Organization.  Each Seller is a corporation duly organized, validly existing and in good standing under the laws of its State of incorporation set forth in the introductory paragraph to this Agreement and has all requisite corporate power and authority to own its properties and assets and to conduct the Business as now conducted.

Section 5.2    Qualification to Do Business.  Each Seller is duly qualified to transact business as a foreign corporation in all jurisdictions where the conduct of its Business or the ownership of the Purchased Assets make such qualification necessary, or where the failure to so qualify would not have a Material Adverse Effect.

Section 5.3    Authorization and Validity of Agreement.  Each Seller has all requisite corporate power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements to which any Seller is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action by the Members and Managers of such Seller, and no other corporate proceeding on the part of Sellers are necessary to authorize such execution, delivery and performance. This Agreement has been, and as of the Closing Date each Ancillary Agreement to which any Seller is a party will be, duly executed by such Seller and constitutes, or as of the Closing Date will constitute, the valid and binding obligation of such Seller, enforceable against it in accordance with its terms.

Section 5.4    No Conflict or Violation.  The execution, delivery and performance by each Seller of this Agreement and of the Ancillary Agreements to which it is a party (a) do not and will not violate or conflict with any provision of the Articles of Organization or Operating Agreement of such Seller, (b) do not and will not violate any provision of law or any order, judgment or decree of any court or other governmental or regulatory authority, (c) do not and will not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Assumed Contract, (d) will not result in the creation or imposition of any Lien (other than Permitted Liens) upon any of the Purchased Assets, and (e) will not result in the cancellation, modification, revocation or suspension of any Permit.

Section 5.5    Consents and Approvals.  Schedule 5.5 sets forth a true and complete list of each consent, waiver, authorization or approval of any governmental or regulatory authority, domestic or foreign, and each declaration to or filing or registration with any such governmental or regulatory authority that is required in connection with the execution and delivery of this Agreement by any Seller or the performance by any Seller of its obligations hereunder.

Section 5.6    Good Title.  Except Liens in favor of Bank which shall be released at Closing, the lien of PROSYS/Process Results which is in dispute in a pending Kent County

Circuit Court action regarding the Owned Real Property (the **"PROSYS Lien"**), and the lien of Rush Creek Excavating also regarding the Owned Real Property which is in dispute (together with the PROYSYS Lien, the **"Priority Liens"**) each Seller has good and marketable title in and to the Purchased Assets owned by such Seller and valid and enforceable leasehold interests in the Purchased Assets leased by such Seller, in each case free and clear of any Liens other than Permitted Liens. As used in this Agreement, the term **"Permitted Liens"** means (i) Liens for Taxes not yet payable; (ii) Liens arising out of, or in connection with, this Agreement, (iii) in the case of the Real Property (in addition to (i) and (ii)), (A) minor imperfections of title (none of which is substantial in amount or materially detracts from the value or impairs the use of such property) and zoning laws and other land use restrictions that do not materially impair the present or anticipated use of the property subject thereto, and (B) matters contained as standard exceptions in an ALTA title insurance policy.

Section 5.7    Litigation.    Except as set forth on Schedule 5.7, there are no claims, actions, suits, proceedings, labor disputes or investigations pending before any national, state or local court or governmental or regulatory authority, domestic or foreign, or before any arbitrator of any nature, brought by or against any Seller or any Seller's respective directors, employees, agents or Affiliates, involving, affecting or relating to the Business, the Purchased Assets or the transactions contemplated by this Agreement. Neither the Business nor the Purchased Assets is subject to any order, writ, judgment, award, injunction or decree of any national, state or local court or governmental or regulatory authority or arbitrator, domestic or foreign.

Section 5.8    No Other Representations or Warranties.    Except as otherwise specifically provided, the Purchased Assets are being sold "AS IS", "WHERE IS", "WITH ALL FAULTS", and without recourse. SELLERS MAKE NO WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE PURCHASED ASSETS, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE HEREBY SPECIFICALLY DISCLAIMED.

SECTION 6.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows, on and as of the Execution Date, and on and as of the Closing Date:

Section 6.1    Organization.    Purchaser is a Michigan limited liability company duly organized, validly existing and in good standing under the laws of Delaware, and Purchaser has all requisite limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

Section 6.2    Authorization and Validity of Agreement.    Purchaser has all requisite limited liability company power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and each of the Ancillary Agreements to which Purchaser is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary action by its Managers, and no other proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance. This

Agreement has been, and as of the Closing Date each Ancillary Agreement to which Purchaser is a party will be, duly executed by Purchaser and constitutes (or as of the Closing Date will constitute) its valid and binding obligation, enforceable against it in accordance with its terms.

Section 6.3    No Conflict or Violation.    The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party (a) do not and will not violate or conflict with any provision of its Articles of Organization or Operating Agreement, (b) do not and will not violate any provision of law, or any order, judgment or decree of any court or other governmental or regulatory authority, and (c) do not and will not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract or other agreement or instrument to which Purchaser is a party or by which it is bound or to which its properties or assets is subject.

Section 6.4    Consents and Approvals.    The execution, delivery and performance of this Agreement' on behalf of Purchaser does not require the consent or approval of, or filing with, any government, governmental body or agency or other Person except: (i) as may be required to transfer any Permits; and (ii) as may be required in connection with the assignment and assumption of the Assigned Agreements.

Section 6.5    Prior Inspection and Diligence.    Purchaser has had an opportunity to inspect and examine the Purchased Assets and has conducted any and all due diligence regarding any such Purchased Assets prior to the date of this Agreement, has relied solely on its own independent review, investigation and/or inspection of any documents and/or assets regarding the Business, and it did not rely upon any written or oral statements, representations, promises, warranties or guarantees whatsoever, whether express or implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith.

SECTION 7.    COVENANTS OF SELLERS.

Section 7.1    Conduct of Business Before the Closing Date.

Without the prior written consent of Purchaser, between the Execution Date and the Closing Date, Sellers shall not except as contemplated by this Agreement:

(a)    make any material change in the conduct of the Business, or enter into any transaction with respect to the Business other than in the ordinary course of business consistent with past practices;

(b)    make any sale, assignment, lease, license, transfer, abandonment or other conveyance of the Purchased Assets or any part thereof, except transactions pursuant to the Assigned Agreements and dispositions of inventory, consumption of personal property, or disposition of worn out or obsolete Equipment for fair or reasonable value, in each case in the ordinary course of business consistent with past practice;

(c)    subject any of the Purchased Assets, or any part thereof, to any Lien or suffer such to exist other than Permitted Liens or Liens that will be released at or prior to the Closing Date;

- 13 -

(d)    acquire any assets, inventory, raw materials or properties related to the Business, or enter into any other transaction related to the Business, other than in the ordinary course of business consistent with past practice;

(e)    enter into any new (or amend any existing) employee benefit plan, program or arrangement affecting the Employees or any new (or amend any existing) employment, severance or consulting agreement relating to any Employee, grant any general increase in the compensation of any Employees (including any such increase pursuant to any bonus, pension, profit- sharing or other plan or commitment) or grant any increase in the compensation payable or to become payable to any Employee;

(f)    make capital expenditures related to the Business;

(g)    knowingly take any other action that would cause any of the representations and warranties made by Sellers in this Agreement not to remain true and correct in any material respect; or

(h)    commit to do any of the foregoing.

Without limiting the generality of the foregoing, Sellers shall, until the Closing Date, operate the Business in the usual and ordinary course, shall maintain the Purchased Assets in accordance with past practice.

Section 7.2    <u>Consents and Approvals</u>.    Sellers shall use commercially reasonable efforts to obtain all consents and approvals of third parties, if any, required to be obtained by Sellers to effect the transactions contemplated by this Agreement. Without limiting the foregoing, as soon as practicable after the Execution Date, Sellers shall make or cause to be made all such further filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis. Sellers agree to promptly provide Purchaser with copies of all final consent, approval, termination or confirmation letters provided to Sellers pursuant to filings made under this Section.

Section 7.3    <u>Access to Properties and Records</u>.    Sellers shall afford to Purchaser, and to the accountants, counsel, financing sources and representatives of Purchaser, reasonable access throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Section 15) to all properties, books, contracts, commitments, Records and personnel relating to the Purchased Assets and/or the Business and, during such period, shall furnish promptly to Purchaser all other information concerning the Purchased Assets and the Business as Purchaser may reasonably request.

Section 7.4    <u>Notices of Certain Events</u>.    Sellers shall promptly notify Purchaser of:

(a)    any written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

- 14 -

(b)     any written communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement that would reasonably be expected to have a Material Adverse Effect; or

(c)     any actions, suits, charges, complaints, claims, investigations or proceedings commenced to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

Section 7.5    <u>Designation of Assigned Agreements</u>.    Purchaser may notify Sellers of any executory contract or unexpired lease to be designated an Assumed Contract hereunder by not later than ten (10) days prior to the Closing Date. If Purchaser so notifies Sellers, such executory contracts or unexpired leases shall be added to <u>Schedule 2.1(a)(iii)</u> and shall be subject to the Cure Costs provisions of Section 2.4(b). If a Seller enters into any material executory contracts and unexpired leases after the date of this Agreement with respect to the Business, such Seller shall notify Purchaser and Purchaser shall have the option of designating such contract or lease as an Assumed Contract as set forth herein.

Section 7.6    <u>Administration of Accounts Receivable</u>.    Sellers shall, subsequent to the Closing Date, forward to Purchaser all payments received by any Seller or its Affiliates from customers for products or services provided by Sellers or Purchaser to such customers.

SECTION 8.    <u>COVENANTS OF PURCHASER.</u>

Section 8.1    <u>Actions Before Closing Date</u>.    Purchaser shall not take any action which shall cause it to be in breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

Section 8.2    <u>Consents and Approvals</u>.    Purchaser shall use commercially reasonable efforts to obtain all consents and approvals of third parties, if any, required to be obtained by Purchaser to effect the transactions contemplated by this Agreement. Purchaser shall make or cause to be made all filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis. Purchaser agrees to promptly provide Sellers with copies of all final consent, approval, termination or confirmation letters provided to Purchaser pursuant to filings made under this Section.

Section 8.3    <u>Notices of Certain Events</u>.    Purchaser shall promptly notify Sellers of:

(a)     any written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)     any written communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement that would reasonably be expected to have a Material Adverse Effect; or

(c)     any actions, suits, charges, complaints, claims, investigations or proceedings commenced or, to Purchaser's knowledge, threatened to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement

Section 8.4    Insider Claims.    Concurrently with the Closing and for no additional consideration, the Purchaser will be deemed to have released and discharged all Insider Claims and all Avoidance Rights.

## SECTION 9.   COVENANTS OF SELLERS AND PURCHASER.

Section 9.1    Retained Jurisdiction.    The Purchaser and the Sellers agree that the Bankruptcy Court shall retain jurisdiction to enforce all aspects of this Agreement. The parties acknowledge and agree that time is of the essence that any failure to timely perform their obligations hereunder would constitute irreparable harm to the parties and that the Bankruptcy Court may grant specific performance with relief to be granted on a shortened notice with regard to all remedies.

## SECTION 10.   EMPLOYEES.

Section 10.1    Offers of Employment.    Effective as of the Closing Date, Purchaser shall offer employment on the terms set forth in this Agreement to all Employees who are employed by Sellers on the Closing Date, except those Employees on disability, FMLA, military or other leave or absence other than vacation or jury duty (such latter Employees, the **"Excluded Employees"**). For a period equal to the longer of six (6) months following the Closing Date or the last date Sellers are legally required to maintain a comparable position for any Excluded Employee, Purchaser shall offer employment on the terms set forth in this Agreement to (a) those Excluded Employees on disability who become certified as ready to work by Purchaser's medical organization and (b) those Excluded Employees who otherwise report eligible to work following any such other leave or absence. All of such Employees who accept Purchaser's offer of employment are referred to herein collectively as the **"Transferred Employees"**. In any event, Purchaser agrees that as of the Closing Date it shall offer jobs to a sufficient number of current full-time employees of the Sellers so as not to trigger any WARN liabilities in respect of Seller, and Purchaser shall indemnify and hold harmless Seller with respect to the same.

Section 10.2    Terms of Employment of Transferred Employees.    Purchaser shall offer each Transferred Employee terms and conditions of employment, including but not limited to benefits, base compensation, retirement and savings plans, and incentive compensation, that are competitive in the industry for businesses of comparable size to the Business and in the geographic locations of the Business. To the extent requested by Purchaser, Sellers will provide to Purchaser for each Transferred Employee such employees' credited years of service and current base salaries. With respect to any bonuses earned by the Transferred Employees prior to the Closing Date, whether or not accrued, Sellers will either pay the amount thereof to Purchaser at the Closing for distribution to the appropriate Transferred Employees, or pay the amount thereof directly to the Transferred Employees in accordance with Sellers' past practice.

Section 10.3    Employee Benefits for Transferred Employees.

(a)    Credit for Service with Seller. In administering any employee benefit plans for the Transferred Employees after the Closing Date, Purchaser will grant full credit to each Transferred Employee for all years of service of such Transferred Employee credited by Sellers for purposes of eligibility, vesting of benefits, calculation of severance pay, determination

of vacation time, sick leave or other approved or statutory leave of absence, and for purposes of determining the amount of benefit coverage under any plan of Purchaser providing for medical, dental, and prescription drug coverage and accrual of pension benefits.

(b)    Savings Plans. Sellers have no profit sharing, defined contribution or savings plans.

(c)    Welfare Benefit Plans.    If Purchaser elects not to assume any Seller Welfare Benefits Plans, effective 12:01 A.M. on the Closing Date, Purchaser shall establish or cause to be established, at its own expense, benefit plans (**"Purchaser Welfare Benefit Plans"**) to provide health care, dental care, accidental death and dismemberment insurance, workers' compensation, disability and other group non-pension benefits for the Transferred Employees from and after the Closing Date. If Purchaser elects not to assume any Seller Welfare Plans, effective as of the Closing Date, the Transferred Employees shall cease to participate in Sellers' group non-pension benefit arrangements (collectively, **"Seller Welfare Benefit Plans"**) and shall commence participation in the Purchaser Welfare Benefit Plans. No waiting period or exclusion from coverage for any pre-existing medical condition shall apply to any such Transferred Employee's participation in any employee benefit plan of Purchaser after the Closing Date except to the extent such restrictions were imposed on a Transferred Employee by Sellers immediately prior to the Closing Date. All charges and expenses of each Transferred Employee and his or her eligible dependents that were applied to the deductible and out-of-pocket maximums under any Seller Welfare Benefit Plan during the plan year of Sellers in which the Closing Date falls shall be credited toward any deductible and out-of-pocket maximum applicable under Purchaser Welfare Benefit Plans in the plan year of Purchaser in which the Closing Date falls. Sellers shall retain responsibility under Seller Welfare Benefit Plans for all amounts payable by reason of claims incurred by the Transferred Employees prior to the Closing Date, and Purchaser shall be responsible under Purchaser Welfare Benefit Plans for all amounts payable by reason of claims incurred by the Transferred Employees on or after the Closing Date. For purposes of this Section, a claim shall be deemed to have been incurred on the date of the occurrence of (i) death or dismemberment in the case of claims under life insurance and accidental death and dismemberment policies, (ii) the date of the initial determination of disability in the case of claims under disabilities policies, or (iii) the date on which the charge or expense giving rise to such claim is incurred in the case of all other claims.

(d)    COBRA. Purchaser, at no expense to Sellers, shall provide the benefits, if any, required from and after the Closing Date pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA for any Transferred Employee who is or becomes entitled to such continuation medical coverage from Sellers or Purchaser on or after the Closing Date. Sellers will provide the benefits, if any, required pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA to the Transferred Employees who became eligible for such benefits prior to the Closing Date.

SECTION 11.   CONDITIONS PRECEDENT TO PERFORMANCE BY SELLERS.

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Sellers in their sole discretion:

Section 11.1   Representations and Warranties of Purchaser.   All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects (and in all respects in the case of each representation and warranty that is qualified as to materiality) on and as of the Closing Date (other than such representations and warranties that speak as of a specific date or time other than the Closing Date, which need only be true and correct in all material respects as of such date or time), except for changes in the ordinary course of business after the Execution Date and in conformity with the covenants and agreements contained herein.

Section 11.2   Performance of the Obligations of Purchaser.   Purchaser shall have performed in all material respects all obligations required under this Agreement to be performed by Purchaser on or before the Closing Date.

Section 11.3   Consents and Approvals.   All consents, waivers, authorizations and approvals of any governmental or regulatory authority, domestic or foreign, and required in connection with the execution, delivery and performance of this Agreement, shall have been duly obtained and shall be in full force and effect on the Closing Date, and all consents, waivers, authorizations, approvals, declarations and registrations listed on Schedule 5.5 that are required in connection with the execution, delivery and performance of this Agreement shall have been duly obtained and shall be in full force and effect on the Closing Date.

Section 11.4   No Violation of Orders.   No preliminary or permanent injunction or other order issued by any court or other governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, domestic or foreign, which declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

Section 11.5   Delivery of Ancillary Agreements.   Purchaser shall have executed and delivered to Sellers each of the Ancillary Agreements to which it is a party.

Section 11.6   Resolutions; Manager's Certificate.   Sellers shall have received a copy of resolutions adopted by the Managers of Purchaser authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser, and a certificate of a Manager of Purchaser, dated the Closing Date, certifying that such resolutions were duly adopted and are in full force and effect at such date and setting forth the incumbency of each person executing this Agreement on behalf of Purchaser.

SECTION 12.   CONDITIONS PRECEDENT TO PERFORMANCE BY PURCHASER.

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Auction Date, of the following

conditions, any one or more of which may be waived by Purchaser in its sole discretion. Without written notice from the Purchaser to the Seller, on or before the close of business on the day preceding the Auction Date, all of the following conditions shall be waived by Purchaser:

Section 12.1    <u>Representations and Warranties of Sellers</u>.    All representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects (and in all respects in the case of each representation and warranty that is qualified as to materiality) on and as of the Closing Date (other than such representations and warranties that speak as of a specific date or time other than the Closing Date, which need only be true and correct in all material respects as of such date or time) except for changes in the ordinary course of business after the Execution Date.

Section 12.2    <u>Performance of the Obligations of Seller</u>.    Sellers shall have performed in all material respects all obligations required under this Agreement to be performed by Sellers on or before the Closing Date.

Section 12.3    <u>Consents and Approvals</u>.    All consents, waivers, authorizations and approvals of any governmental or regulatory authority, domestic or foreign, that are required in connection with the execution, delivery and performance of this Agreement shall have been duly obtained and shall be in full force and effect on the Closing Date, and all consents, waivers, authorizations, approvals, declarations and registrations listed on <u>Schedule 12.3</u> shall have been duly obtained and shall be in full force and effect on the Closing Date.

Section 12.4    <u>No Violation of Orders</u>.    No preliminary or permanent injunction or other order issued by any court or governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, which declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby shall be in effect.

Section 12.5    <u>Delivery of Ancillary Agreements</u>.    Sellers shall have executed and delivered to Purchaser each of the Ancillary Agreements to which a Seller is a party.

Section 12.6    <u>No Material Adverse Change</u>.    During the period from Execution Date to the Closing Date, there shall not have occurred any Material Adverse Effect.

Section 12.7    <u>Bank Matters</u>.    The Bank shall have as of the Closing (a) fully and unconditionally released William B. Hunt and Susan Hunt from any and all claims, including, without limitation, those related to each's personal guarantys of the debt of the Sellers with the Bank (other than related to the two personal loans to William B. Hunt in the aggregate principal amount of $1,000,000 (the **"Personal Loans"**)); (b) fully and unconditionally released Susan Hunt's guaranty of the Personal Loans and Mrs. Hunt's personal residence; and (c) have transferred to Sellers (for transfer to Purchaser under this Agreement) all equipment currently leased by the Bank to Sellers as listed on <u>Schedule 2.1(a)(ii)</u> hereto.

Section 12.8    <u>Financing</u>.    Purchaser shall have obtained financing for the Purchase Price on terms acceptable to it, which contingency shall expire on August 30, 2010.

SECTION 13.   CONDITIONS PRECEDENT TO PERFORMANCE BY THE PURCHASER AND THE SELLER.

Section 13.1   The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)   there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)   the Bankruptcy Court shall have entered the Sale Order in a form which is reasonably satisfactory to Purchaser and Sellers.

SECTION 14.   BANKRUPTCY PROCEDURES.

Section 14.1   Motions and Notices Regarding Sale of Acquired Assets and Assumption and Assignment of Seller Contracts.

(a)   Sale Motion. On or before today's date, Sellers shall file the Motion for Sale and give sufficient notice in accordance with the requirements of the Bankruptcy Code, and the terms and conditions of this Agreement.  Sellers shall seek prompt entry of the Sale Order after sufficient notice has been given, which Sale Order shall include, among other things, findings of fact and conclusions of law that Purchaser is not a successor in interest to Sellers or any Affiliate of Sellers.

(b)   Notice of Proposed Cures. Sellers represent that Sellers have served or shall promptly serve the third parties who are parties to Assigned Agreements (such third parties being "Cure Obligees") with written notice of proposed Cures on the Assigned Agreements (such notice being the "Proposed Cure Notice"), which Proposed Cure Notice shall be provided to Purchaser. The Proposed Cure Notice shall establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures or be deemed to have waived any such objection.

Section 14.2   Defense of Orders.  Sellers, at their sole cost and expense, shall defend the Order approving the Motion for Sale and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Purchased Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders.

SECTION 15.   TERMINATION.

Section 15.1   Conditions of Termination.   Notwithstanding anything to the contrary contained herein, this Agreement may be terminated as follows:

(a)   by mutual consent of Sellers and Purchaser;

- 20 -

(b)    by Sellers if (i) there has been a material breach by Purchaser of its representations and warranties or in the observance, or in the due and timely performance of any of the covenants or agreements contained in this Agreement on Purchaser's part to be performed, and such breach shall not have been cured within five (5) days after written notice thereof, or (ii) any of the conditions set forth in Section 11 shall become reasonably incapable of fulfillment and are not waived (unless the failure of such conditions results primarily from Sellers breaching any of its representations, warranties or covenants contained in this Agreement);

(c)    by Purchaser if (i) there has been a material breach by Sellers of their representations and warranties or in the observance, or in the due and timely performance of any of the covenants or agreements contained in this Agreement on Sellers' part to be performed, and such breach shall not have been cured within five (5) days after written notice thereof, or (ii) any of the conditions set forth in Section 12 shall become reasonably incapable of fulfillment and are not waived (unless the failure of such conditions results primarily from Purchaser breaching any of its representations, warranties or covenants contained in this Agreement); or

(d)    by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or agreement set forth herein) if a Material Adverse Effect event, condition or matter shall have occurred and be continuing at the time of such termination.

Section 15.2    Effect of Termination.    In the event of termination pursuant to Section 15.1, this Agreement shall become null and void and have no effect, with no liability on the part of Sellers or Purchaser, or their respective Affiliates, directors, officers, managers, agents, members or stockholders, with respect to this Agreement; provided, however, that nothing herein shall relieve any party from any liability for any willful and material breach by such party of any of its covenants or agreements set forth in this Agreement and all rights and remedies of such nonbreaching party under this Agreement in the case of such a breach, at law or in equity, shall be preserved.

SECTION 16.    MISCELLANEOUS.

Section 16.1    Successors and Assigns.    Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect, provided that Purchaser may assign its rights hereunder, or any portion thereof, to an Affiliate and to any party providing financing in connection with the transactions contemplated hereby, but no such assignment shall reduce or otherwise vitiate any of the obligations of Purchaser hereunder. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

Section 16.2    Governing Law; Jurisdiction.    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of Michigan, without giving effect to the principles of conflicts of laws thereof. The parties hereto irrevocably elect the Bankruptcy Court as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement and the other Ancillary Agreements, and consent to the jurisdiction of, the Bankruptcy Court.

Section 16.3   Expenses.   Each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees, whether or not the transactions contemplated hereby are consummated. Sellers shall bear the cost of any real property transfer taxes on the Real Property and any other state and local transfer, excise, value-added or other similar Taxes, and all sales and use Taxes and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets.

Section 16.4   Broker's and Finder's Fees.   Each of the parties represents and warrants that it has not dealt with any broker or finder in connection with any of the transactions contemplated by this Agreement, and no broker or other Person is entitled to any commission or finder's fee in connection with any of these transactions.

Section 16.5   Severability.   In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

Section 16.6   Notices.   All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

| If to Sellers: | With a copy to: |
|---|---|
| Surefil, LLC<br>Surefil Properties, LLC<br>4560 Danvers Drive, S.E.<br>Kentwood, MI 49512<br>Attention: William B. Hunt | Nantz, Litowich, Smith & Gerard &<br>Hamilton PC<br>600 Weyhill Building<br>2025 East Beltline, SE<br>Grand Rapids, MI 49546<br>Attention: Hal Nelson |
| If to Purchaser: | With a copy to: |
| Coryell Limited, LLC<br>1959 San Lu Rae Drive<br>East Grand Rapids, MI 49506<br>Attention: Susan Hunt | Miller, Canfield, Paddock and Stone, P.L.C.<br>99 Monroe Avenue, N.W., Suite 1200<br>Grand Rapids, MI 49503<br>Attention: John M. Sommerdyke |

Any party may change its address for the purpose of this Section by giving the other party written notice of its new address in the manner set forth above.

Section 16.7   Amendments; Waivers.   This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 16.8   Entire Agreement.   This Agreement and the Ancillary Agreements contain the entire understanding among the parties hereto with respect to the transactions contemplated hereby, and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

Section 16.9   Parties in Interest.   Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Sellers, Purchaser, and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Sellers or Purchaser. No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Sellers or Purchaser.

Section 16.10   Section and Paragraph Headings.   The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 16.11   Construction.   The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute shall be deemed to refer to such statute as amended and to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "include" or "including" means include or including, without limitation. All references in this Agreement to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.

Section 16.12   No Survival of Representations and Warranties.   The Parties agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof.   The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing, and each Party shall be liable to the other after the Closing for any breach thereof.

    Section 16.13 <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

***[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]***

SIGNATURE PAGE TO ASSET SALE AND PURCHASE AGREEMENT

SELLERS:

SUREFIL, LLC

By: _____
Name: William Hunt, Manager


SUREFIL PROPERTIES, LLC

By: _____
Name: William Hunt, Manager


PURCHASER:

CORYELL LIMITED, LLC

By: _____
Name: Susan Hunt, Manager

LIST OF EXHIBITS:

| | |
|---|---|
| Exhibit A: | Bill of Sale |
| Exhibit B: | Form of Real Property Deed |
| Exhibit C | Form of FIRPTA Affidavit |
| Exhibit D: | Assignment and Assumption Agreement |
| Exhibit E: | Escrow Agreement |

## SCHEDULE 2.1(a)(i)

4560 Danvers Drive SE
Kentwood MI 49512

Lots 25 and 26 of Airview Industrial Park No. 2

Owned by Surefil Properties, LLC

## SCHEDULE 2.1(a)(ii)

**Lease 1-Lease # 0006373-01**
Caterpillar 2EC25-forklift
Hawker ATR 3020 Life Speed Raid Charger
2 Hawker 18-85F-25 LS Rapid Charge Battery
Used Caterpillar Forklift Truck Model
Hawker ATR 3020 Life Speed Raid Charger
Caterpillar Electric Cushion Tire Forklift

**Lease 2-Lease # 0006373-02**
Mix Tank
Pearson Case Erector
Pearson Case Sealer
15 GPM USP 29 Purified Water System
Rapid Battery Charge system hookup
Trash Compactory hookup
Water and PreMix tanks
(4700gl, 6000gl, 1500gl, 6500 gal Hold Tank)
Install Transfer line & Butterfly value
Fairbanks 30" x 30" SS Safe Barrel Scale
80 Gallon Broen Kettle
Jordon Back pressure Regulator, ITT Pureflo
10ml Burette, Electrodes, Beakers, Titrator System
Drum Dumper, Retrieval System
Heat Refrigerated Circular Bath
Nicolet 380 Spectrometer Software
Refractometer
Universal SL 1000 Labeler, Case Conveyor

**Lease 3-Lease # 0006373-03**
Trash Compactor
15 GPM USP 29 Purified Water System
Provide Services to Clean and Passivate USP Water Loop and Tank
Pearson Case Erector and Sealer
Components for Packaging Conveyor System
Case Conveyor Pearson Install and Electric Install
Water and Pre Mix tanks
(4700gl, 6000gl, 1500gl, 6500 gal Hold Tank)
Fairbanks 30" x 30" SS Safe Barrel Scale
Jordon Back pressure Regulator, ITT Pureflo
Refractometer

**Lease 4-Lease # 0006373-04**
EPD-6000 120-T-Mix
New Hawker ATR3020 LifeSpeed Charger
2000 Scissor 19ft Electric Mini Model
New Hawker 18-85F-26LS Powerline Battery For LifeSpeed
Scale balance 3100F/.01G

**Lease 5-Lease # 0006373-05**
Head Rotary Labeling System Model: 5600
4700 Gallon Tank
New England Machinery NEHHLPE-72

**Lease 6-Lease # 0006373-06**
EPD-6500-126-T-Mix
Pearson Case Erector
Pearson Case Erector
Model 600 D Case Packer
Belding Tank
10400 Gal Hold Tank

**Lease 7-Lease # 0006373-07**
2007 Stand-up Electric Reach Truck, 240" Triplex
Charges Model: ATR3020
Rapid Charge Batteries Model: 18-85F-25LS
2004 Electric Forklift
2001 Electric Forklift
Clamp Model
Rapid Charge Batteries Model: 18-125-13LS

**Lease 8-Lease # 0006373-08**
Vacuum Conveyou 4.5 Idler 40" Low Profile
Drive Transfer 4.5 Drive 60" 1 hp motor
Multi Head Ket for Multi Base
Multi Head Base for 2 Heads
100 Gallon DCI 316 Stainless Steel Tank
19232320-005/30010
27" Vibratory Bowl (New Vibratory Sorting Bowl, New Cart, New Drive)
6 Head Storage Rack
2711 PT7c4DI AB Tch 6.5" Color Enet/Serial
9358 HstS2100 RCK RS Historian 150 Tag Server
9701VWSS025LENE AB Rsview SE Server 25 W/RSLINX Enterprise
1747L1551 AB SLC 5/05 16K Processor
CKR-202-002 Cognex 200 Series Checker with IO Box Cable USB Cable lens
Lightnin Mixer Model X6P300
Lightnin Mixer Model X6P150
Lightnin Mixer Model X6P150
3" BTRFLY Valve-No Handle
Jumpers 3"
3150 Diaphragm Pump 2" w/o leak Det
Cart SS Portable Cart
12-316 Valve
Process Control on 4 Hold Tank
275 Gal Momor Tote w/quick Connect VLV
34" Lion 8000 Sweeper w/ charger SN:1000464296
Upgrade Accountmate 15 User
Air Solenoid Panel for 2 Relief for 2 Relief Valves
4"Caps With
4"Wiper Pigs
1" Triclamp Butterfly Valves
Pig Product Recover Products Recovery System Parts


**Lease 9-Lease # 0006373-09**
A300+Standard Printer with Airdryer
Mix Expansion for Tanks #1 and #2
Additional Screens added to existing controls


**Lease 10-Lease # 0006373-10**
Automatic Filler capper monoblock MO% 28/12-150
Total of Lease 10

| Asset # | Description |
|---------|-------------|
| **Class #: COMPUTER HARDWARE** | |
| 4009 | Server-IBM Tower |
| 4022 | Update all Data & Voice Cabling |
| 4025 | Desktop Computers (HP) - 5 |
| 4013 | HP Managed Switch |
| 4015 | Thermal Bar Code Printer |
| 4028 | Dell PC's & Monitors (5) |
| 4027 | Additional work-Upgrade all data cable |
| 4004 | Ricoh CL400DN Printer |
| 4011 | Intel Pentium 4 1u Rack Server |
| 4008 | Backup media fo rAuto Loader-Server |
| 4007 | Rackmount Firewall 1u Unix |
| 4012 | Rack Cabinet Server Enclosure |
| 4020 | HP 5150m 3200 Desktop PC (2) |
| 4000 | Compaq EVO D51S Desktop PC |
| 4017 | CISCO Wireless Router-Business |
| 4005 | Power-CISCO Wireless Router |
| 4026 | 17" HP Monitors - 5 |
| 4029 | Sales laptop |
| 4019 | HP 2200 MT P4 Desktop PC |
| 4023 | 19" Monitors (2), USB Adapters (2) |
| 4024 | HP Intel Microtower PC |
| 4006 | HP Laserjet Printer |
| 4001 | Gateway Desktop PC & Monitor |
| 4010 | IBM X Series Cabinet Conversion |
| 4021 | HP L1706 LCD 17" Monitor (2) |
| 4014 | Rackmount KVM Switch |
| 4016 | Patch Panel & Power Cords |
| 4003 | HP Inkjet Printer |
| 4018 | Famous Naga V 19" LCD Monitor |

*COMPUTER HARDWARE: 29 Record(s)*

| Asset # | Description |
|---------|-------------|
| **Class #: COMPUTER SOFTWARE** | |
| 5000 | Installation of All Software |
| 5002 | Accountmate MFG/ACCTG Software |
| 5020 | AB Software |
| 5021 | Project Mgmt Software, Attask, Inc. |
| 5018 | Microsoft Office - Licenses |
| 5019 | Microsoft/Accountmate Licenses |
| 5009 | SC System Athlon 64 |
| 5001 | Accountmate Cycle Support Services |
| 5003 | Accountmate System 5 User |
| 5011 | Accountmate System - 5 Users Add on |
| 5012 | Fixed Asset Software - FADS Accoumt |
| 5006 | Microsoft Office Basic OLP |
| 5010 | Peachtree Mfg/Acctg Software |
| 5014 | Visio Professional 2003 |
| 5004 | C.A. Integreated Threat MGM |
| 5022 | Spam/Virus Server, 2/90 Sign Systems |
| 5017 | Accountmate Cons Ledger Module |
| 5008 | Microsoft Windows XP Pro |

| Asset # | Description |
|---------|-------------|
| 5007 | Microsoft Windows Server 2003 |
| 5015 | Microsoft Projects 2007 Software |
| 5016 | CA Integrated Threat Mgt-Add'l Licenses |
| 5005 | Microsoft & CA OLP Media |
| 5013 | AutoCad 2004 Software |

*COMPUTER SOFTWARE: 23 Record(s)*

| Asset # | Description |
|---------|-------------|

**Class #: EQUIPMENT**

| | |
|---------|-------------|
| 1166 | Line 2 Process & CIP Piping |
| 1333 | Acma Corniani Filler/Capper Line 2 |
| 1101 | Ebels Construction - Progress Billing |
| 1167 | Line 2 Install& Integration-conveyors |
| 1129 | #2 USP Water System (Rev Osmosis) |
| 1139 | Process/CIP Piping to tanks & filler P-2 |
| 1041 | Ronchi  18/6 Automatic Mag Flow Filler |
| 1142 | CIP Cleaning System P-2 |
| 1161 | DeviceNet-Tanks C&D |
| 1146 | Sine Pumps Package (MR135 & MR150) 6 |
| 1020 | New England Unscrambler - IPM |
| 1133 | 200 HP Boiler, Chem Feed Syst & Install |
| 1085 | E-Pak Capper - Packaging Line-PH2 |
| 1022 | Shorewood Labeler-IPM |
| 1078 | Boiler & Installation |
| 1066 | Shorewood 15 head Labeler #5600 |
| 1059 | Allen Bradley Motor Control Center |
| 1023 | Ink Jet Coders - IPM |
| 1042 | 5280 Gl 90 psi Mix Tank |
| 1021 | Marburg Tamper Banding Machine |
| 1131 | Inkjet Bottle Coding System Line2 |
| 1188 | Filler Add - Ons (Corniani) Line 2 |
| 1104 | Phase I Process Results - Equip Proc |
| 1187 | Line #2 Conveyor Systems |
| 1030 | Sanimatic Combo CIP/COP Washer |
| 1079 | 15,000 gl Hold Tank |
| 1179 | RM Piplines - 3 to tanks in Compounding |
| 1031 | Temporary  Piping in Mix/Compounding |
| 1083 | 8800 gl Mueller Storage Tank |
| 1165 | Valves/Legs/Clamps-Hold Tanks |
| 1143 | Atlas Air Cooled Air Compressor |
| 1132 | Forklift Truck Model 2EC25 |
| 1077 | HVAC Units |
| 1160 | Electrical work/hook up - tanks,chiller, |
| 1012 | Load Cells for 5280 & 1500 gl tanks |
| 1084 | Plate Heat Exchanger #99AGC |
| 1004 | Air Compressor |
| 1027 | Ronchi  Filler/Capper(ACMA)  Install |
| 1138 | Lantech Q300XT Stretch Wrapping System |
| 1026 | Parellel Transfer Unit - IPM |
| 1071 | Ronchi Filler - Add Ons & Improvements |
| 1024 | Pallet Wraper - Robopak 506 |
| 1192 | HMI Panel - Tank D & Hold Tank |

| Asset # | Description |
|---------|-------------|
| 1186 | CIP/COP Wiring |
| 1304 | Pig Launch System |
| 1088 | Sanitary Safety Heads, Burst Sensors |
| 1366 | Labor cost of putting Line 4 |
| 1099 | Sanitary Piping to Hold Tank |
| 1149 | Fairbanks Scales w/cart (2) |
| 1144 | Filler CIP System P-2 |
| 1076 | Temp & Pressure Trasmitters for Mix Tank |
| 1172 | Display Remote Station in Compounding |
| 1194 | Expansion to CIP System Controls |
| 1045 | Shear Pump 30 hp |
| 1016 | Induction Sealer - Surplus Eq |
| 1044 | Pigging System for Hold Tank (loeb) |
| 1108 | Predator SS Stretch Wrapper (2) |
| 1128 | Mainstream Filter/Strainer (MDE) |
| 1141 | Tri Clamp Level Radar Transmitters(3) |
| 1163 | 1510 15 HP Base Mounted Pump |
| 1134 | Load Cells for Tank C |
| 1363 | Weber 5200 print/apply units |
| 1140 | Graco Pump #SB3661 & Cart |
| 1303 | Semi-Auto Label Applicator |
| 1067 | Trane 60 Ton Chiller Package |
| 1029 | Wright Model 1300 Pump |
| 1037 | Wright Pump Model 1300  15 hp |
| 1038 | Wright Pump Model 1300  15 hp |
| 1047 | Portable Pump Carts (7) |
| 1068 | Assorted Tanks, Pressure Gauges, Pots |
| 1130 | Load Cells for Tank D |
| 1039 | Wright Pump Model 1300  7.5hp |
| 1046 | Diaphram Pumps & Fittings |
| 1178 | Parallel Transfer Unit III-Conveyor |
| 1043 | Transfer Pump Bypass Valves/Installation |
| 1171 | Controls for RM Tanks (3) |
| 1306 | Semi-Auto Capper/Retorquer Jars/Bottles |
| 1074 | Upgrade Shorewood Model 400 Labeler |
| 1072 | Filters for Fliers Water System |
| 1106 | Improvments to #1083-8800 gl Tank |
| 1127 | Groen N 150 Kettle |
| 1098 | Transfer Lines to Hold Tank |
| 1365 | Domino Model A100 Ink jet printer |
| 1310 | Printhead Module, C6000 |
| 1056 | Floor Scrubber-Walk Behind T3 |
| 1318 | Packing Head Assembly |
| 1307 | 25' Variable Speed Drive Power Conveyor |
| 1159 | Training/Set up/Installation-Hamrick Pac |
| 1316 | 5hp pump |
| 1162 | Electrical Hook ups-Satorius,Radar,TankC |
| 1055 | Stainless Steel Floor Scale 48" x 48" |
| 1164 | Temp Piping to Hold Tank |
| 1185 | Spare parts-Case Erector |
| 1190 | Stainless Steel Mix Kettles-Chg Pot (2) |
| 1107 | Filters for Compounding/Mix Piping |

| Asset # | Description |
|---------|-------------|
| 1070 | Hanson HK-Heat Exchanger Components |
| 1040 | Wright Pump TRA405-Centrifugal 20hp |
| 1175 | Conveyor - 460 Volt 60 FPM Varispeed |
| 1057 | IBC Containers (totes) 275 Gal |
| 1150 | UV Light Controls for USP #1 & #2 |
| 1302 | Interior Tank Lights & Controls |
| 1035 | Back Pressure Regulator |
| 1102 | Back Pressure Regulator |
| 1063 | Receptacles & Plugs |
| 1184 | 15 hp Eurodrive Motor for Sine pump |
| 1347 | CDI Cells |
| 1348 | CDI Cells |
| 1364 | 2000 gallon stainless steel tank |
| 1147 | Straddle Stacker-Big Joe Intermediate |
| 1145 | Variable Frequency Drives for Pumps |
| 1330 | Packing Head Assembly |
| 1120 | Spare Tape Heads for Case Erec/Sealer |
| 1191 | Allocator System-Chemicals |
| 1036 | Enhancements to Case Erector-Pearson |
| 1301 | Pearson Pkg upgrade |
| 1061 | Allen Bradley E-Stop Stations |
| 1015 | Bottle Neck Cleaner-Drill System |
| 1176 | Rupture disk & sensors- USP#2 |
| 1073 | Unicom Inkjet Printer w/Plug #21493 |
| 1006 | Storage Cabinets-maint. |
| 1060 | Lithonia 2 x 4 Flourescent Light Fixture |
| 1367 | Tank transportation |
| 1352 | Used Domino A100 Inkjet printer |
| 1086 | Conveyor System Upgrade - Packaging Line |
| 1180 | Install ALFA Laval Horiz Disc valves |
| 1340 | cdilx dilute spacer |
| 1335 | Shrink Tunnel |
| 1170 | Thornton 770 Multiparameter Meter USP2 |
| 1195 | Panelview Terminal Line#2 |
| 1177 | Boiler Auxiliaries - Blowdown cont/break |
| 1048 | Silicone Reinf Wire & Food Grade Hose |
| 1305 | CIP Mode Screen |
| 1058 | Maintenance Tools |
| 1344 | Dock seals |
| 1174 | Set Up/Service - Case Packer |
| 1096 | Tank Upgrade/Gaskets & O-Rings |
| 1314 | Filler bottle handling/infeed timing scr |
| 1354 | Transportation for tanks |
| 1090 | Packaging Line Improvements |
| 1054 | Stainless Steel Bench Scale 18" x 18" |
| 1319 | Domino parts for C6000 |
| 1183 | AMU Unit Connection to Boiler |
| 1168 | Warehouse Location Signs |
| 1097 | Stainless Steel Tables |
| 1053 | Shimadzu UW Balance w/Ethernet Server |
| 1181 | Skimmer Outlet for COP Tank |
| 1300 | Pressure Transmitter, USP Header |

| Asset # | Description |
|---------|-------------|
| 1345 | Chiller for compounding |
| 1007 | Drum Heater, 55 G 115 V |
| 1008 | Maintenance Tools |
| 1338 | Audio equipment for plant tours |
| 1326 | 60" UV Lamp |
| 1359 | Air compressor lines for line 4 |
| 1357 | Electrical supplies for line 4 |
| 1346 | Chiller pump |
| 1617 | MDE Air Blow Clamps for Pigging System |
| 1315 | Gear Moter inline 3/4 30:1 |
| 1358 | Add electrical supplies for line 4 |
| 1069 | PECO Fill Height Detector |
| 1173 | Load Cells/Device Net  USP #2 |
| 1075 | Stepper Pac Motor w/seal |
| 1320 | Remanufacture controller |
| 1182 | Install Pipeline RM tank to load area |
| 1361 | Rewire for line 4 unscrambler |
| 1325 | 30" cart |
| 1342 | 30" carts |
| 1052 | Shimadzu UW Balance 2200g x .01g Scale |
| 1311 | Lumen Emergency Lighting |
| 1065 | PECO Fill Height Detector |
| 1317 | Lamp UV 60" and 30" |
| 1151 | Electrical Installation-Shrink Wrap Equi |
| 1103 | Hobart Wire Welder & Service Plan |
| 1313 | Cable for E & H Flow Meter |
| 1343 | Drain line for furnaces |
| 1355 | Misc part for line 4 |
| 1126 | Wet/Dry Band Saw 7" Round |
| 1308 | New Device Net Module |
| 1109 | Low Profile Ramp Stretch Wrapper |
| 1362 | Electrical control schematic for line 4 |
| 1327 | Shock Absorber and misc parts |
| 1201 | Large Display Process Meter |
| 1014 | Tote Stands for Antifreeze Program |
| 1062 | Conservation Vent-Pipeaway Pressure Rel |
| 1091 | Dust Cover for Mix Tank Agitator |
| 1353 | Device Net Card |
| 1087 | Improvements to Box Erector |
| 1350 | Line 3 ball and ball stop gasket |
| 1356 | Fiber optic light |
| 1013 | Sartorius Devicenet Interface-Mix Tank |
| 1336 | 3ph  transformer |
| 1312 | Diaphragm for Filling Valve |
| 1368 | Glycol Pump fittings |
| 1089 | Pallet Jack |
| 1093 | Faucet, Wrenches, Drum Pump |
| 1064 | GSE Dual Station Digital Printing Scale |
| 1095 | Upgrade Agitator on Hold Tank |
| 1360 | New cord end for motor in slipper room |
| 1092 | Drum Cart |
| 1094 | Electric "Eye" for Filler |

| Asset # | Description |
|---------|-------------|
| 1351 | Graco repair kit |
| 1349 | Line 3 Norgren cylinder |

*EQUIPMENT: 208 Record(s)*

| Asset # | Description |
|---------|-------------|

**Class #: LAB**

| | |
|---------|-------------|
| 2007 | HP 1050 HPLC System |
| 2008 | CEM Smart System 5 |
| 2029 | Centrifuge w/Rotor & Buckets IECFL40 |
| 2005 | Mettler DL 28 Titrator |
| 2030 | Mettler Toledo Balance Scales (2) |
| 2022 | Sutherland 4 Speed Dig Rub Tester |
| 2009 | Homogenizer/Disperser Kit 115V |
| 2010 | Element dis S50 N-G45G Course |
| 2032 | Digital Torque Meter |
| 2021 | Chatillon Digital Force Gauge |
| 2011 | Model D Helipath Stand 115V |
| 2028 | Burette 10 Ml DV010 |
| 2026 | Dessicator, weigh pan, indicator |
| 2024 | Dispenser & Flask, 5.0 to 25 ml |
| 2001 | Hypersil ODS, Columns/Fittings C-18 |
| 2020 | Varnish Comparator CL-605-V2 |
| 2006 | Beckman pHI 10 pHmeter w/ATC capability |
| 2016 | Prop 1/2B 316 (2) Impeller |
| 2004 | Rv Spindle Set - SSR Viscometer |
| 2013 | Specific Gravity Cup 83.2ml |
| 2015 | Pneumatic Mixer Improvements |
| 2002 | 2 Stage 100 psi Regulator for Air tanks |
| 2000 | Manual Crimper 11mm caps |
| 2003 | Model A Lab Stand |
| 2014 | Classic Mixer Shaft |

*LAB: 25 Record(s)*

| Asset # | Description |
|---------|-------------|
| 1351 | Graco repair kit |
| 1349 | Line 3 Norgren cylinder |

*EQUIPMENT: 208 Record(s)*

| Asset # | Description |
|---------|-------------|

**Class #: LAB**

| Asset # | Description |
|---------|-------------|
| 2007 | HP 1050 HPLC System |
| 2008 | CEM Smart System 5 |
| 2029 | Centrifuge w/Rotor & Buckets IECFL40 |
| 2005 | Mettler DL 28 Titrator |
| 2030 | Mettler Toledo Balance Scales (2) |
| 2022 | Sutherland 4 Speed Dig Rub Tester |
| 2009 | Homogenizer/Disperser Kit 115V |
| 2010 | Element dis S50 N-G45G Course |
| 2032 | Digital Torque Meter |
| 2021 | Chatillon Digital Force Gauge |
| 2011 | Model D Helipath Stand 115V |
| 2028 | Burette 10 Ml DV010 |
| 2026 | Dessicator, weigh pan, indicator |
| 2024 | Dispenser & Flask, 5.0 to 25 ml |
| 2001 | Hypersil ODS, Columns/Fittings C-18 |
| 2020 | Varnish Comparator CL-605-V2 |
| 2006 | Beckman pHI 10 pHmeter w/ATC capability |
| 2016 | Prop 1/2B 316 (2) Impeller |
| 2004 | Rv Spindle Set - SSR Viscometer |
| 2013 | Specific Gravity Cup 83.2ml |
| 2015 | Pneumatic Mixer Improvements |
| 2002 | 2 Stage 100 psi Regulator for Air tanks |
| 2000 | Manual Crimper 11mm caps |
| 2003 | Model A Lab Stand |
| 2014 | Classic Mixer Shaft |

*LAB: 25 Record(s)*

| Asset # | Description |
|---------|-------------|

**Class #: OFFICE**

| Asset # | Description |
|---------|-------------|
| 3088 | Nortel Networks Telephone/VM System |
| 3092 | Interior Signs |
| 3140 | Security Card Reader System/Install |
| 3136 | Break Room Furniture |
| 3135 | Credenza, File, Chairs, Hutch-CEO Office |
| 3016 | Meridian Lateral File 3 drawer 36" |
| 3093 | Office Interior Decorating |
| 3038 | HON #VL601 Metal Mid-Back Chair |
| 3090 | HP Pavillion a1310y Desktop PC |
| 3009 | Premira #PL189-CHE 71"x36"x41" Desk |
| 3094 | Oval Desk , 3 drawer file |
| 3089 | Surefil Sign for Front Wall |
| 3067 | SC #474-410N side Chair, No Arms |
| 3149 | Kyocera FS2020D Printer-Accounting |
| 3137 | File Cabinets, Lamp, Hangers/tackboard |

| Asset # | Description |
| --- | --- |
| 3102 | Premira PL#104 Laminate Desk Shell |
| 3139 | New Security Office Furn. |
| 3000 | Haworth A841-1741 Accolade Chairs |
| 3116 | Steelcase Protege-blk (6) |
| 3001 | 18 Ft Conference Table |
| 3147 | Desk componets |
| 3113 | Installation/Delivery/Set Up Chgs 1-3-07 |
| 3144 | Bow Top Desk, File & Pedestal |
| 3096 | HM Panel A02 48 x 67 Nonpowered, fabric |
| 3097 | HM Panel A02 24 x 67, non powered, fabri |
| 3019 | Lateral Files, 2 drawer 42" Locking |
| 3026 | SC #856030 Rec Table 30" x 60" T-Leg |
| 3099 | HM Panel A02 24 x 53, nonpowered, fabric |
| 3034 | HON Basyx Leather Guest Chair w/arms |
| 3095 | Digital Phone |
| 3050 | LTAF254 Conf Table H-Leg 6 x 26 |
| 3064 | HON #VL606 Metal Mid-Back Guest Chair |
| 3148 | Desk componts |
| 3138 | HM Shelf/File/Light/Pedestal File |
| 3003 | Steelcase Lateral File, 5 drawer 42" |
| 3058 | H-Leg 27 3/4 x 18 x 2 Post, Blk #LHAF182 |
| 3114 | Sandusky/Lee Storage Cabinet (2) |
| 3006 | HON #695L Lateral File, 5 drawer 42" blk |
| 3134 | HM Shelves, wallboard, tackboard,lateral |
| 3049 | Basyx Folding Table 30 x 60  3/4" |
| 3062 | #141 Bar Stool w/chrome legs, blk seat |
| 3007 | Premira #PL112  2 drawer lateral file |
| 3146 | Desk componets |
| 3066 | ABCO #OP6649H Panel 49 x 66 |
| 3115 | SC Desk 30 x 60, single ped |
| 3008 | Context Reception Station |
| 3004 | HON #VBKS4S 60 x 36 x12 Bookcase |
| 3010 | Boat Shaped Conf. Table 42 x 96 Laminate |
| 3105 | Pencil Drawers |
| 3129 | Premire #PL189 D Bow Front Desk |
| 3011 | HON #94011 Queen Ann Base Kit |
| 3012 | Green Conf Room Chairs |
| 3013 | 4 Drawer 36" Black Lateral File |
| 3002 | Sandusky/Lee Storage Cabinet 2 Shelf |
| 3014 | Premir #PL175 12/12 Full HGT Pedestal |
| 3112 | HM B-Style 1/2 Height Shelf |
| 3126 | Coat Tree |
| 3015 | Vertiflex Floor Lecturn VRT-50051 23x46x |
| 3104 | Premira PL#166 6/6/12 Pedestal w/lock |
| 3130 | Premira #PL175 Pedestal w/lock |
| 3039 | HON #4222 Mid Back Desk Chair w/o Arms |
| 3042 | Basyx Deluxe Folding Table 30 x 96 |
| 3017 | SC #9HBS6015 Half Height Shelves |
| 3018 | Premira #PL143  71" Credenza, Honey Lam |
| 3111 | Dry Erase Boards (4) |
| 3020 | Premiera 30" x 72" Desk Shell |
| 3021 | Hanging Clamps for Blueprints SAF-5002 |

| Asset # | Description |
|---------|-------------|
| 3127 | Steelcase Pedestal 18 3/8 x 27 |
| 3110 | HM Tackboards 60"W |
| 3022 | Anderson Hikey Lateral File, 4 drawer |
| 3109 | Coat Rack-Quartet 20404 Bk 48" |
| 3047 | Meridian Bookcase 42" |
| 3023 | 42" x 60" Oval Conference Surface 2/7122 |
| 3005 | Premira #PL121 Desk Shell 30 x 48 |
| 3106 | HM Wall Tracks |
| 3124 | HM B-Style 1/2 Height Shelf 12 1/2 x 15 |
| 3024 | 24" x 96" Work Surface #10745-60 |
| 3025 | Premira #PL107 Laminate 6/12 pedestal |
| 3027 | Context 30" Blk Lateral File -under desk |
| 3028 | Magazine Rack-Medium Oak |
| 3029 | SC #98009 panel, 42" x 42" |
| 3030 | HON #80192 Table 24 x24 x 20 Cher Lamint |
| 3031 | VRT #5008 Lecturn |
| 3032 | SC #9HBS7015 Shelf 14-7/8 x 70 x 7-5/8 |
| 3033 | SAF-3960 Adj Drafting Table Base |
| 3035 | SC 24 x 48 Table Oak Laminate |
| 3122 | HM Panel A02  24 x 47, non powered fabri |
| 3036 | SC Context Mobile Ped 20"D 12/12 Blk |
| 3037 | SC #9705806 Wardrobe Storage Cab |
| 3060 | ESR-132123 Hard Floor Chair Mat |
| 3068 | Armless Grey Task Chair |
| 3040 | SC #98215 Panel, 45" x  65" |
| 3041 | Premira #PL154 Bookcase 32 x 14 x 30 |
| 3043 | HON #VBKS2S Bookcase 36 x 36 x 12 |
| 3133 | 12/12 Lt Grey Pedestal-Warehouse Office |
| 3091 | Office Door Signs |
| 3118 | HM A02  3-Way connectors 62" |
| 3044 | Contex 6/6/12 30" Pedestal, blk |
| 3081 | Basyx Table Leg 2-3/8: Diam  Blk |
| 3045 | Context 12/12 Pedestal 24" D Blk |
| 3046 | SC #98213 Panel, 30" x 65" |
| 3086 | SC Wall Track 65" Aluminum/ST9000 |
| 3048 | Conference Surface 36" x 72" |
| 3100 | HM A02 2-way 90 Degree Connectors |
| 3052 | SC #9HBS3015  Shelf 14-7/8 x 30 x 7-5/8 |
| 3119 | HM A02 Finished End Hard Surfaces |
| 3098 | Wall Starter Kits |
| 3051 | Drafting Table surface 42" x 30" |
| 3053 | Meridian Bookcase 42" w/laminate surface |
| 3054 | SC #730552 Metal Bookcase 55 x 15 x 30 |
| 3055 | Tensco Magazine Rack |
| 3056 | Hon Wood Frame Guest Chair |
| 3132 | Coat Rack |
| 3057 | Modern Art Canvas |
| 3077 | Kimball Armless Task Chair-Red Fabric |
| 3082 | Herman Miller Paperflow |
| 3108 | HM Paperflow (5) |
| 3059 | HON FC01 Folding Chairs, Lt Beige |
| 3073 | Ansel Adams Pictures |

| Asset # | Description |
|---------|-------------|
| 3085 | BCO #TB-OB00 Connectors |
| 3061 | Herman Miller Ergon |
| 3125 | HM A01 Work Surface 24 x 72 |
| 3131 | 2 Drawer File Cabinet |
| 3120 | HM A01 Work Surface 24 x 48 |
| 3063 | Blueprint Wall Mount Rack |
| 3065 | ABCO #OP6031H Panel 31 x 60 |
| 3069 | Guest Chair, Oak Frame, Charcoal Fabric |
| 3128 | HM A0520.1360 A01 Style Shelf |
| 3070 | SC #9HBS4215 Shelf 14-7/8 |
| 3071 | Dry Erase Board 24 x 36 |
| 3072 | Tackboard 24 x 36 |
| 3074 | Work Surface 15 x 30 Pecan Laminate |
| 3075 | Teamwork Picture |
| 3121 | Cantilever 16.5" for 24 work surface |
| 3076 | Pencil Drawer 22 x 19.25 x 2 |
| 3083 | ABCO Free Standing T-Base Foot for Panel |
| 3078 | Wood Work Surface 25 x 45 |
| 3079 | Herman Miller 48" Tool Bar |
| 3107 | HM 48" Tool Bars |
| 3117 | Basyx Table Legs-for worksurface support |
| 3080 | Work Surface |
| 3087 | Herman Miller Wall Track & Tackboard |
| 3123 | HM Draw Rods 62" x 42" H |
| 3101 | HM #A0211 Panel 62" Connectors |
| 3084 | Self Adhesive Label Holder |

*OFFICE: 145 Record(s)*

| Asset # | Description |
|---------|-------------|
| **Class #: TOOLING** | |
| 7003 | 25.4 oz Perfect Storm - Change Parts |
| 7019 | Change Parts for Ronchi Filler |
| 1334 | Acma filler bottle handling parts |
| 7005 | 19.95 oz  WR Change Parts |
| 7001 | 16 oz Mouthwash  Change Parts |
| 7010 | 15 oz Suave - Labeler Change Parts |
| 7014 | 33.80oz WR Cap Handling |
| 7025 | 33.8 oz WR Cap Handling Parts |
| 7004 | 15 0z Perfect Storm Change Parts |
| 7006 | 15 oz Change Parts - Shorewood Labeler |
| 7008 | 12 oz WR Body Wash Change Parts |
| 1341 | Change parts for 24 oz mouthwash |
| 7030 | Candlelite change parts |
| 7018 | Suave 15 oz Bottle Handling Chg Parts |
| 7015 | Suave Conditioner Change Parts |
| 7000 | Filler/Capper  Exactr-R 2438 |
| 7024 | 33.8 oz WRS Bottle Hdlg/Chageparts |
| 7012 | 33.8 oz WRS Bottle Handling-Chng Parts |
| 1337 | Change parts for Nehhlpe-72 |
| 7020 | 33.8 oz WRS Change Parts-Bottle Handling |
| 7017 | 19.95 oz WR-Bottle Handling Chg Parts |
| | 33.8 oz Change Parts (labeler) |

| Asset # | Description |
|---------|-------------|
| 7032 | Candlelite label plates |
| 7031 | Plates for shippers for Hand Sanitizer |
| 7027 | Timing screws for Acma Filler |
| 7029 | More tooling for Acma filler |
| 1328 | Change parts for SN 2800 |
| 7013 | 19.95 oz WR Shorewood Labeler-Chng Parts |
| 7009 | 15oz Suave - Rnd Cap - FLip Cap Change |
| 7016 | Support Structure for Snap Capper-chgprt |
| 7026 | FIA CC Tooling |
| 7022 | 12 oz Body Wash - Feed Screws |
| 1339 | Labler Bottle handling parts |
| 7028 | Tooling for Shorewood Labeler |
| 7011 | 33.8 oz WRS Change Parts - labeler |
| 7007 | Ron-Chuck Jaw Inserts  15oz & 24.5 oz |
| 7021 | 15 oz 7 25.4 oz Chuck Jaw Inserts |

*TOOLING: 37 Record(s)*