UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

    Surefil, LLC,

    Case No. HG09-06914
    Chapter 11
    Honorable Jeffrey R. Hughes
    Jointly Administered

_____ Debtor./

In re:

    Surefil Properties, LLC,

    Case No. HG09-06916
    Chapter 11
    Honorable Jeffrey R. Hughes
    Jointly Administered
    Hearing: August 12, 2010 at 1:30 p.m. in Grand Rapids

_____ Debtor./

UNITED STATES TRUSTEE'S OBJECTION TO
DEBTORS' MOTION TO APPROVE SALE AND FOR OTHER RELATED RELIEF

Daniel M. McDermott, United States Trustee for Region 9, objects, pursuant to his authority under 11 U.S.C. Section 307 and 28 U.S.C. Section 586(a)(3), to the debtors' motion to approve sale and for other related relief, for the following reasons:

*I. The History of the Case*

1. Surefil, LLC, the operating company, filed a petition for relief under Chapter 11

of the Bankruptcy Code on June 8, 2009. Surefil Properties, LLC, which owns the real estate that is used by Surefil, LLC, also filed a petition for relief under Chapter 11 on June 8, 2009.

     2. William B. Hunt is the managing member of both Surefil, LLC, and Surefil Properties, LLC. Mr. Hunt also owns 87.5% of the equity of each company.

     3. On June 29, 2009, the Court entered orders in both cases (Case No. HG09-06916, Docket No. 29; Case No. HG09-06914, Docket No. 47) granting the debtors' motions for joint administration.

     4. The United States Trustee has appointed an Official Committee of Unsecured Creditors. That Committee has not retained counsel.

***A. Plan Status***

     5. On September 4, 2009, the Court entered an order requiring the debtor to file a proposed plan of reorganization and disclosure statement by February 1, 2010.

     6. The United States Trustee verbally agreed to extensions of that date, but upon information and belief, all agreed extensions have expired.

     7. As of this date, the debtors have still not filed a proposed plan of reorganization and disclosure statement.

*B. Current Financial Situation*

8. Pursuant to Paragraph 9 of this Court's Definitive Order, entered in this case on June 9, 2009, and the United States Trustee's operating instructions, the debtor is required to file monthly financial reports with the United States Trustee.

9. The debtor's financial reports are current. According to those reports, as of June 30, 2010, the debtor had sustained losses of $710,376 since the date of filing. As of June 30, 2010, the debtor had total unpaid post petition debts of $381,824, of which $126,050 was past due. As of June 20, 2010 the debtor had cash on hand of $227,771. The debtor appears to be cash flowing through depreciation. As of June 20, 2010, the debtor had $1.8 million in receivables, of which $754,075 was over 60 days.

10. Based upon the debtors' performance in Chapter 11, there is no reason to believe that the debtors can propose a feasible plan of reorganization based upon future operations.

11. As of the date of filing, Surefil Properties, LLC, owned land valued at $2.2 million, which was subject to a mortgage in the amount of $11.6 million held by Huntington National Bank and three construction liens. The mortgage and the construction liens totaled $12,791,155.30. Surefil Properties listed no personal property, no priority debts, and no unsecured debts. Mr. Hunt and Surefil, LLC were listed as the guarantors of the Huntington mortgage.

12. As of the date of filing, Surefil, LLC, listed no real property in its schedules.

*B. Current Financial Situation*

8. Pursuant to Paragraph 9 of this Court's Definitive Order, entered in this case on June 9, 2009, and the United States Trustee's operating instructions, the debtor is required to file monthly financial reports with the United States Trustee.

9. The debtor's financial reports are current. According to those reports, as of June 30, 2010, the debtor had sustained losses of $710,376 since the date of filing. As of June 30, 2010, the debtor had total unpaid post petition debts of $381,824, of which $126,050 was past due. As of June 20, 2010 the debtor had cash on hand of $227,771. The debtor appears to be cash flowing through depreciation. As of June 20, 2010, the debtor had $1.8 million in receivables, of which $754,075 was over 60 days.

10. Based upon the debtors' performance in Chapter 11, there is no reason to believe that the debtors can propose a feasible plan of reorganization based upon future operations.

11. As of the date of filing, Surefil Properties, LLC, owned land valued at $2.2 million, which was subject to a mortgage in the amount of $11.6 million held by Huntington National Bank and three construction liens. The mortgage and the construction liens totaled $12,791,155.30. Surefil Properties listed no personal property, no priority debts, and no unsecured debts. Mr. Hunt and Surefil, LLC were listed as the guarantors of the Huntington mortgage.

12. As of the date of filing, Surefil, LLC, listed no real property in its schedules.

Surefil, LLC, did list $5.1 million in personal property, which allegedly was subject to the Huntington secured claim of $11.6 million. Surefil, LLC, listed no other secured creditors, no priority debts, and $7,652,029.75 in general unsecured debts. Surefil, LLC, filed an amended Schedule F on August 26, 2009 which reduced the total unsecured debts to $5,469,152.27.

*C. Duties of Delta Equity Advisors*

13. The Court appointed Delta Equity Advisors, LLC, as financial advisors to the debtor on May 4, 2010.  (Bankruptcy Court Docket No. 181.) The United States Trustee did not object to this appointment. (Bankruptcy Court Docket Note dated April 29, 2010.)

14. On June 30, 2010 the debtor filed an Emergency Motion for Use of Cash Collateral.  (Bankruptcy Court Docket No. 208.) According to that motion, the role of Delta Equity was to be expanded to put Delta in charge of negotiating a sale of the debtors' assets.  The motion also mentioned a carve out to ensure that the professional fees would be paid.

15. At the hearing on the motion for use of cash collateral on July 7, 2010, the debtor indicated that it had already received some bids or expressions of interest.  The amounts being offered appeared to be in the range of $3 to $4 million.

16. At the hearing of July 7, 2010, the Court asked for a redrafted motion, and the debtor withdrew the motion for use of cash collateral.

17. The debtor filed a motion to expand the duties of Delta Equity on July 9, 2010. (Bankruptcy Court Docket No. 215.) That motion again made it clear that the debtors' intended course for the future is a sale of assets and operations. The motion also repeated the request for a carve out to pay professional fees, but preserved the right of the United States Trustee, among others, to object to a carve out.

18. The Court approved the expansion of Delta's duties, and the restriction of the debtors' discretion, by order of July 20, 2010. (Bankruptcy Court Docket No. 227.) That order did not approve any carve out for professional fees.

19. Upon information and belief, a sale for anything less than $11.6 million will be insufficient to pay Huntington Bank in full, let alone administrative expenses, professional fees, and unsecured creditors, absent a carve out consented to by Huntington Bank.

20. There is no indication in the record that Huntington Bank has agreed to a carve out for the benefit of the unsecured creditors, or administrative creditors other than the professionals.

21. The requests for a carve out for professionals would appear to be a tacit admission that the parties fear or anticipate a secondary insolvency in the event of a sale of the assets and operations.

22. Based upon the foregoing, it appears that the debtors' intended course is to pursue a sale that will be insufficient to pay Huntington Bank in full, that will not produce

any return for the unsecured creditors, and which may leave administrative creditors, other than the professionals, unpaid.

### D. *Hunt Family Conflicts*

23. As noted above, William B. Hunt is the managing member of both Surefil, LLC, and Surefil Properties, LLC. Mr. Hunt also owns 87.5% of the equity of each company.

24. According to Surefil, LLC's response to question 10 of the amended statement of financial affairs (Case No. HG09-06914, Bankruptcy Court Docket No. 66, filed July 28, 2009), on or about October 31, 2008, Surefil, LLC purchased from Ascendia Brands, Inc., all right, title and interest in the "Lander" line of products, and Surefil then transferred the Lander brand to another entity, Grand Brands, which was owned by an insider of Surefil, LLC. Surefil valued the property transferred at $400,000.

25. Upon information and belief, Surefil has produced, bottled, distributed and sold products for Grand Brands under the Lander brand under a license agreement. Grand Brands has no production facilities of its own and never has had such facilities. In return, Surefil pays a licensing fee or royalty to Grand Brands.

26. Upon information and belief, Grand Brands is owned or controlled by either Mr. Hunt's wife or his daughter, or both.

27. Upon information and belief, Surefil, LLC, financed the transaction with

Grand Brands so that Grand Brands was able to repay Surefil by offsetting the license fee or royalties until Surefil was paid in full.

28. According to Surefil, LLC's response to question 3(c) of the amended statement of financial affairs, prior to filing the Chapter 11 petition, Surefil paid $474,962.60 to Grand Brands, at least $35,961.53 to Mr. Hunt's wife, at least $245,406.62 to Mr. Hunt, and $564.38 to Mr. Hunt's daughter.

29. According to the amended Schedule F filed by Surefil, LLC on August 26, 2009 (case No. HG09-06914, Bankruptcy Court Docket No. 76, page 9) Mr. Hunt is owed two debts by Surefil, one debt of $225,000, and another debt of $1,096,095.60. Therefore, of the total unsecured debts of $5,469,152.27, about $1,321,095.60, or about 24%, is owed to Mr. Hunt.

30. As noted above, Mr. Hunt is listed as a guarantor of the Huntington mortgage.

31. Lastly, as the motion for use of cash collateral and the motion to expand the duties of Delta Equity candidly state, Mr. Hunt is affiliated with one of the possible bidders in any sale of the assets and operations of these debtors. That conflict of interest led the debtor and Huntington to attempt to divest Mr. Hunt of any control over the sale process by expanding the duties of Delta and restricting the discretion of the debtors, as mentioned above.

32. Based upon many of the facts summarized above, the United States Trustee filed a motion requesting the conversion of this case to one under Chapter 7 under 11

U.S.C. Section 1112(b). That motion was filed on July 13, 2010 and is scheduled to be heard on the same date and at the same time as the motion for approval of the sale, August 12, 2010 at 1:30 p.m.

*II. The Sale Motion*

33. The debtors have filed a motion for sale of all assets. The hearing on that motion has been set for August 12, 2010 at 1:30 p.m.

34. The sale motion is accompanied by a copy of the asset sale and purchase agreement between the debtors and the "stalking horse" bidder, Coryell Limited, LLC. The purchase agreement is signed on behalf of the debtors by William Hunt. The purchase agreement is signed on behalf of Coryell by Susan Hunt.

35. According to the purchase agreement, page 10, the purchase price will be $3.2 million. Of this sum, $1.2 million will be escrowed for the satisfaction of two disputed construction liens. The allocation of the purchase price between the two estates will be agreed between the purchaser and the sellers not less than 5 days prior to the closing date. (Purchase Agreement, page 10, Section 3.2.) The Closing Date is defined as ten days after the entry of the order approving the sale, or at any other time agreed to by the sellers and the purchaser. (Purchase Agreement, page 10, Section 4.1.) The property to be sold consists of all the property of the debtors (Purchase Agreement, page 5, Section 2.1(a)), including any and all real estate owned by the debtors (Purchase Agreement, page 5,

Section 2.1(a)(i)), all accounts receivable (Purchase Agreement, page 7, Section 2.1(a)(xi)), all cash (Purchase Agreement, page 7, Section 2.1(a)(xii)), all claims against insiders (Purchase Agreement, page 7, Section 2.1(a)(xvi)), and any and all rights to avoid the transfer of the Lander Brand to Grand Brands, LLC (Purchase Agreement, page 7, Section 2.1(a)(xvi)).  The motion also requests that the Court eliminate the 14 day stay of the effectiveness of the order approving the sale provided for under Federal Rule of Bankruptcy Procedure 6004(h)(although the motion refers to the stay period as ten days long).

### *III. The United States Trustee's Objection*

36. The Sixth Circuit set forth the criteria for a sale free and clear of liens before the confirmation of a plan of reorganization in *Stephens Industries, Inc., v. McClung*, 789 F.2d 386 (6th Cir. 1986), adopting the Second Circuit's holding that "there must be some articulated business justification ... for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such a disposition under section 363(b)" and requiring that the bankruptcy judge "expressly find from the evidence presented ... at the hearing a good business reason to grant such an application." The Sixth Circuit also quoted the Second Circuit's guidance to bankruptcy courts reviewing such a sale:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient

>factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

789 F.2d at 389. As noted, this list is not exclusive, and indeed, in the *Stephens Industries* opinion the Sixth Circuit also considered whether the sale had been arranged in a commercially reasonable manner. 789 F.2d at 391. This proposed sale does not meet the criteria of *Stephens Industries, Inc., v. McClung* for the following reasons.

### A. Insufficiency of Bidding Procedures

37. The debtors have failed to allege any grounds justifying the elimination of the 14 day stay of the effectiveness of any order under Federal Rule of Bankruptcy Procedure 6004(h).

38. In *Stephens Industries* the Sixth Circuit also considered whether the sale had been arranged in a commercially reasonable manner. 789 F.2d at 391. The motion fails to meet this standard because it does not state adequate sale procedures. The motion merely states that: 1) bidders must agree to enter into an Asset Purchase Agreement acceptable in from to the seller; 2) the bidder must agree that its bid may be considered irrevocable until 15 days after the closing date; 3) bidding shall be in increments of $50,000; 4)

whether a bidder is a qualified bidder shall be determined by the debtor in consultation with Huntington Bank and Delta; and 5) at the conclusion of the bidding, the debtor, after consultation with Delta and the Huntington Bank shall identify the highest and best offer "on the basis of such factors as the Debtor may determine to take into account." (Sale Motion, pages 3 to 4, paragraphs 15 to 17.) This is insufficient for the following reasons.

39. All bidders should be required to bid upon the same terms as set forth in a Court approved agreement, not one acceptable to the debtor. Otherwise different bidders may be bidding based upon different agreements, and it will be impossible to determine an objective winner.

40. The motion sets forth only two, non-exclusive objective criteria for determining qualified bidders: the terms of its bid must not be conditioned upon obtaining financing or upon the outcome of unperformed due diligence.(Sale Motion, page 4, paragraph 16.) However, Coryell is exempted from the financing requirement. The purchase agreement specifically states that as a condition precedent to Coryell's performance Coryell must have obtained financing for the purchase price on terms acceptable to Coryell by August 30, 2010. (Purchase Agreement, page 19, Section 12.8.) To add to the inequality, the Seller together with Delta and Huntington are apparently allowed to take any other criteria they want into consideration in determining whether a bidder is qualified to make a bid.

41. As noted above, the Closing Date is defined as ten days after the entry of the

order approving the sale, or at any other time agreed to by the sellers and the purchaser. (Purchase Agreement, page 10, Section 4.1.) Therefore, requiring a bidder to agree that its bid may be considered irrevocable until 15 days after the closing date is the same as requiring that the bidder agree that its bid be irrevocable forever, because the seller and the first purchaser have absolutely unfettered discretion in setting the closing date.

42. At the conclusion of the bidding, the debtor, after consultation with Delta and the Huntington Bank, shall identify the highest and best offer "on the basis of such factors as the Debtor may determine to take into account." (Sale Motion, page 4, paragraph 17.) In the event of a dispute, the Court will have absolutely no objective criteria to apply to determine whether a bidder was or should have been the winning bidder. To approve such criteria is to invite a subjective decision which may benefit insiders of the debtor more than the estates.

***B. The Allocation of the Purchase Price is Not Stated***

43. The sale motion has been brought by two estates, each of which is selling all of its assets in this one sale. Therefore, there will be one sale price, which must be allocated between the estates.

44. In order to bid, a bidder other than Coryell must submit a purchase agreement which clearly states the purchase price offered and clearly allocates that purchase price between the assets being purchased. (Motion, pages 3 to 4, paragraph 15(i).)

45. The Coryell purchase agreement, however, states that Coryell will present the sellers with an allocation statement not less than five days before the closing date. (Purchase Agreement, page 10, Section 3.2.) The purchase agreement defines the Closing Date as ten days after the entry of the order approving the sale, or at any other time agreed to by the sellers and the purchaser. (Purchase Agreement, page 10, Section 4.1.) Therefore, Coryell will be allowed to dictate to the sellers the allocation after the sale is approved, while every other bidder will be required to propose an allocation to the sellers as a condition to being allowed to bid, and the sellers will be able to reject any bidder based upon that proposed allocation, or any other factor.  This is unfair to both any other bidder beside Coryell and to the estates.  It is unfair to other bidders because they are not afforded the same terms as Coryell.  It is unfair to the estates because of the common ownership of the two debtors, as well as possibly Coryell.  Coryell may be able to manipulate the allocation of the purchase price for the benefit of the equity owner of the debtors, Mr. Hunt, and since the sale will already have been approved, there will be no way a subsequent trustee or an unsecured creditor could attack that allocation.

*C. Undisclosed Conflicts*

46.  William B. Hunt is the managing member of both Surefil, LLC, and Surefil Properties, LLC.  Mr. Hunt also owns 87.5% of the equity of each company.

47. The purchase agreement is signed on behalf of the debtors by William Hunt.

The purchase agreement is signed on behalf of Coryell by Susan Hunt.

48. Upon information and belief, Susan Hunt may be Mr. Hunt's wife. This should be clarified and disclosed, as should the identity of all equity owners of Coryell.

49. As noted above, prior to filing the bankruptcy petition, Surefil transferred the Lander brand to another entity, Grand Brands, which was owned by an insider of Surefil, LLC. Surefil valued the property transferred at $400,000. Surefil has produced, bottled, distributed and sold products for Grand Brands under the Lander brand under a license agreement. Surefil pays a licensing fee or royalty to Grand Brands. Grand Brands may be owed or controlled by either Mr. Hunt's wife or his daughter, or both.

50. According to Surefil, LLC's response to question 3(c) of the amended statement of financial affairs, prior to filing the Chapter 11 petition, Surefil paid $474,962.60 to Grand Brands, at least $35,961.53 to Mr. Hunt's wife, at least $245,406.62 to Mr. Hunt, and $564.38 to Mr. Hunt's daughter.

51. The property to be sold to Coryell includes all claims against insiders (Purchase Agreement, page 7, Section 2.1(a)(xvi)), and any and all rights to avoid the transfer of the Lander Brand to Grand Brands, LLC (Purchase Agreement, page 7, Section 2.1(a)(xvi)).

52. Therefore, by including these insider claims and avoidance actions in the sale, the debtor is in essence allowing Mr. Hunt to settle all these claims against himself and his family. That should be clarified and disclosed.

53. The purchase agreement requires the purchaser to offer employment to all employees. (Purchase Agreement, page 16, Section 10.1.)

54. Mr. Hunt is not only an owner of the debtors, but also an employee.

55. Therefore, to the extent this provision is approved in this purchase agreement, or the debtors require the insertion of this paragraph in any other purchase agreement, they are requiring that Mr. Hunt be allowed to keep his job as a condition for the approval of the sale.  This should be clarified and disclosed.

56. Both the Emergency Motion for Use of Cash Collateral filed on June 30, 2010 (Bankruptcy Court Docket No. 208) and the motion to expand the duties of Delta Equity filed on July 9, 2010 (Bankruptcy Court Docket No. 215) requested that the Court approve a carve out to pay professional fees.  The Order of July 20, 2010 (Bankruptcy Court Docket No. 227) did not approve any carve out for professional fees.

57. However, it is still possible that Huntington Bank and the professionals have an agreement for a carve out.  Any such agreement should be clarified and disclosed.

58. Mr. Hunt has guaranteed the Huntington Bank debt.  Any agreements between Huntington Bank and Mr. Hunt concerning that guarantee should be clarified and disclosed.

59. Mr. Hunt's conflicts require denial of approval of the sale and the granting of the United States Trustee's motion to convert.

***D. The Inadequacy of the Purchase Price***

60. The Sixth Circuit included among the list of factors to consider the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property. Instead of appraisals, we have the debtors' own schedules and financial reports, all submitted under penalty of perjury. When the values in those documents are compared with the purchase price, it is clear this sale cannot be approved.

61. In return for the $3.2 million purchase price, Coryell and its owners are receiving all the assets the debtors. These assets include real estate valued at $2.2 million on the Surefil Properties' schedules; cash of $227,771; accounts receivable of $1.8 million (of which amount $754, 075 was over 60 days old); the right to set aside the transfer of the Lander brand to Grand Brands, a transaction Surefil valued at $400,000; and the right to review and, if appropriate, set aside Surefil's payments of $474,962.60 to Grand Brands, at least $35,961.53 to Mr. Hunt's wife, at least $245,406.62 to Mr. Hunt, and $564.38 to Mr. Hunt's daughter. These assets altogether have an approximate value of $4.6 million to $5.3 million (depending upon the accounts receivable). In addition, this sale between entities controlled by insiders will give Coryell the inventory, intellectual rights, going concern value, and every other item owned by these two estates. That could add another $3 million to the total value of the property being purchased.

62. Based upon the debtors' own schedules, statements of financial affairs, and monthly financial reports, the consideration offered by Coryell is inadequate. The

discrepancy is especially glaring in light of Mr. Hunt's known conflicts set forth above. Indeed, the debtors themselves conceded these conflicts of interest in filing the Emergency Motion for Use of Cash Collateral on June 30, 2010 (Bankruptcy Court Docket No. 208) and the motion to expand the duties of Delta Equity on July 9, 2010 (Bankruptcy Court Docket No. 215). The insufficiency of the sale price is another reason to disapprove this sale and to convert these cases to Chapter 7.

### *E. This Sale Will Not Support a Plan*

63. The Sixth Circuit included in its list of criteria for approving a sale the likelihood that a plan of reorganization will be proposed and confirmed in the near future, and the effect of the proposed disposition on future plans of reorganization. 789 F.2d at 389.

64. Upon information and belief, if this sale is approved as proposed, after payment of the Huntington Bank and construction liens, there will be no money left over to pay the $381,824 in post petition trade debt that the debtor lists on its financial reports. Postpetition trade debts are administrative claims, and no plan can be confirmed unless all administrative claims are paid in full on the effective date, unless the claimant accepts other terms.  Presumably, administrative claimants are unlikely to agree to receive nothing.  Nor will there be any proceeds for the unsecured creditors, but the sale will have conferred benefits on the insiders. Therefore, no plan can be confirmed that is based upon

this sale.

### F. *This Sale Will Not Benefit the Estates*

65. This sale will benefit a number of parties. The three secured creditors will get payment on their claims, in part or in full. Mr. Hunt and his family will retain control over the assets and business of the debtors at a very favorable price. Mr. Hunt and his family will also have the insider claims against them settled. However, the sale will produce nothing for the estates and the unsecured creditors. In fact, to the extent there are $381,824 in unpaid postpetition trade claims, this sale may produce a secondary insolvency.

66. For all these reasons, the Court should deny approval of the proposed sale and instead grant the United States Trustee's motion for conversion to Chapter 7.

For all the above reasons, the United States Trustee asks that the Court decline to approve the proposed sale, or that the Court grant such other relief as the Court may deem just.

                                      Respectfully submitted,
                                      DANIEL M. MCDERMOTT
                                      United States Trustee
                                        Region 9

Date:_____          By:_____
                                      By: */s/ Michael V. Maggio*
                                        Michael V. Maggio
                                        Trial Attorney
                                        Office of the United States Trustee
                                        United States Department of Justice
                                        The Ledyard Building, Second Floor
                                        125 Ottawa Avenue NW, Suite 200R
                                        Grand Rapids, Michigan 49503
                                        Tel: (616) 456-2002, ext. 114