## UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

      Surefil, LLC,                            Case No. HG09-06914
                                                Chapter 11
                                                  Honorable Jeffrey R. Hughes
                                                  Jointly Administered

_____Debtor./

In re:

      Surefil Properties, LLC,            Case No. HG09-06916
                                                  Chapter 11
                                                  Honorable Jeffrey R. Hughes
                                                  Jointly Administered
                                                   Hearing: August 30, 2010 at 10:00
                                                  a.m. in Grand Rapids

_____Debtor./

## UNITED STATES TRUSTEE'S OBJECTION TO
## DEBTORS' REVISED MOTION TO APPROVE SALE AND FOR OTHER RELATED RELIEF

        Daniel M. McDermott, United States Trustee for Region 9, objects, pursuant to his

authority under 11 U.S.C. Section 307 and 28 U.S.C. Section 586(a)(3), to the debtors'

revised motion to approve sale and for other related relief, for the following reasons:

## I. The History of the Case

1. Surefil, LLC, the operating company, filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 8, 2009.  Surefil Properties, LLC, which owns the real estate that is used by Surefil, LLC, also filed a petition for relief under Chapter 11 on June 8, 2009.

2. William B. Hunt is the managing member of both Surefil, LLC, and Surefil Properties, LLC.  Mr. Hunt also owns 87.5% of the equity of each company.

3. On June 29, 2009, the Court entered orders in both cases (Case No. HG09-06916, Docket No. 29; Case No. HG09-06914, Docket No. 47) granting the debtors' motions for joint administration.

4. The United States Trustee has appointed an Official Committee of Unsecured Creditors.  That Committee has not retained counsel.


### A. Plan Status

5. On September 4, 2009, the Court entered an order requiring the debtor to file a proposed plan of reorganization and disclosure statement by February 1, 2010.

6. The United States Trustee verbally agreed to extensions of that date, but upon information and belief, all agreed extensions have expired.

7. As of this date, the debtors have still not filed a proposed plan of reorganization and disclosure statement.

***B. Current Financial Situation***

8. Pursuant to Paragraph 9 of this Court's Definitive Order, entered in this case on June 9, 2009, and the United States Trustee's operating instructions, the debtor is required to file monthly financial reports with the United States Trustee.

9. The debtor's financial reports are not current. The debtor has not yet filed the monthly operating reports for July, 2010, which were due on August 20, 2010. According to the last reports filed, as of June 30, 2010, the debtor had sustained losses of $710,376 since the date of filing. As of June 30, 2010, the debtor had total unpaid post petition debts of $381,824, of which $126,050 was past due. As of June 20, 2010 the debtor had cash on hand of $227,771. The debtor appears to be cash flowing through depreciation. As of June 20, 2010, the debtor had $1.8 million in receivables, of which $754,075 was over 60 days.

10. Based upon the debtors' performance in Chapter 11, there is no reason to believe that the debtors can propose a feasible plan of reorganization based upon future operations.

11. As of the date of filing, Surefil Properties, LLC, owned land valued at $2.2 million, which was subject to a mortgage in the amount of $11.6 million held by Huntington National Bank and three construction liens. The mortgage and the

-3-

construction liens totaled $12,791,155.30. Surefil Properties listed no personal property, no priority debts, and no unsecured debts. Mr. Hunt and Surefil, LLC were listed as the guarantors of the Huntington mortgage.

12. As of the date of filing, Surefil, LLC, listed no real property in its schedules. Surefil, LLC, did list $5.1 million in personal property, which allegedly was subject to the Huntington secured claim of $11.6 million. Surefil, LLC, listed no other secured creditors, no priority debts, and $7,652,029.75 in general unsecured debts.  Surefil, LLC, filed an amended Schedule F on August 26, 2009 which reduced the total unsecured debts to $5,469,152.27.


*C. Duties of Delta Equity Advisors*

13. The Court appointed Delta Equity Advisors, LLC, as financial advisors to the debtor on May 4, 2010.  (Bankruptcy Court Docket No. 181.) The United States Trustee did not object to this appointment. (Bankruptcy Court Docket Note dated April 29, 2010.)

14. On June 30, 2010 the debtor filed an Emergency Motion for Use of Cash Collateral.  (Bankruptcy Court Docket No. 208.) According to that motion, the role of Delta Equity was to be expanded to put Delta in charge of negotiating a sale of the debtors' assets.  The motion also mentioned a carve out to ensure that the professional fees would be paid.

15. At the hearing on the motion for use of cash collateral on July 7, 2010, the

-4-

debtor indicated that it had already received some bids or expressions of interest. The amounts being offered appeared to be in the range of $3 to $4 million.

16. At the hearing of July 7, 2010, the Court asked for a redrafted motion, and the debtor withdrew the motion for use of cash collateral.

17. The debtor filed a motion to expand the duties of Delta Equity on July 9, 2010. (Bankruptcy Court Docket No. 215.) That motion again made it clear that the debtors' intended course for the future is a sale of assets and operations. The motion also repeated the request for a carve out to pay professional fees, but preserved the right of the United States Trustee, among others, to object to a carve out.

18. The Court approved the expansion of Delta's duties, and the restriction of the debtors' discretion, by order of July 20, 2010. (Bankruptcy Court Docket No. 227.) That order did not approve any carve out for professional fees.

19. Upon information and belief, a sale for anything less than $11.6 million will be insufficient to pay Huntington Bank in full, let alone administrative expenses, professional fees, and unsecured creditors, absent a carve out consented to by Huntington Bank.

20. There is no indication in the record that Huntington Bank has agreed to a carve out for the benefit of the unsecured creditors, or administrative creditors other than the professionals.[1]

---

[1]The revised motion does state that any prospective bid must agree to assume and pay all Chapter 11 administrative expenses when due, but it is unclear if that includes professional fees,

21. The requests for a carve out for professionals would appear to be a tacit admission that the parties fear or anticipate a secondary insolvency in the event of a sale of the assets and operations.

22. Based upon the foregoing, it appears that the debtors' intended course is to pursue a sale that will be insufficient to pay Huntington Bank in full, that will not produce any return for the unsecured creditors, and which may leave administrative creditors, other than the professionals, unpaid.

### D. Hunt Family Conflicts

23. As noted above, William B. Hunt is the managing member of both Surefil, LLC, and Surefil Properties, LLC.  Mr. Hunt also owns 87.5% of the equity of each company.

24. According to Surefil, LLC's response to question 10 of the amended statement of financial affairs (Case No. HG09-06914, Bankruptcy Court Docket No. 66, filed July 28, 2009), on or about October 31, 2008, Surefil, LLC purchased from Ascendia Brands, Inc., all right, title and interest in the "Lander" line of products.  Upon information and belief, Surefil purchased these rights jointly with Oleander brands, LLC, or an affiliate of

---

and there is no indication that Huntington has agreed to any payment of administrative expenses, since Huntington apparently has not yet agreed to the sale.  *See*, Revised Sale Motion, paragraph 32, page 8, "The Debtor is reasonably confident that the Bank will support the concept of a sale as described herein, but reserves the right to credit bid or object to any such sale." A credit bid will not pay any administrative expenses.

Oleander.  Surefil retained the rights to the Lander brand in the United States and Canada, and transferred the rights to the Lander brand in the rest of the world to Oleander Brands, LLC. (Concurrence of Oleander Intangibles LLC, Bankruptcy Court Docket No. 247, paragraphs 3 to 4, pages 1 to 2.)   Surefil then transferred the Lander brand to another entity, Grand Brands, which was owned by an insider of Surefil, LLC.  Surefil valued the property transferred at $400,000. (Statement of Financial Affairs, question 10, Case No. HG09-06914, Bankruptcy Court Docket No. 66, filed July 28, 2009.)

25. Upon information and belief, Surefil has produced, bottled, distributed and sold products for Grand Brands under the Lander brand under a license agreement. Grand Brands has no production facilities of its own and never has had such facilities. In return, Surefil pays a licensing fee or royalty to Grand Brands.

26. Upon information and belief, Grand Brands is owned or controlled by either Mr. Hunt's wife or his daughter, or both.

27. Upon information and belief, Surefil, LLC, financed the transaction with Grand Brands so that Grand Brands was able to repay Surefil by offsetting the license fee or royalties until Surefil was paid in full.

28. According to Surefil, LLC's response to question 3(c) of the amended statement of financial affairs, prior to filing the Chapter 11 petition, Surefil paid $474,962.60 to Grand Brands, at least $35,961.53 to Mr. Hunt's wife, at least $245,406.62 to Mr. Hunt, and $564.38 to Mr. Hunt's daughter.

29. According to the amended Schedule F filed by Surefil, LLC on August 26, 2009 (case No. HG09-06914, Bankruptcy Court Docket No. 76, page 9) Mr. Hunt is owed two debts by Surefil, one debt of $225,000, and another debt of $1,096,095.60. Therefore, of the total unsecured debts of $5,469,152.27, about $1,321,095.60, or about 24%, is owed to Mr. Hunt.

30. As noted above, Mr. Hunt is listed as a guarantor of the Huntington mortgage.

31. Mr. Hunt was affiliated with one of the possible bidders in the first sale of the assets and operations of these debtors.  That conflict of interest led the debtor and Huntington to attempt to divest Mr. Hunt of any control over the sale process by expanding the duties of Delta and restricting the discretion of the debtors, as mentioned above.

32. Based upon many of the facts summarized above, the United States Trustee filed a motion requesting the conversion of this case to one under Chapter 7 under 11 U.S.C. Section 1112(b).  That motion was filed on July 13, 2010 and was scheduled to be heard on the same date and at the same time as the first motion for approval of the sale, August 12, 2010 at 1:30 p.m.  The motion for conversion, as well as the motion to approve a sale, were both adjourned to August 30, 2010 at 10:00 a.m.

## II. The Revised Sale Motion

33. The debtors filed a motion for sale of all assets.  The hearing on the original

motion was set for August 12, 2010 at 1:30 p.m. The hearing commenced on August 12,
2010, and was then adjourned to August 13, 2010.  At the adjourned hearing on August
13, 2010 the debtor reported that it had received no offers.  The Court adjourned the
hearing to August 30, 2010 at 10:00 a.m. to allow the debtor time to file a revised sale
motion and to allow other bidders time to conduct their due diligence.  The debtor filed
the revised sale motion on August 18, 2010. (Bankruptcy Court Docket No. 254.)

    34. The revised motion states that the debtors are selling all of their assets of any
nature whatsoever, including the right to the "Lander" brand for the United States, but
excluding any and all claims or causes of action under Chapter 5 of the Bankruptcy Code.
(Revised Motion, paragraph 13, page 3.)   The revised motion requests that the Court
approve this sale under Sections 363(b) and 363(f) of the Bankruptcy Code, with all liens
attaching to the proceeds. (Revised Motion, paragraph 14(A) and (B), page 3.) The
revised sale motion does not identify an initial or "stalking horse" bidder. Instead, if the
debtor receives any offers, the debtor may accept the First Acceptable Offer and open the
bidding with that offer; if there are no acceptable offers accepted, then the first bidder
shall apparently make an offer in open court and bidding shall then proceed in increments
of $50,000.  (Revised Motion, paragraphs 21 and 22, page 5.) The determination of what
constitutes an acceptable bid shall be made by the Debtor in consultation with Delta and
approval by the bank; the motion states no other binding, objective criteria. (Revised
Motion, paragraph 19, page 4.)  The revised motion states that all due diligence shall be

completed by bidders by August 25, 2010 at 5:00 p.m. EDT. (Revised Motion, paragraph 16, page 4.) All offers must: provide for payment price in cash on closing; provide for closing within 10 days after entry of the order approving the sale; commit the bidder to assume and pay "all" Chapter 11 administrative expenses; commit the bidder, if the bidder tenders the second best offer, to agree that the bid shall be irrevocable for 15 days after successful bidder is required to close the a sale; and be subject to no conditions precedent or contingencies whatsoever, other than Court approval.  (Revised Motion, paragraph 17, page 4.) After bids are received, the motion requests that the debtor be authorized to review the bids "on the basis of such factors as the Debtor may determine in consultation with Delta and the Bank" and determine which bid is the best. (Revised Motion, paragraph 23, page 5.) The motion also states that the debtor may simply accept the First Acceptable Offer, and dispense with the auction. (Revised Motion, paragraph 23, pages 5 to 6.)  The motion preserves the right of the secured creditors to credit bid. (Revised Motion, paragraph 24, page 6.) The motion calls for the escrow of $490,679 for the PROSYS secured claim, and the payment of the balance of the purchase price to the Bank at closing. (Revised Motion, paragraph 27, page 6.)   The revised motion states that at the sale hearing the Debtor may ask the Court to approve a "break up fee" for the benefit of the First Acceptable Offeror. (Revised Motion, paragraph 21, page 5.) The revised motion also requests that the Court eliminate the 14 day stay of the effectiveness of the order approving the sale provided for under Federal Rule of Bankruptcy Procedure

6004(h). (Revised Motion, paragraph 14(D), page 3.)


### III. The United States Trustee's Objection

35. The Sixth Circuit set forth the criteria for a sale free and clear of liens before

the confirmation of a plan of reorganization in *Stephens Industries, Inc., v. McClung*, 789

F.2d 386 (6th Cir. 1986), adopting the Second Circuit's holding that "there must be some

articulated business justification ... for using, selling, or leasing property out of the

ordinary course of business before the bankruptcy judge may order such a disposition

under section 363(b)" and requiring that the bankruptcy judge "expressly find from the

evidence presented ... at the hearing a good business reason to grant such an application."

The Sixth Circuit also quoted the Second Circuit's guidance to bankruptcy courts

reviewing such a sale:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and
> cry of the most vocal special interest groups; rather, he should consider all salient
> factors pertaining to the proceeding and, accordingly, act to further the diverse
> interests of the debtor, creditors and equity holders, alike. He might, for example,
> look to such relevant factors as the proportionate value of the asset to the estate as
> a whole, the amount of elapsed time since the filing, the likelihood that a plan of
> reorganization will be proposed and confirmed in the near future, the effect of the
> proposed disposition on future plans of reorganization, the proceeds to be obtained
> from the disposition vis-a-vis any appraisals of the property, which of the
> alternatives of use, sale or lease the proposal envisions, and,  most importantly
> perhaps, whether the asset is increasing or decreasing in value.  This list is not
> intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

789 F.2d at 389. As noted, this list is not exclusive, and indeed, in the *Stephens Industries*

opinion the Sixth Circuit also considered whether the sale had been arranged in a

commercially reasonable manner.  789 F.2d at 391.  This proposed sale does not meet the criteria of *Stephens Industries, Inc., v. McClung* for the following reasons.

### A. Insufficiency of Bidding Procedures

36. The debtors have failed to allege any grounds justifying the elimination of the 14 day stay of the effectiveness of any order under Federal Rule of Bankruptcy Procedure 6004(h).

37. In *Stephens Industries* the Sixth Circuit also considered whether the sale had been arranged in a commercially reasonable manner.  789 F.2d at 391. The revised motion fails to meet this standard because it does not state adequate sale procedures. The revised sale motion sets forth the following requirements or procedures: bidding shall proceed in increments of $50,000 (Revised Motion, paragraphs 21 and 22, page 5); the determination of what constitutes an acceptable bid shall be made by the Debtor in consultation with Delta and approval by the bank (Revised Motion, paragraph 19, page 4).  Furthermore, all offers must provide for payment of the price in cash on closing; provide for closing within 10 days after entry of the order approving the sale; commit the bidder to assume and pay "all" Chapter 11 administrative expenses; commit the bidder, if the bidder tenders the second best offer, to agree that the bid shall be irrevocable for 15 days after successful bidder is required to close the a sale; and be subject to no conditions precedent or contingencies whatsoever, other than Court approval.  (Revised Motion,

-12-

paragraph 17, page 4.) After bids are received, the motion requests that the debtor be authorized to review the bids "on the basis of such factors as the Debtor may determine in consultation with Delta and the Bank" and determine which bid is the best. (Revised Motion, paragraph 23, page 5.) The motion also states that the debtor may simply accept the First Acceptable Offer, and dispense with the auction. (Revised Motion, paragraph 23, pages 5 to 6.)  The motion preserves the right of the secured creditors to credit bid. (Revised Motion, paragraph 24, page 6.) The motion calls for the escrow of $490,679 for the PROSYS secured claim, and the payment of the balance of the purchase price to the Bank at closing. (Revised Motion, paragraph 27, page 6.) This is insufficient for the following reasons.

38. The motion requests that the debtor, in consultation with Delta and the bank, be given unfettered discretion to decide what constitutes an acceptable bid, and which bid is the winning bid. The motion states no binding, objective criteria for these decisions. In the event of a dispute, the Court will have absolutely no objective criteria to apply to determine whether a bidder was or should have been the winning bidder.  To approve such criteria is to invite a subjective decision which may benefit insiders of the debtor more than the estates.

39. It is also unclear exactly what is being sold.  Although the debtor states that it is selling all property of the estates other than the Chapter 5 actions, there is no list of property to be sold attached.  The motion fails to explain why the cash and the accounts

-13-

receivable are being sold.  The motion states that the rights to the Lander brand in the

United States will be included, but there is no documentation attached to substantiate that.

The motion also states that the rights to the Lander brand in the United States will be sold,

but leaves unstated the disposition of the Canadian rights to the Lander brand.

40. Upon information and belief, there are still potential bidders who have been

unable to get information from the debtors.  Despite Delta's expanded powers, Delta has

either been unable or unwilling to provide these bidders with information that the bidders

deem necessary to the formulation of a bid.  Upon information and belief, at least one of

these potential bidders has signed the required confidentiality agreement, but still has not

received the requested information.

41. Without current financial reports, bidders cannot know the approximate

amount of the administrative expenses they are being asked to pay.

### B. The Private Sale Option Violates the Rule and Chills Bidding

42.  The motion also states that the debtor may simply accept the First Acceptable

Offer, and dispense with the auction, "to negate further cost and expense and to maximize

the value of the Assets."(Revised Motion, paragraph 23, pages 5 to 6.)

43. Since most of the effort of a sale would appear to be generated by the

negotiations before the sale or over the terms of the purchase agreement, not by the

courtroom auction, it is unclear to the United States Trustee how great this savings can

be.

44. Under the Bankruptcy Code and the Rules, a debtor or trustee may sell property of the estate outside of the normal course of business either through a public auction or through a private sale.  Federal Rule of Bankruptcy Procedure 6004(f)(1). Unless the Court shortens notice, creditors musty be given at least 21 days' notice of both public auctions and private sales. Federal Rule of Bankruptcy Procedure 2002(a)(2).  The content requirements of the two notices differ. The notice of a public auction must state the time and place of the auctions; the notice of a private sale must include the terms and conditions of the private sale.  Federal Rule of Bankruptcy Procedure 2002(c)(1). The revised sale motion does not meet the requirements of Rule 2002(c)(1) for a private sale because it does not state the terms and conditions of the private sale. Neither the identity of the purchaser nor the purchase price are stated.  Those are two material terms that should be included in any notice of a private sale.  If the debtor enters into any sort of a purchase agreement, the terms of that agreement should be at least summarized in the motion.

45. The inclusion of this "private sale option" will chill bidding.  Why should any bidder do due diligence and participate in the process if they might be told at the last minute that there will not in fact be an auction and that there will be a private sale, and they will not even be able to come before the court for a hearing? The private sale option is not transparent.  Even if it does not lead to the manipulation of the sale to benefit an

insider, it may convey the impression that such manipulation is possible, thereby discouraging bidders from bidding.  If the Court were to approve this provision, the debtors would be able to legally sell the property to Mr. Hunt or an insider or affiliate of his for a price deemed sufficient by the debtor and the bank.

### C. The Break Up Fee Is Unjustified and May Chill Bidding

46.  The revised motion states that at the sale hearing the Debtor may ask the Court to approve a "break up fee" for the benefit of the First Acceptable Offeror. (Revised Motion, paragraph 21, page 5.)

47. The purpose of a break up fee is to encourage "what is colloquially referred to as a 'stalking horse' offer, which is an initial bid that is then 'shopped around' to attract higher offers." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D. N.Y. 1992), aff'd 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed sub nom.*, *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 3 F.3d 49 (2nd Cir. 1993). "In general, a break up fee is permissible if reasonably related to the bidder's efforts and the transaction's magnitude." *Id.*, at 662-663.  However, a break up fee must be approved by motion before the sale hearing, not as part of the sale hearing, otherwise all bidders are not "on equal footing on a level playing field." *In re Public Service Company of New Hampshire*, 160 B.R. 404, 455 (Bankr. D. N.H. 1993). "'A break up fee may discourage an auction process and preclude further

bidding when the fee is so large as to make competing bids too expensive.'" *Id., quoting Integrated Resources , Inc.*, 135 B.R. at 750.  An unknown and unknowable break up fee is equally discouraging to other bidders, if not more so.

48. The debtor's request for a break up fee is improper because it has not been approved by the Court prior to the noticing out of the sale.  Therefore, other bidders and the creditors have no idea of what the break up fee is, and they cannot assess the bids in light of the break up fee. Furthermore, potential bidders may wonder why they should expend the effort to do due diligence and prepare a bid when they may be faced with an exorbitant break up fee at the auction, if the debtor does not just opt for a private sale. Nor can the reasonableness of the amount of the break up fee be determined when it is unknown.  Parties and bidders are entitled to notice of the break up fee before the sale is noticed out.

### D. The Allocation of the Purchase Price is Not Stated

49. The revised sale motion has been brought by two estates, each of which is selling all of its assets in this one sale.  Therefore, there will be one sale price, which must be allocated between the estates.  The revised motion does not address the allocation of the purchase price at all.

### E. Potential Undisclosed Conflicts

50.  William B. Hunt is the managing member of both Surefil, LLC, and Surefil Properties, LLC.  Mr. Hunt also owns 87.5% of the equity of each company.

51. Any relationship between Mr. Hunt or any family member or insider of Mr. Hunt or the debtors and any bidder should be disclosed.

52. Both the Emergency Motion for Use of Cash Collateral filed on June 30, 2010 (Bankruptcy Court Docket No. 208) and the motion to expand the duties of Delta Equity filed on July 9, 2010 (Bankruptcy Court Docket No. 215) requested that the Court approve a carve out to pay professional fees.  The Order of July 20, 2010  (Bankruptcy Court Docket No. 227) did not approve any carve out for professional fees.

53. However, it is still possible that Huntington Bank and the professionals have an agreement for a carve out.  Any such agreement should be clarified and disclosed.

54. Mr. Hunt has guaranteed the Huntington Bank debt.  Any agreements between Huntington Bank and Mr. Hunt concerning that guarantee should be clarified and disclosed.


*F. The Inadequacy of the Purchase Price*

55. The Sixth Circuit included among the list of factors to consider the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property.  Instead of appraisals, we have the debtors' own schedules and financial reports, all submitted under penalty of perjury.  When the values in those documents are compared with the purchase

-18-

price, it is clear this sale cannot be approved.

56. Apparently the assets to be sold include real estate valued at $2.2 million on the Surefil Properties' schedules; cash of $227,771; accounts receivable of $1.8 million (of which amount $754, 075 was over 60 days old); the Lander brand rights which Surefil valued at $400,000. These assets altogether have an approximate value of $3.6 million to $4.3 million (depending upon the accounts receivable). In addition, this sale may include the inventory, intellectual rights, going concern value, and every other item owned by these two estates. That could add another $3 million to the total value of the property being purchased.

57. The United States Trustee reserves the right to object to any sale that does not produce adequate consideration for these assets.

### G. This Sale May Not Support a Plan

58. The Sixth Circuit included in its list of criteria for approving a sale the likelihood that a plan of reorganization will be proposed and confirmed in the near future, and the effect of the proposed disposition on future plans of reorganization. 789 F.2d at 389.

59. The United States Trustee reserves the right to object to any sale that does not produce sufficient proceeds to support a sale.

### H. This Sale May Not Benefit the Estates

60. This sale may benefit Huntington.  However, the sale may produce nothing for the estates and the unsecured creditors.  If Huntington credit bids, that may leave the estimated $381,824 in postpetition trade claims, plus professional fees in an unknown amount, unpaid.  Even if a buyer agrees to pay the trade debt, it is unclear how professional fees will be paid. The original sale motion escrowed $1.2 million for secured claims other than Huntington.[2] The revised sale devotes only $490,679 for the secured claim of PROSYS, on the theory that the Rush Creek secured claim is not truly secured. However, if that opinion of the Rush Creek claim proves inaccurate, there will be no funds with which to pay it. Depending upon the purchase price and terms, all of which are unknown, this sale may produce a secondary insolvency.

### I. The Revised Sale Motion Is No Better Than the Original Sale Motion

60. The Court allowed the debtor to file a revised sale motion so the sale could be held before the August 31, 2010 cash collateral deadline.  The debtor has made some welcome changes in the revised motion.  However, many of the changes in the revised

---

[2]The revised motion is a sale motion, yet the motion also asks that the debtor be authorized to pay proceeds of the sale to two secured creditors.  The debtor offers no authority for this request, and does not state whether these payments will be in full satisfaction of the secured debts, nor how the debtor can use a sale motion to deem certain asserted secured claims to be truly secures, while deeming another secured claim unsecured.  In essence, the debtor is asking for the authority to allow and disallow claims, and to pay allowed claims.  The debtor offers no authority for this request.

motion are not improvements.  The original motion seemed designed to discourage bidders other than Mr. Hunt or his family.  The revised motion seems designed to just discourage any bidders, in favor of an unknown party.

61. For all these reasons, the Court should deny approval of the proposed sale and instead grant the United States Trustee's motion for conversion to Chapter 7.


For all the above reasons, the United States Trustee asks that the Court decline to approve the proposed sale, or that the Court grant such other relief as the Court may deem just.


Respectfully submitted,
DANIEL M. MCDERMOTT
United States Trustee
Region 9



Date:_____          By:_____
                                   By: */s/ Michael V. Maggio*
                                       Michael V. Maggio
                                       Trial Attorney
                                       Office of the United States Trustee
                                       United States Department of Justice
                                       The Ledyard Building, Second Floor
                                       125 Ottawa Avenue NW, Suite 200R
                                       Grand Rapids, Michigan 49503
                                       Tel: (616) 456-2002, ext. 114